UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  23-CV-22629-RAR

MANUEL JESUS ALONSO,

     *Plaintiff,*

vs.

SUNBELT RENTALS, INC.,

     *Defendant.*

_____

## EXHIBIT D – AUTHORITIES FOR DISCOVERY HEARING[1]

### PLAINTIFF'S AUTHORITIES

**Cases**
1. *Bailey v. City of Daytona Beach Shores,* 2012 WL 5379061 (M.D. Fla. Oct. 31, 2012)
2. *Charlemagne v. Alibayof,* 2021 WL 8565992 (S.D. Fla. Nov. 11, 2021)(Valle, M.J.)
3. *Fedderman v. Palm Beach Cnty. Sch. Bd.,* 2023 WL 8040932 (S.D. Fla. Nov. 20, 2023)(Matthewman, M.J.)
4. *Graham v. Carroll,* 2011 WL 855331 (N.D. Fla. Mar. 9, 2011)
5. *Northwestern Mem. Hosp. v. Ashcroft,* 362 F.3d 923 (7th Cir. 2004)
6. *Sherlock v. Fontainebleau,* 229 F.Supp.3d 1277 (S.D. Fla. Jan. 18, 2017)(Goodman, M.J.)

### DEFENDANT'S AUTHORITIES

**Statutes and Rules**
1. 29 U.S.C. § 2617
2. Section III(A) of the Court's Discovery Procedures
3. Southern District of Florida Local Rule 26.1(e)(2)(A)

**Cases**
4. *Bank of Mong. v. M&P Glob. Fin. Servs., Inc.*, 258 F.R.D. 514, 518-19 (S.D. Fla. 2009)
5. *Sream, Inc. v. Hassan Hakim & Sarwar, Inc.*, 2017 WL 878704, at *1 (S.D. Fla. Mar. 6, 2017)
6. *Scott v. Miami-Dade Dep't of Corr.*, 2017 WL 11610728, at *3 (S.D. Fla. Apr. 13, 2017)
7. *Stevens v. ACR Sales & Serv., Inc.*, 2009 WL 10670163, at *4 (M.D. Fla. Jan. 14, 2009)

_____

[1] Defendant Sunbelt Rentals, Inc. ("Defendant") reads the Court's Discovery Order to permit a list of authorities upon which the parties intend to rely only for "non-routine issues."  Plaintiff Manuel Jesus Alonso ("Plaintiff") believes this is an instance where authorities must be provided.  Defendant disagrees, but provides the authorities in Exhibit D in an abundance of caution.

8.  *Breneisen v. Motorola, Inc.*, 2009 WL 1759575, at *7 (N.D. Ill. June 22, 2009)
9.  *Cavaliere v. Advert. Specialty Inst. Inc.*, 853 F. Supp. 2d 472, 487 (E.D. Pa. 2012)

2012 WL 5379061
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Orlando Division.

Christine BAILEY, Plaintiff,

v.

CITY OF DAYTONA
BEACH SHORES, Defendant.

No. 6:12–cv–71–Orl–18TBS.
|
Oct. 31, 2012.

**Attorneys and Law Firms**

Romin N. Currier, William Hoffman Pincus, Pincus &
Currier, LLP, West Palm Beach, FL, for Plaintiff.

Donna Noelle Maloney Hansen, Douglas T. Noah, Dean,
Ringers, Morgan & Lawton, PA, Orlando, FL, for Defendant.

*ORDER*

THOMAS B. SMITH, United States Magistrate Judge.

**\*1** Pending before the Court is Defendant, City of Daytona
Beach Shores' Motion to Compel Responses to Defendant's
First Set of Interrogatories. (Doc. 36). Plaintiff has filed a
response in opposition to the motion. (Doc. 41).

**I. Background**
Plaintiff was employed by Defendant as a fire inspector.
(Doc. 1, ¶ 9). In March, 2010, Plaintiff received a note from
her doctor, stating that she had a medical condition which
required treatment and that would prevent her from working
from March 23 through March 31, 2010. (Doc. 1, ¶¶ 11 &
12). Plaintiff gave the note to the Defendant before she went
on medical leave and the Defendant approved her request for
medical leave. (Doc. 1, ¶¶ 13 & 14). While she was on leave,
Defendant accessed her medical records and discovered that
she had been prescribed a medication that is classified as a
narcotic. (Doc. 1, ¶¶ 14 & 18). On March 30, 2010, Defendant
terminated Plaintiff for an alleged violation of Defendant's
drug free work place policy. (Doc. 1, ¶¶ 8 & 26).

Following her termination, Plaintiff instituted State of Florida
Division of Administrative Hearings Case No. 11–0972
against the Defendant. (Doc. 39–9). In that proceeding,
Defendant attempted to introduce the names of Plaintiff's drug
prescriptions and the restrictions associated with those drugs.
(Id.). Petitioner objected, based upon the Health Insurance
Portability and Accountability Act of 1996 ("HIPAA") and
the hearing officer asked the parties to brief the issue. (Id.).
Defendant filed a motion for a HIPPA qualified protective
order and order to disclose protected health information
("PHI") in which it admitted that the information it sought
to introduce in evidence was PHI as defined in 45 C.F.R.
§ 160.103 and which "is generally not to be disclosed or
used without the consent of the individual." (Doc. 39–1, ¶
1). The Defendant argued that the PHI it wanted to use was
admissible because it fell within the HIPPA exception for
administrative hearings, 45 C.F.R. § 164.512(e). (Doc. 39–
1, ¶ 2). The hearing officer disagreed. (Doc. 39–10). He held
that Defendant's alleged need for the PHI did not outweigh
the protection afforded by HIPPA or the prejudice to Plaintiff
if the PHI was disclosed. (Id.)

Plaintiff instituted this lawsuit on January 18, 2012, alleging
interference with her rights under the Family Medical Leave
Act ("FMLA"), 29 U.S.C. § 2601 et seq., and for retaliation
for exercising her FMLA rights. (Doc. 1). On June 26, 2012,
Defendant served Plaintiff with its first set of Interrogatories.
(Doc. 36). Plaintiff responded to Defendant's requests on
August 8, 2012. (Id.). Defendant filed this motion the day
discovery ended. (Doc. 17). The motion addresses Plaintiff's
responses to interrogatories 4, 5, 9, 11, and 12. (Doc. 36).
Plaintiff contends that Defendant has waived its right to
compel discovery because Defendant waited two months after
Plaintiff provided its responses to file its motion. (Doc. 41).
Plaintiff bases her other objections on harassment, lack of
relevancy, overbreadth, and the confidentiality afforded by
HIPPA. (Id.). In addition, Plaintiff maintains that she has
already provided all relevant information for interrogatories
4, 5, and 11. (Id.).

**II. Discussion**
**\*2** Parties may obtain discovery on "any nonprivileged
matter that is relevant to any party's claim or defense ...."
Fed.R.Civ.P. 26(b)(1). Courts interpret relevancy broadly
"to encompass any matter that bears on, or that reasonable
could lead to other matter[s] that could bear on, any issue
that is or may be in the case. *Oppenheimer Fund, Inc. v.
Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253
(1978). The party seeking discovery has the threshold burden

of demonstrating that the discovery requested is relevant. *Siddiq v. Saudi Arabian Airlines Corp.,* No. 6:11–cv–69–Orl–19GJK, 2011 WL 6936485 *2 (M.D.Fla. Dec.7, 2011).

"The discovery process is designed to fully inform the parties of the relevant facts involved in their case." *U.S. v. Pepper's Steel & Alloys, Inc.,* 132 F.R.D. 695, 698 (S.D.Fla.1990) (referencing *Hickman v. Taylor,* 329 U.S. 495, 501, 67 S.Ct. 385, 91 L.Ed. 451 (1947)). "[A] party demanding discovery is required to set forth its requests simply, directly, not vaguely or ambiguously ...." *Treister v. PNC Bank,* No. 05–23207–CIV, 2007 WL 521935 at *2 (S.D.Fla. Feb.15, 2007). "It is not a ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to discovery of admissible evidence." *Dollar v. Long Mfg., N.C., Inc.,* 561 F.2d 613, 616 (5th Cir.1977)[1]; Fed.R.Civ.P. 26(b).

[1]     In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

Rule 33 limits each party to "no more than 25 written interrogatories, including all discrete subparts," and directs that each interrogatory be answered "separately and fully in writing under oath." Fed.R.Civ.P. 33(a)(1), (b)(3). An opposing party must state its grounds for objection with specificity. Fed.R.Civ.P. 33(b)(4). Upon motion, the court may compel a party to answer the interrogatories. Fed.R.Civ.P. 37; *Dollar v. Long Mfg., N.C., Inc.,* 561 at 617. If the motion to compel is granted, the court must direct the party whose conduct necessitated the motion, "or the attorney advising that conduct, or both," to compensate the movant for "reasonable expenses incurred in making the motion, including attorney's fees," except in certain limited circumstances. *Id.* at (a)(5)(A).

Plaintiff first argues that Defendant's motion should be denied because Defendant delayed filing its motion to compel until nearly two months after receiving Plaintiff's responses to the interrogatories. Defendant offers no explanation in its motion for its delay in filing the motion to compel. After a review of the docket, it appears Defendant spent most of August and September trying to obtain a response from Plaintiff to its first request for production. (Doc. 45). Plaintiff did not respond to Defendant's request until September 22, 2012, 12 days before Defendant filed its motion to compel production (Doc. 35) and 14 days before Defendant filed this motion. Given the similarity of the motions and that Defendant filed them

in proximity to each other, and with the understanding that dispositive motions are not yet due, the circumstances do not warrant a denial of Defendant's motion to compel for delay. *See Hinson v. Clinch County, Georgia Bd. Of Educ.,* 231 F.3d 821, 826 (11th Cir.2000) (holding that a district court did not abuse its discretion in denying party's motion to compel due to delay in not bringing motion until after parties had briefed dispositive motions).

**\*3** Next, the Court analyzes the interrogatories and the Plaintiff's responses.

### Interrogatory # 4

List the names and business addresses of all other physicians, medical facility or other health care providers by whom or at which you have been examined or treated in the past 10 years; and state as to each the dates of examination or treatment and the condition or injury for which you were examined or treated.

### Plaintiff's Response # 4

Plaintiff objects to this request as harassing. Plaintiff further objects as such request seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff has filed the instant lawsuit alleging that the City violated her FMLA rights. Plaintiff has already provided the City with a note from her physician notifying the City of Plaintiff's need to take leave on the week of March 21, 2010. Plaintiff has identified this physician as well as the facility in which it was located. During the depositions of the multiple employees of the City, they acknowledged receipt of the notice which identified both the physician as well as the facility. Thus, all physicians and facilities that have any relevance to his claim have already been identified and discussed at length.

Moreover, the City has already admitted that Plaintiff was an eligible employee. The City merely disputes that Plaintiff suffered from a serious health condition. None of the information sought in this interrogatory will assist in investigating this issue. Moreover, the City's sworn testimony is that its entire basis for terminated Plaintiff was for receiving prescription medications that the City learned of only after violating her Federal HIPPA Rights. Plaintiff's medical history for the past 10 years will not assist the City in discovering whether or not its bases for her termination was a legitimate, non discriminatory basis.

Analysis:

Defendant asserts that Plaintiff should be compelled to answer this interrogatory because she placed her medical condition "at issue" by putting Defendant on notice of her condition and requesting leave under the FLMA. Plaintiff argues that: (1) Defendant waived its right to question Bailey's FMLA qualifications by failing to inquire into her condition in March of 2010; (2) she did not place her medical condition at issue because the only issue is whether she suffered from a "serious health condition," which is objectively defined in the Act; (3) she already disclosed any and all information that could be reasonably calculated to lead to the discovery of admissible evidence; and (4) HIPAA bars the City from disclosing "Protected Health Information" ("PHI"). (Doc. 41).

The Court has addressed this issue in its previous Order granting in part Defendant's motion to compel production. (Doc. 45). This Court will not decide, at this time, whether the Defendant waived its right to question Plaintiff's "serious health condition." The issue before the Court concerns the Defendant's right to discover information, not whether that information will ultimately prove to be relevant and material to the resolution of this dispute.

**\*4** Under the FMLA, eligible employees who suffer from a "serious health condition that makes the employee unable to perform the functions of the position of such employee" may take up to 12 weeks of unpaid leave. 29 U.S.C. § 2612(a)(1)(D). "The term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves-(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

Adequate notice to the employer is a prerequisite for an employee to take FMLA leave. *Murphy v. Fed Ex Nat. LTL, Inc.,* 618 F.3d 893, 900 (8th Cir.2010). When determining whether the employee gave adequate notice "[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Darboe v. Staples, Inc.,* 243 F.Supp.2d 5, 17 (S.D.N.Y.2003) (quoting *Brohm v. JH Props., Inc.,* 149 F.3d 517, 523 (6th Cir.1998) (citations omitted).

Once the employee gives the employer the required notice, the "employer may require that a claim that an employee is unable to return to work because of the continuation, recurrence, or onset of the serious health condition ... be supported by—

(ii) a certification issued by the health care provider of the eligible employee, ..." 29 U.S.C. § 2614(c)(3)(A)(ii). Plaintiff argues that her act of giving a note from her doctor to the Defendant, combined with the Defendant's admission that she was hospitalized during the relevant period, establishes that she was suffering from a serious health condition in March of 2010. (Doc. 41). On this basis, she concludes that she has not placed her medical condition at issue and any materials other than the ones already provided are not relevant, nor discoverable. (*Id.*). Conversely, Defendant's affirmative defenses include both that Plaintiff did not provide sufficient notice for purposes of the FLMA and that Plaintiff's condition did not qualify as a serious health condition under the FLMA. (Doc. 7 ¶¶ 47–52).

Under the FMLA, an employer "may" require certification of the employee's serious health condition, but it is not mandatory and the statute does not provide any consequences for the employer's failure to do so. 29 U.S.C. § 2614(c)(3). Plaintiff has not cited any case holding that an employer waives its right to challenge an employee's allegation of a serious health condition when that employee gives a doctor's note to her employer and the employer does not request additional certification. The scope of discovery is broad, this issue has not been sufficiently briefed by the parties, and it would be premature for the Court to rule on this matter. Accordingly, Plaintiff's objection that Defendant has waived its right to challenge whether she had a serious health condition is **OVERRULED.**

This brings the Court to Plaintiff's assertion of HIPPA as a ground for not answering the interrogatories. While HIPPA applies to the disclosure of PHI, it does not create a privilege. *Northwestern Memorial Hospital v. Ashcroft,* 362 F.3d 923, 925–26 (7th Cir.2004). What HIPPA creates is "a procedure for obtaining authority to use medical records in litigation." (*Id.*)

**\*5** Plaintiff relies upon 45 C.F.R. § 164.504(f)(2)(ii)(C)[2] which states that a group health plan may "[n]ot disclose protected health information to the plan sponsor for the purpose of employment-related actions or decisions or in connection with any other benefit or employee benefit plan of the plan sponsor." Plaintiff reads this section to mean the Defendant cannot use her PHI because this is an "employment-related action." The only authority Plaintiff cites in support of her argument is a letter from the Department of Health & Human Services, written in response to Plaintiff's complaint that Defendant misused her PHI. (Doc.

41–5). The letter does not constitute controlling authority and based upon a plain reading of 45 C.F.R. § 164.504(f)(2)(ii)(C) the Court finds that it does not prohibit the use of Plaintiff's PHI in this case.

2    Plaintiff cites to 45 C.F.R. § 164.504(f)(ii)(C) however, the Court believes the correct cite is 45 C.F.R. § 164.504(f) *(2 )* (ii)(C). The same error appears the in letter, Doc. 39–8.

Still, the Court agrees with Plaintiff that some of the information sought by Interrogatory # 4 is overbroad. The only relevant information pertains to Plaintiff's serious health condition up to March 22, 2010. Therefore, Plaintiff shall only provide Defendant with the names and addresses of the physicians, medical facilities, and other health care providers who treated Plaintiff for her serious health condition prior to March 22, 2010.

To the extent that answering this interrogatory requires Plaintiff to produce her PHI, the PHI shall be safeguarded by a protective order. 45 C.F.R. § 164.512(e) contemplates the entry of a "qualified protective order," to ensure the limited and proper disclosure of PHI. The Court will order the disclosure of Plaintiff's PHI only on the terms stated in this Order.

Interrogatory # 5

Please state whether any physician has prescribed medications to you for any mental disorder, including but not limited to behavior, emotional, or cognitive disorders or stress, in the last 10 years. If so, identify each disorder with which you have been diagnosed, the physician that made the diagnosis, and medications that were prescribed to treat the symptoms of the disorder.

Plaintiff's Response # 5

Plaintiff objects to this request as harassing. Plaintiff further objects that such request seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff has filed the instant lawsuit alleging the City violated her FMLA Rights. The FMLA does not provided relief for any pain and suffering nor is the Plaintiff alleging any mental anguish or disorders relating to her termination. Moreover, the City's sworn testimony is that its entire bases for terminating Plaintiff was for receiving prescription medication that the City learned of only after violating her Federal HIPAA

Rights. Plaintiff's medical history for the past 10 years will not assist the City in discovering whether or not its bases for her termination was a legitimate, nondiscriminatory basis. The City is not entitled to such medical information as a matter of Federal HIPPA law and any attempts to back door access to such information through such discovery requests is hereby rejected by Plaintiff.

**\*6** Analysis:

The parties make the same arguments concerning this interrogatory. Plaintiff's objections are **SUSTAINED** except as to information concerning her serious health condition which information existed prior to March 22, 2010.

Interrogatory # 9

Please state if you have ever been a party, either Plaintiff or Defendant, in a lawsuit other than the present matter, and if so, state whether you were Plaintiff or Defendant, the nature of the action, and the date and court in which such suit was filed.

Plaintiff's Response # 9

Bailey objects to this request as overbroad as to time and vague as to lawsuit. In the last 10 years, Bailey has been a party to one lawsuit. See below for details:

Plaintiff, sexual harassment; Suit was filed in Broward Circuit Civil Court, in or around 2004.

Analysis:

Plaintiff's objections to this interrogatory are ineffective as Plaintiff has already answered the interrogatory. Anything before the last ten years is overbroad in scope, and Plaintiff has otherwise provided the requested information. Defendant's motion to compel a better response to Interrogatory # 9 is **DENIED.**

Interrogatory # 11

Are you alleging that the City of Daytona Beach Shores discriminated or retaliated against you because you engaged in activity protected by the Family and Medical Leave Act? If yes, state with particularity:

(b) If the activity was availing yourself of leave because of a serious health condition, the condition that made you unable to perform the duties of your assigned position, the names and addresses of all treating health care providers

who diagnosed the condition, and the date the condition was diagnosed;

Plaintiff's Response # 11

Bailey objects to this request to the extent the City seeks information protected under Bailey's Federal HIPPA rights. Without waiving her objections, Bailey was under the continuing care of her health care provider during the relevant time period. Specifically, Bailey provided the City with a letter from Dr. Delichi Haynes, Family First Health Center, 1898 S. Clyde Morris Blvd., Daytona Beach, FL 32119–1579; Telephone: 386–492–1064. A copy of the letter which has been previously provided on multiple occasions is attached hereto as Exhibit A. Moreover, Bailey was hospitalized from March 23, 2010 until March 27, 2010, at Florida Hospital Deland under the care of Dr. Kaden, 701 W. Plymouth Ave., Deland, FL 32720.(386) 943–4522. A copy of the discharge paperwork which has been provided on multiple occasions is attached hereto as Exhibit B.

Analysis:
The parties repeat their same arguments once again. In addition, Defendant complains that Plaintiff did not attach any exhibits to her answer as stated in her response. Plaintiff has attached the exhibits to her response to Defendant's motion. (Doc. 41, 41–2, 41–4). Plaintiff's objections are **SUSTAINED** except as to information concerning her serious health condition which information existed prior to March 22, 2010. There is no need for Plaintiff to produce the exhibits again.

**\*7**  Interrogatory # 12

Please state whether you have ever declared bankruptcy and, if so, the court in which the action was filed.

Plaintiff's Response # 12

Bailey objects to this request as it overbroad in scope. Bailey further objects that such request seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving her objections, Bailey has not filed bankruptcy seven (7) years.
Plaintiff argues that although the request is overbroad, she has nonetheless complied with the interrogatory and provided

the information it seeks. While Plaintiff's response is limited to the last seven years, the Court finds this is a sufficient time frame. However, Plaintiff has not fully answered the interrogatory because she has not identified the court in which her bankruptcy case was filed. Accordingly, Plaintiff shall supplement her response to Interrogatory # 12 with the name of the court in which she filed her bankruptcy case.

The award of attorney's fees and legal expenses is not warranted in these circumstances.

The Defendant and its counsel are **PROHIBITED** from using or disclosing Plaintiff's PHI, disclosed in response to Defendant's interrogatories, for any purpose other than this litigation. At the conclusion of this litigation, the Defendant and its counsel shall return to Plaintiff all of her PHI or destroy the PHI and so certify to Plaintiff in writing.

None of Plaintiff's PHI shall be disclosed to anyone except:

(1) Counsel for the Defendant;

(2) Support personnel who work in Defendant's counsel's law firm and who actually work on this case;

(3) Experts retained for the defense of Plaintiff's claims in this case;

(4) The Court. When PHI is filed with the Court it shall be designated as PHI and sealed.

(5) Plaintiff's PHI, disclosed in response to these interrogatories, may only be used:

(a) By Defendant's experts in formulating their opinions and testifying in this case.

(b) During depositions taken in this case. If Plaintiff's PHI is disclosed during a deposition then it shall be sealed.

(c) At hearings and the trial of this case.

To the extent she has not already done so, Plaintiff shall provide the information compelled in this Order within the next 14 days.

**IT IS SO ORDERED.**

**DONE** and **ORDERED** in Orlando, Florida on the 30th day of October, 2012.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 5379061

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2021 WL 8565992
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

Daveflore CHARLEMAGNE, Plaintiff,

v.

Samantha ALIBAYOF and

Nicole Alibayof, Defendants.

CASE NO. 20-CV-62043-SMITH/VALLE
|
Signed 11/11/2021

**Attorneys and Law Firms**

Jennito Simon, Pierre Simon, LLC, Fort Lauderdale, FL, Faudlin Pierre, Miami, FL, for Plaintiff.

Che Christian Padron, Zediker, Associates, P.A., Coral Gables, FL, Marc Scott Buschman, Clark, Robb, Mason, Coulombe & Buschman, Miami, FL, Michael Austin Robb, Clark Robb Mason Coulombe & Buschman, Coral Springs, FL, for Defendants.

**OMNIBUS ORDER ON DEFENDANTS' DISCOVERY MOTIONS[1]**

[1]  The discovery period in this case has now closed; however, Defendants' Motions to: (i) Compel Plaintiff to Sign Medical Authorizations for Records; and (ii) to Overrule Plaintiff's Objections and to Allow Subpoenas for Plaintiff's School Records and Motion for Sanctions were timely filed prior to the cutoff. Accordingly, the issues raised in the Defendants' Motions to Compel will be considered.

ALICIA O. VALLE, UNITED STATES MAGISTRATE JUDGE

**\*1**  THIS CAUSE is before the Court upon Defendants' Motions to: (i) Compel Plaintiff to Sign Medical Authorizations for Records (ECF No. 79); and (ii) to Overrule Plaintiff's Objections and to Allow Subpoenas for Plaintiff's School Records and Motion for Sanctions (ECF No. 81) (together, the "Motions"). In particular, Defendants seek to compel Plaintiff to execute HIPAA authorization forms for the release of medical records and permission to issue Rule 45 subpoenas to Miami Dade College and Florida Atlantic University for Plaintiff's educational records. *See generally* (ECF Nos. 79, 81). Having reviewed the Motions, Plaintiff's Responses, and Replies, *see* (ECF Nos. 79, 81, 82, 86, 87, 91), and being duly advised in the matter, the Motions are **GRANTED IN PART AND DENIED IN PART** for the reasons set forth below.

**I.  MOTION REGARDING MEDICAL AUTHORIZATIONS**

Previously, the undersigned denied Plaintiff's motion to quash several third-party subpoenas issued to Plaintiff's medical providers, but nonetheless found the scope of subpoenas overbroad and limited production to five years from the date of the hearing. *See* (ECF No. 90 at 31, 37) (Transcript of April 27, 2021 discovery hearing). To date, however, two of the health care providers have refused to respond to the subpoenas until Plaintiff executes a HIPAA release authorizing the production of the subpoenaed medical records to Defendants. (ECF No. 79 at 1-2); *see also* 45 C.F.R. 164-508. The instant Motion followed. (ECF No. 79).

Plaintiff objects to the Motion, arguing that: (i) it is untimely under Local Rule 26(g)(1), which requires that motions be filed within 30 days after the discovery dispute arose; and (ii) the Court cannot compel Plaintiff to execute a release for the subpoenaed medical records. *See generally* (ECF No. 82). In reply, Defendants argue that Plaintiff is not prejudiced by the relief sought and the subpoenaed medical records are relevant. *See generally* (ECF No. 86).

Regarding the timeliness of the Motion, courts have discretion to consider a motion filed beyond the 30-day period contemplated in Rule 26(g)(1). *Ctr. for Individual Rights v. Chevaldina*, No. 16-CV-20905, 2017 WL 5905191, at \*3 (S.D. Fla. Nov. 29, 2017). Here, although it is unclear when Defendants learned of the issue leading to the Motion, the record reflects that the parties attempted to resolve the dispute without court intervention. (ECF Nos. 79 at 2-3, 86 at 2-3). Accordingly, in the exercise of the Court's discretion, the undersigned will decide the Motion on the merits. *Ctr. for Individual Rights,* 2017 WL 5905191, at \*3 (finding good cause to consider an otherwise untimely motion based on the offending party's ongoing effort to resolve the dispute without court intervention); *see also Cotromano v. United Tech. Corp.*, No. 13-CV-80928, 2020 WL 3268268, at \*2 (S.D. Fla. Apr.

Case 1:23-cv-22629-RAR   Document 18-4   Entered on FLSD Docket 12/01/2023   Page 10 of 90

Charlemagne v. Alibayof, Not Reported in Fed. Supp. (2021)

7, 2020) ("[T]his Court has a strong preference for deciding cases on the merits, and not a procedural misstep.").

Turning to the substance of the Motion, the parties do not dispute that Plaintiff has placed her physical and mental health at issue. Nonetheless, Plaintiff has refused to sign a HIPAA authorization for the release of the requested medical records. There is no Eleventh Circuit precedent on whether this Court can compel Plaintiff to execute such a release, and district courts have taken conflicting positions. *See Williams v. Carnival Corp.,* No. 18-CV-21654, 2020 WL 854809, at *1-2 (S.D. Fla. Feb. 11, 2020) (collecting cases); *Sherlock v. Fontainebleau,* 229 F. Supp. 3d 1277, 1281-82 (S.D. Fla. 2017) (collecting cases); *see also Cupp v. U.S.,* No. CV512-005, 2015 WL 510134, at *3 (S.D. Ga. Feb. 6, 2015) (noting no Eleventh Circuit precedent, but further noting that several district courts have recognized the court's authority to compel a plaintiff to sign a HIPAA authorization form); *but cf. Chase v. Nova Se. Univ., Inc.* No. 11-CV-61290, 2012 WL 1936082, at *1 (S.D. Fla. May 29, 2012) (denying motion to compel execution of medical release forms).

**\*2** In the absence of controlling authority, the undersigned adopts the reasoning in *Sherlock* and declines to compel Plaintiff to execute a medical release form. *Sherlock,* 229 F. Supp. 3d 1277 at 1282-83; *see also Graham v. Carroll,* No. 5-10-CV-65, 2011 WL 855331, at *2 (N.D. Fla. Mar. 9, 2013). Defendant may, however, obtain the requested medical records through HIPAA Orders, which would permit the health care providers to disclose "only the protected health care information expressly authorized by such order." 45 C.F.R. 164.512(e)(1). Accordingly, Defendants' Motion to Compel Plaintiff to Sign Medical Authorizations for Records is **GRANTED IN PART AND DENIED IN PART** to permit Defendants to submit appropriate HIPAA Orders for the Court's consideration. Consequently, the fact discovery deadline is extended to **November 22, 2021** to allow Defendants to submit proposed HIPPA Orders that comply with the requirements of 45 C.F.R. 164.512(e)(1) and this Court's April 2021 discovery rulings. All other deadlines in the Scheduling Order remain unchanged. *See* (ECF No. 18).

## II. MOTION REGARDING SUBPOENAS FOR SCHOOL RECORDS

Plaintiff has alleged various injuries, including traumatic brain injury, memory loss, and concentration difficulties. *See* (ECF No. 63 at 2-3). On October 7, 2021, Defendants

sent an email to Plaintiff advising Plaintiff of their intent to issue Rule 45 subpoenas to Miami Dade College and Florida Atlantic University for Plaintiff's educational records, which Defendants claim are relevant to their expert's analysis of Plaintiff's mental functioning prior to the accident. (ECF Nos. 81 at 2, 87 at 1-2). Defendants' email did not attach the proposed subpoena, but advised Plaintiff that Defendants would serve the subpoena by 4 p.m. the next day if they did not hear back from Plaintiff before then. (ECF No. 87 at 1-2). On October 8, 2021, Plaintiff's counsel replied, "We don't agree." *Id.* at 2. The instant Motion followed. (ECF No. 81). To date, the proposed subpoenas have not been served. (ECF No. 91 at 4).

Plaintiff objects to the Motion, arguing that: (i) Defendants failed to comply with the requirements of Rule 45; and (ii) there is no cognizable discovery dispute before the Court. (ECF No. 87 at 2-3). In reply, Defendants argue that the school records sought are relevant and they provided Plaintiff with adequate notice of the underlying subpoenas. *See generally* (ECF No. 91).

Pursuant to Rule 45, before a subpoena can be served on a third-party, notice and a copy of the subpoena must be served on each party to the litigation. Fed. R. Civ. P. 45(a)(4). The purpose of the "prior notice" provision is to give an opposing party the opportunity to object to the subpoena prior to the date in the subpoena. *Warren v. Delvista Towers Condo. Ass'n, Inc.,* No. 13-CV-23074, 2014 WL 1608369, at *1 (S.D. Fla. Apr. 22, 2014). The notice requirement is mandatory, and failure to provide notice constitutes grounds to quash a subpoena. *Gonzalez v. RFJD Holding Co., Inc.,* No. 14-CV-61041, 2014 WL 12600141, at *2 (S.D. Fla. Sep. 2, 2014). Here, Plaintiff first received a copy of the proposed subpoenas when Defendant attached them as exhibits to their Reply to the instant Motion. *See* (ECF No. 91 at 7-14).

Against this factual and legal backdrop, the undersigned finds that Defendants failed to comply with the requirements of Rule 45 in that Defendants' October 7, 2021 email to Plaintiff did not include a copy of the proposed subpoenas and demanded an almost immediate response from Plaintiff. Indeed, Defendants did not provide Plaintiff with copies of the proposed subpoenas until their Reply to Plaintiff's Response. *See* (ECF No. 91). Although Defendants' notice was technically defective, quashing the subpoena at this late stage of the litigation is imprudent as it may deprive Defendants of relevant discovery. Furthermore, Plaintiff has

not shown prejudice, now having received copies of the still unserved subpoenas.

**\*3** Nonetheless, the proposed subpoenas are overbroad in that they seek "any and all school records, grades, reports pertaining to scholastic achievements, attendance, general conduct, and any and all records or information in any way pertaining to and [a]ny and [a]ll other [d]ocuments in [y]our [p]ossession [c]oncerning" Plaintiff. (ECF No. 91 at 7, 11). To promote efficient case management, the undersigned will amend the subpoenas to limit production to: *School records, grades, and reports pertaining to Plaintiff's scholastic achievements, attendance, and disciplinary history during Plaintiff's enrollment at the subpoenaed institution.*

Accordingly, Defendants' Motion to Overrule Plaintiff's Objections and Allow Subpoenas for School Records is **GRANTED IN PART**, as amended by the Court. By **November 15, 2021**, after having reviewed the amended subpoenas and conferring with Defendants (conferral may be telephonic), Plaintiff may file a motion to quash, if necessary. Absent a motion to quash, Defendants may then serve the amended subpoenas to the respective academic institutions.

## III. CONCLUSION

Accordingly, the Motions are **GRANTED IN PART AND DENIED IN PART** as follows:

1. Defendants' Motion to Compel Plaintiff to Sign Medical Authorizations (ECF No. 79) is **GRANTED IN PART AND DENIED IN PART**. By **November 22, 2021**, Defendants shall submit to the Court proposed HIPPA Orders that comply with the requirements of 45 C.F.R. 164.512(e)(1) and this Court's April 2021 rulings.

2. Defendants' Motion to Overrule Plaintiff's Objections and Allow Subpoenas for School Records is **GRANTED IN PART**. By **November 15, 2021**, after having reviewed the amended subpoenas and having conferred with Defendants, Plaintiff may file a motion to quash, if necessary. Absent a motion to quash, Defendants may then serve the amended subpoenas to the respective academic institutions.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida on November 11, 2021.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 8565992

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 8040932
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

Diana FEDDERMAN, Plaintiff,

v.

PALM BEACH COUNTY SCHOOL
BOARD, a Florida political subdivision, and
Michael J. Burke, individually, Defendants.

Case No. 22-81857-Civ-MATTHEWMAN
|
Signed November 20, 2023

**Attorneys and Law Firms**

Karen Coolman Amlong, Jennifer E. Daley, William Robert Amlong, Amlong & Amlong, PA, Fort Lauderdale, FL, for Plaintiff.

V. Danielle Williams, Office of General Counsel Palm Beach County School Board, West Palm Beach, FL, Sarah Gail Weber, Laufer, Laufer PA, Boca Raton, FL, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR LIMITED PROTECTIVE ORDER TO NARROW THE SCOPE OF DEFENDANTS' SUBPOENA RE: GYNECOLOGICAL RECORDS AND INFORMATION [DE 116]**

WILLIAM MATTHEWMAN, United States Magistrate Judge

**\*1** **THIS CAUSE** is before the Court upon Plaintiff Diana Fedderman's ("Plaintiff") Motion for Limited Protective Order to Narrow the Scope of Defendants' Subpoena re: Gynecological Records and Information ("Motion") [DE 116]. Defendants Palm Beach County School Board and Michael J. Burke ("Defendants") have filed a Response [DE 123], and Plaintiff has filed a Reply [DE 125]. Thus, the matter is fully briefed and ripe for review. The Court held a hearing on this matter on November 20, 2023. The Court has carefully considered the Motion, the Response, and the Reply, the arguments of counsel at the hearing, as well as the entire docket in this case.

## I. BACKGROUND

On March 8, 2023, Plaintiff Diana Fedderman filed a First Amended Complaint for Damages and Injunctive Relief ("First Amended Complaint") [DE 52] against Defendants Palm Beach County School Board and Michael J. Burke. Within the First Amended Complaint, Plaintiff specifically states that she has suffered damages, including but not limited to, diminishment of earning capacity and emotional distress and anguish. [DE 52 at 8 ¶ 19].

Accordingly, on October 30, 2023, Defendants issued a subpoena duces tecum to Dr. Stewart P. Newman—apparently Plaintiff's gynecologist—seeking the following:

> **A copy of any and all records concerning anxiety, mood disorder, depression, mental health, insomnia, headaches and or migraines, treatments which have potential side effects that may include change of mood, depression, anxiety, insomnia and headaches and or migraines,** which includes, but my [sic] not be limited to, office notes, office records, office statements, test results, medical records, medical bills, consultation reports, X-ray films, radiological reports, diagnostic test results, MR, CT and/or CAT scans films, and their reports, psychiatric and/or psychological reports and records, reports to insurance companies, photographs and/or videotapes, disability ratings, reports and records of an [sic] charges and payments, correspondence memoranda, etc., relating to the care and treatment of ... [Plaintiff].

[DE 116-1 at 5]. Thereafter, Plaintiff filed the instant Motion. And, on November 9, 2023, the Court issued a Paperless Order [DE 126] expediting briefing on the Motion and staying the subpoena until the Court ruled on Plaintiff's Motion. *See* DE 126.

## II. MOTION, RESPONSE, AND REPLY

### a. The Motion [DE 116]

As part of Plaintiff's Motion, Plaintiff seeks an order "limiting the scope of highly sensitive records to be produced by Dr. Newman, a gynecologist (whom [P]laintiff has seen for the past 30 years or so for various gynecological issues, who did not treated [sic] her for the damages sought in this action and is not on either party's witness list) solely to the anti-anxiety medication that [P]laintiff testified she was prescribed back in the early 2000s (2007 or 2008), as well as the reason for

the prescription." [DE 116 at 1]. Plaintiff also seeks an order limiting the scope of deposition testimony from Dr. Newman.

In support, Plaintiff cites cases which Plaintiff submits stands for the proposition that the "highest sensitivity" is afforded to gynecological records. *Id.* at 2–3. Further, Plaintiff maintains that the broad language of the subpoena, including the "Definitions" and proposed HIPAA release, "means essentially everything in the doctor's file." *Id.* at 3. According to Plaintiff, "Defendants' subpoena is no less invasive because a portion seemingly limits the records to certain symptoms — [D]efendants ignore that some of those symptoms (e.g., insomnia, trouble focusing, mood changes, depression, anxiety, etc.) may arise for other conditions, such as menopause, which have absolutely no bearing on this action." *Id.*

b. Defendants' Response [DE 123]

**\*2** Defendants first argue that Plaintiff cannot hide her medical records from discovery, as Plaintiff has put her mental condition at issue through the First Amended Complaint and her claim for damages for emotional distress and anguish. [DE 123 at 2–3]. In this regard, Defendants state that "[t]he records requested to Dr. Newman are limited to the issues relevant to the emotional distress damages claimed by Plaintiff, and Defendant has not requested any specific sexual or gynecology records. Rather, only records regarding headaches/migraines and records regarding psychological complaints were requested." *Id.* at 3. Moreover, Defendants contend that they are entitled to investigate Plaintiff's previous psychological and physical problems from before the events at issue allegedly occurred. *Id.* This is because "courts have permitted discovery into plaintiffs' medical records when the plaintiffs put their mental conditions at issue by claiming emotional distress damages, even where they assert the type of 'garden variety' claims nearly all plaintiffs in employment suits assert." *Id.* at 4. However, according to Defendants, they "have no intention of engaging in a fishing expedition for Plaintiff's entire sexual and gynecological history, but ... should have the ability to discover whether Plaintiffs' [sic] relevant medical records indicate other, independent causes for the[ ] alleged emotional distress." *Id.* at 5.

c. Plaintiff's Reply [DE 125]

As a preliminary matter, Plaintiff argues that Defendants "miss the point" of Plaintiff's Motion, as the Response ignores the specific language of the subpoena "and the case law cited by [P]laintiff about the standard applicable when highly

sensitive gynecological records are sought." [DE 125 at 1]. That being said, Plaintiff first argues that Defendants' Response "is internally inconsistent regarding what records their subpoena seeks and does not refute [P]laintiff's argument that there is language in the subpoena and HIPAA release that far exceed[s] what Defendants contend they seek." *Id.* Second, Plaintiff again points out that an emotional distress claim does not give Defendants an unfettered right to pursue her entire medical history. *Id.* at 2. To this end, Plaintiff notes that "Defendants' Response relies primarily on cases that addressed discovery for medical records or records from psychological/psychiatric providers, not gynecological records." *Id.* (footnote omitted).

## III. LEGAL STANDARD & ANALYSIS

Under Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case ...." Fed. R. Civ. P. 26(b)(1). "[T]he party resisting discovery ... has the burden to demonstrate specifically how the request is unreasonable or not relevant." *Adelman v. Boy Scouts of Am.*, 276 F.R.D. 681, 689 (S.D. Fla. 2011). Further, Federal Rule of Civil Procedure 26(c) provides that a court "for good cause shown ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense ...." Fed. R. Civ. P. 26(c). "While Rule 26(c) articulates a single standard for ruling on a protective order motion, that of 'good cause,' the federal courts have superimposed a somewhat more demanding balancing of interests approach under the Rule." *Farnsworth v. Ctr. for Disease Control*, 758 F.2d 1545, 1547 (11th Cir. 1985) (citations omitted).

In evaluating whether a party has satisfied the burden of "good cause," "a court should balance the non-moving party's interest in obtaining discovery and preparing for trial against the moving party's proffer of harm that would result from the [discovery]." *Barrata v. Homeland Housewares, LLC*, 242 F.R.D. 641, 642 (S.D. Fla. 2007) (citing *Farnsworth*, 758 F.2d at 1547). "Generally, a party moving for a protective order must make a specific demonstration of facts in support of the request, as well as of the harm that will result without a protective order." *Fargeon v. Am. Nat'l Prop. & Cas. Co.*, No. 08-60037-CIV, 2008 WL 11332027, at \*4 (S.D. Fla. July 8, 2008) (citing *Dunford v. Rolly Marine Serv., Co.*, 233 F.R.D. 635, 636 (S.D. Fla. 2005)). "As courts have

recognized, medical records regarding a patient's sexual and gynecological history 'are not only sensitive, but of the highest sensitivity.' " *Prado v. Equifax Info. Servs. LLC*, 331 F.R.D. 134, 137 (N.D. Cal. 2019) (quoting *Batchelor v. Merck & Co., Inc.*, No. 3:05-CV-791 JTM, 2007 WL 4179015, at *5 (N.D. Ind. Nov. 20, 2007)).

**\*3** Here, as stated above, Defendants seek the following documents:

**A copy of any and all records concerning anxiety, mood disorder, depression, mental health, insomnia, headaches and or migraines, treatments which have potential side effects that may include change of mood, depression, anxiety, insomnia and headaches and or migraines**, which includes, but my [sic] not be limited to, office notes, office records, office statements, test results, medical records, medical bills, consultation reports, X-ray films, radiological reports, diagnostic test results, MR, CT and/or CAT scans films, and their reports, psychiatric and/or psychological reports and records, reports to insurance companies, photographs and/or videotapes, disability ratings, reports and records of an [sic] charges and payments, correspondence memoranda, etc., relating to the care and treatment of ... [Plaintiff].

[DE 116-1 at 5]. Due to Plaintiff's request for emotional distress and anguish damages, there is no question that discovery into Plaintiff's mental or emotional condition is appropriate in this case. The question is the scope of that production from Plaintiff's gynecologist. In this regard, the Court finds that the following records sought by Defendants are relevant and proportional under Rule 26(b)(1):

(a) Documents and materials relevant to Plaintiff's claim of emotional distress damages;

(b) Documents and materials where Plaintiff complains of, discusses, or is treated for headaches, migraines, anxiety, mood disorder, depression, mental health issues, and insomnia, as well as suggested or actual treatment related to those conditions and medications prescribed.

However, sexual, menopause, or gynecological records shall not be produced.

More specifically, the Court will require the following procedures to ensure that Plaintiff's sensitive gynecological information is adequately protected. Dr. Newman shall produce all records sought by the subpoena to Plaintiff's counsel forthwith. Immediately upon receipt, Plaintiff's counsel shall review the medical records and produce the

above categories of medical records that the Court has stated are relevant and proportional to Defendants' counsel. If Plaintiff is uncertain whether certain records should be produced or withheld pursuant to this Court's Order, it can seek guidance from the Court by way of a motion. Additionally, if Defendants believe in good faith that Plaintiff has improperly withheld any relevant and proportional medical records, it can file a motion seeking this Court to review the withheld documents *in camera*. Before any party files any motion pursuant to this procedure, however, counsel shall confer in good faith in an effort to resolve the dispute among themselves. With this procedure in mind, the Court is confident that Plaintiff's sensitive information will be adequately protected, while still permitting Defendants discovery that is relevant and proportional to the needs of the case under Rule 26(b)(1).

### IV. CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Plaintiff's Motion for Limited Protective Order to Narrow the Scope of Defendants' Subpoena re: Gynecological Records and Information [DE 116] is **GRANTED IN PART AND DENIED IN PART**. Specifically, the Motion [DE 116] is **GRANTED** to the extent that Plaintiff seeks an adequate mechanism to protect her sensitive information. Dr. Newman shall produce the records sought by the subpoena to Plaintiff's counsel forthwith, in accordance with the procedures described above. However, Plaintiff's Motion [DE 116] is **DENIED** to the extent that Plaintiff seeks to preclude Dr. Newman from producing information that would necessarily be relevant to Plaintiff's mental or emotional condition and to her claim for damages stemming from emotional distress and anguish.

**\*4** Moreover, the Court notes that Defendants represented during the November 20, 2023 Zoom VTC hearing that, upon ultimately obtaining Dr. Newman's records, a deposition of Dr. Newman would likely be unnecessary. To this end, the Court reserves jurisdiction to order the deposition of Dr. Newman and to extend the discovery cutoff deadline for the limited purpose of taking Dr. Newman's deposition.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 20th day of November, 2023.

**All Citations**

Slip Copy, 2023 WL 8040932

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 855331
Only the Westlaw citation is currently available.
United States District Court, N.D. Florida,
Panama City Division.

David Eugene GRAHAM, Plaintiff,

v.

S CARROLL, et al, Defendants.

No. 5:10–cv–00065–RS–GRJ.
|
March 9, 2011.

**Attorneys and Law Firms**

David Eugene Graham, Raiford, FL, pro se.

Maricruz Rahaman Fincher, Office of the Attorney General, Mark Jerry Hiers, Tallahassee, FL, for Defendants.

*ORDER*

GARY R. JONES, United States Magistrate Judge.

 **\*1** Pending before the Court are: (1) Defendants' Motion to Compel (Doc. 32) and (2) Defendants' Motion for Extension of Time. (Doc. 33.) The Plaintiff has not filed responses[1] and the time for doing so has passed. For the reasons discussed below, Defendant's Motion to Compel is due to be denied and Plaintiff's Motion for Extension of Time is due to be granted the motion to compel is due to be **DENIED.**

[1]    Plaintiff has filed a Motion for Entry of Default. (Doc. 34.) While this filing does not constitute a response to the motions it is evident that the Plaintiff opposes Defendants' request for an extension of time. The motion for entry of default is due to be denied because Defendants' Motion to Compel and Motion for Extension of Time are more than sufficient to demonstrate that Defendants have not failed to "otherwise defend" as required by Rule 55(a) of the Federal Rules of Civil Procedure before a default may be entered.

*DISCUSSION*

In Plaintiff's Third Amended Complaint, Plaintiff alleges that Defendants Searcy and Witalec—two correctional officers at Northwest Florida Reception Center—used excessive force by unnecessarily spraying Plaintiff with chemical agents causing severe burns to Plaintiff's skin and respiratory system. (Doc. 16.) Defendants contend that they must have access to Plaintiff's medical records in order to formulate a response to Plaintiff's Third Amended Complaint. According to Defendants, they have requested Plaintiff to sign a HIPPA[2] release but Plaintiff has refused to do so. Consequently, Defendants request the Court to enter an order compelling Plaintiff to sign a HIPPA release or in the alternative, to dismiss Plaintiff's Eighth Amendment excessive force claim. In their motion for extension of time Defendants request the Court to enter an order enlarging the time within which Defendants must respond to Plaintiff's Third Amended Complaint by thirty days from the date the Court rules on Defendants' Motion to Compel.

[2]    The Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d et seq.

Without citing to any authority Defendants contend that Plaintiff should be compelled to execute a HIPPA release because Plaintiff has placed his medical condition at issue by alleging that he suffered injuries as a result of Defendants' actions.

Discovery has not yet commenced because the Court has not yet issued a scheduling order. Further, because the Plaintiff is a prisoner and is not represented by an attorney, the case is exempt from the initial disclosure requirements of Fed. R. Civ.P. 26(a)(1). *See,* N.D.Fla.Loc.R. 26.1(A). As such, Plaintiff is not yet obligated to provide any discovery.

Moreover, even assuming Defendant's request that Plaintiff execute a HIPPA release was made during discovery, Plaintiff would not be obligated to do so. Rule 34 of the Federal Rules of Civil Procedure requires a party to produce all "documents and things" over which the party has "possession, custody or control." Thus, there is nothing in the wording of the Rule that would require a plaintiff to execute a consent or medical release unless the Plaintiff wishes to do so voluntarily.

Case law in this circuit is not instructive in view of the fact that the Eleventh Circuit has never directly addressed the issue of whether a party can be compelled to execute a medical release. The issue has been addressed, however, by several district courts from other circuits.

For example, in *Clark v. Vega Wholesale, Inc.,* 181 F.R.D. 470, 472 (D.Nev.1998) the United States District Court for the District of Nevada refused to order a party to execute a medical release in response to a Rule 34 request to produce finding that because the Plaintiff did not have exclusive control of the documents, the relationship between the plaintiff and her doctor was not sufficient to establish control for purposes of Rule 34. That position is also consistent with the position taken by the District Court of Colorado in *Neal v. Boulder,* 142 F.R.D. 325 (D.Colo.1992) (finding no basis under Fed.R.Civ.P. 34 that allows courts to compel releases for the medical records because of the plaintiffs' lack of custody of the records).

**\*2** This position is, however, not universal. For example, in *Smith v. The Logansport Community Sch. Corp.,* 139 F.R.D. 637, 649 (N.D.Ind.1991),￼ the Northern District of Indiana directed the plaintiff to execute a release of her counseling records, finding that where "the mental or physical condition of a party has been placed in issue, the practice of obtaining written consents for the release of records represents the least expensive and most efficient means of procuring information rom medical or counseling providers."

While the Court acknowledges that in some circumstances, compelling a party to execute releases may be a more expedient and less costly method for a party to obtain the desired information from a third party, the Court, nonetheless, concludes that the reasoning in *Clark* to be more consistent with Rule 34, and therefore, the Court declines to order that the Plaintiff be compelled to execute a medical release form.

The fact that the Plaintiff has filed a lawsuit placing his medical condition in issue does not waive the confidentiality of Plaintiff's medical records. Thus, under HIPPA the filing of a lawsuit does not waive the confidentiality of health information, and unless the patient gives written consent the medical provider may only disclose confidential health information under the steps outlined in HIPPA.

Therefore, although the Court declines to compel Plaintiff to execute a HIPPA release, when discovery commences Defendants will be entitled to obtain the required medical records (even though Plaintiff has refused consent) in several ways under HIPPA. Counsel may obtain a court order

which allows the health care provider to disclose "only the protected health information expressly authorized by such order." 45 C.F.R. 164.512(e)(1)(I). In the absence of a court order counsel may avail herself of additional methods used in conjunction with traditional means of discovery. These additional methods include obtaining the information through a subpoena or request to produce in compliance with the requirements of 45 C.F.R. § 164.512(e).

Thus, in sum while Defendants cannot compel Plaintiff to execute a HIPPA release simply because Plaintiff filed a lawsuit placing his medical condition in issue Defendants will be entitled to obtain this information, if necessary, through the procedures for disclosure of medical records provided in HIPPA.

The Court appreciates that the medical records could be very relevant to Defendants' defense to the claims in this case. The medical records, however, are not essential to the formulation of a response to the Third Amended Complaint. Indeed, most defendants responding to complaints are fully able to do so without the benefit of discovery and without the benefit of access to all of a plaintiff's medical records. To the extent that medical information is relevant to Defendant's defense Defendants will have full and fair opportunity to obtain the records in discovery and full and fair opportunity to use the records to support an appropriate motion.

**\*3** Accordingly, for these reasons, it is **ORDERED:**

1. Defendants' Motion to Compel (Doc. 32) is **DENIED.**

2. Defendants' Motion for Extension of Time (Doc. 33) is **GRANTED.** Defendants shall file their response to the Third Amended Complaint within thirty (30) days of this date.

3. Plaintiff's Motion For Entry of Default (Doc. 34) is **DENIED.**

**DONE AND ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 855331

---

*End of Document*

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Northwestern Memorial Hosp. v. Ashcroft, 362 F.3d 923 (2004)

58 Fed.R.Serv.3d 173, 64 Fed. R. Evid. Serv. 334

362 F.3d 923
United States Court of Appeals,
Seventh Circuit.

NORTHWESTERN MEMORIAL

HOSPITAL, Plaintiff–Appellee,

v.

John ASHCROFT, Attorney General of

the United States, Defendant–Appellant.

No. 04–1379.
|
Argued March 23, 2004.
|
Decided March 26, 2004[*].

[*]  This opinion is being released in typescript; a printed
version will follow.

**Synopsis**
**Background:** Hospital challenged Department of Justice
(DOJ) subpoena seeking medical records of certain patients
upon whom late-term abortion procedures had been
performed, which were sought for use in litigation
challenging constitutionality of Partial-Birth Abortion Ban
Act. The United States District Court for the Northern District
of Illinois, Charles P. Kocoras, C.J., quashed subpoena
based on state statute and Health Insurance Portability and
Accountability Act (HIPAA) regulations, and DOJ appealed.

**Holdings:** The Court of Appeals, Posner, Circuit Judge, held
that:

[1] supersession clause of HIPAA privacy provisions does not
impose state evidentiary privileges on suits to enforce federal
law;

[2] HIPAA regulations' procedure for obtaining authority to
use medical records in litigation is purely procedural in nature
and does not create federal physician-patient or hospital-
patient privilege;

[3] there is no federal common law privilege for abortion
records; but

[4] subpoena imposed undue burden on hospital, when
limited probative value of records in question was weighed
against patients' fear of identification and consequent harm to
hospital.

Affirmed.

Manion, Circuit Judge, filed opinion concurring in part and
dissenting in part.

West Headnotes (4)

[1]  **Courts** 🔑 Exclusive or Concurrent
Jurisdiction

**Federal Courts** 🔑 Privilege and
confidentiality

Supersession clause of privacy provisions of
Health Insurance Portability and Accountability
Act (HIPAA), stating that if state law imposes
more stringent medical-records privilege than
Act's regulations then state law governs, does
not impose state evidentiary privileges on suits
to enforce federal law; state can enforce more-
stringent privilege in suits in state court to
enforce state law and in suits in federal court
where state law supplies rule of decision. Social
Security Act, § 1173(c)(2), as amended, 42
U.S.C.A. § 1320d–2(c)(2); Fed.Rules Evid.Rule
501, 28 U.S.C.A.

89 Cases that cite this headnote

[2]  **Privileged Communications and
Confidentiality** 🔑 Health information
statutes and regulations

Procedure for obtaining authority to use medical
records in litigation, created by Health Insurance
Portability and Accountability Act (HIPAA)
regulations, is purely procedural in nature
and does not create federal physician-patient
or hospital-patient privilege. Social Security
Act, § 1173, as amended, 42 U.S.C.A. §
1320d–2; 45 C.F.R. §§ 160.203(b), 164.512(e)
(1), 164.514(a); Fed.Rules Evid.Rule 501, 28
U.S.C.A.

Northwestern Memorial Hosp. v. Ashcroft, 362 F.3d 923 (2004)

58 Fed.R.Serv.3d 173, 64 Fed. R. Evid. Serv. 334

134 Cases that cite this headnote

**[3]** **Privileged Communications and Confidentiality** 🔑 Abortion

There is no federal common law privilege for abortion records. Fed.Rules Evid.Rule 501, 28 U.S.C.A.

58 Cases that cite this headnote

**[4]** **Privileged Communications and Confidentiality** 🔑 Impeachment or rehabilitation of witnesses

**Privileged Communications and Confidentiality** 🔑 Medical or hospital records or information

Undue burden on hospital was imposed by Department of Justice (DOJ) subpoena seeking medical records of certain patients upon whom late-term abortion procedures had been performed, for use in suit challenging constitutionality of Partial-Birth Abortion Ban Act in order to impeach physician who had performed procedures and who was to testify as plaintiff's expert; limited probative value of records for crucial question of medical necessity of dilation and extraction (D & X) procedure contrasted with great sensitivity of records, patients' fear of identification even if records were redacted, and consequent harm to hospital via loss of patients' confidence. 18 U.S.C.A. § 1531; Fed.Rules Civ.Proc.Rule 45(c)(3)(A)(iv), 28 U.S.C.A.

75 Cases that cite this headnote

**Attorneys and Law Firms**

**\*924** Joshua Waldman, Department of Justice Civil Division, Appellate Section, Washington, D.C., Shannen Wayne Coffin (argued), Department of Justice Office of the Attorney General, Washington, D.C., for Defendant-Appellant.

George F. Galland, Jr. (argued), Miner, Barnhill & Galland, Chicago, IL, for Appellee.

Before POSNER, MANION, and WILLIAMS, Circuit Judges.

**Opinion**

POSNER, Circuit Judge.

The government appeals from an order by the district court quashing a subpoena commanding Northwestern Memorial Hospital in Chicago to produce the medical records of certain patients on whom Dr. Cassing Hammond had performed late-term abortions at the hospital using the controversial method known variously as "D & X" (dilation and extraction) and "intact D & E" (dilation and evacuation). We accelerated briefing and argument, and now accelerate our decision, in view of the pressures of time discussed later in the opinion.

The subpoenaed records, apparently some 45 in number, are sought for use in the forthcoming trial in the Southern District of New York of a suit challenging the constitutionality of the Partial–Birth Abortion Ban Act of 2003, Pub.L. No. 108–105, 117 Stat. 1201, 18 U.S.C. § 1531. See National Abortion Federation v. Ashcroft, 2004 WL 540470 (S.D.N.Y. Mar.17, 2004) (order denying summary judgment for plaintiffs). Dr. Hammond is one of the plaintiffs in that suit and will also be testifying as an expert witness. The district court held that the production of the records is barred by regulations issued under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub.L. 104–191, 110 Stat. 1936, and let us begin there.

Section 264 of HIPAA, 42 U.S.C. § 1320d–2 Note, directs the Secretary of Health and Human Services to promulgate regulations to protect the privacy of medical records, but provides in subsection (c)(2) that such a regulation "shall not supercede a contrary provision of State law, if the provision of State law imposes requirements, standards, or implementation specifications that are more stringent than the requirements, standards, or implementation specifications imposed under the regulation." See also 45 C.F.R. § 160.203(b). A standard is "more stringent" if it "provides greater privacy protection for the individual who is the subject of the individually identifiable health information" than the standard in the regulation. § 160.202(6).

The particular focus of the appeal is an HHS regulation entitled "Standard: Disclosures for Judicial and Administrative **\*925** Proceedings," § 164.512(e), which authorizes a "covered entity" (such as Northwestern

Memorial Hospital) to disclose private health information in judicial or administrative proceedings "in response to an order of of a court." § 164.512(e)(1)(i). The regulation also allows the disclosure of such information in those proceedings "in response to a subpoena, discovery request, or other lawful process," § 164.512(e)(1)(ii), if the party seeking the information either notifies the patient (or at least makes a good faith effort to do so) or makes a "reasonable effort" to secure a qualified protective order, that is, an order that prohibits the use or disclosure of the information outside the litigation and requires the return or destruction of the information at the end of the litigation. 45 C.F.R. § 164.512(e)(1)(v).

The district judge presiding over the case in New York issued an order authorizing, although not directing, the hospital to provide the records to the government after redaction to remove information identifying the patients. The parties agree that his order is an "order" within the meaning of the "in response" provision. It hardly matters; the government didn't need such an order because it had obtained a protective order, thus qualifying under the alternative procedure for disclosure of medical records. But under Illinois law, even redacted medical records are not to be disclosed in judicial proceedings, with immaterial exceptions. 735 ILCS 5/8–802; *Department of Professional Regulation v. Manos,* 326 Ill.App.3d 698, 260 Ill.Dec. 364, 761 N.E.2d 208, 216–17 (2001); *Parkson v. Central DuPage Hospital,* 105 Ill.App.3d 850, 61 Ill.Dec. 651, 435 N.E.2d 140, 143–44 (1982). The district court in our case ruled that the Illinois law, because it sets a "more stringent" standard for disclosure than the HIPAA regulation, trumps that regulation by virtue of HIPAA's supersession provision. So he quashed the subpoena, precipitating this appeal.

[1]  Although the issue is not free from doubt, we agree with the government that the HIPAA regulations do not impose state evidentiary privileges on suits to enforce federal law. Illinois is free to enforce its more stringent medical-records privilege (there is no comparable federal privilege) in suits in state court to enforce state law and, by virtue of an express provision in Fed.R.Evid. 501, in suits in federal court (mainly diversity suits) as well in which state law supplies the rule of decision. But the Illinois privilege does not govern in federal-question suits, such as the suit in the Southern District of New York. The enforcement of federal law might be hamstring if state-law privileges more stringent than any federal privilege regarding medical records were applicable to all federal cases. We say "might" not "would" because some federal statutes authorize subpoenas in terms that would override the HIPAA

regulations. See, e.g., 18 U.S.C. § 3486; *In re Subpoena Duces Tecum,* 228 F.3d 341 (4th Cir.2000). But almost certainly there are gaps; and we think it improbable that HHS intended to open such a can of worms when it set forth a procedure for disclosure of medical records in litigation—intended, that is, to be regulating, actually or potentially (depending on other statutory provisions regulating subpoenas), the litigation of federal employment discrimination cases, social security disability cases, ERISA cases, Medicare and Medicaid fraud cases, Food and Drug Administration cases, and the numerous other classes of federal case in which medical records whether of the parties or of nonparties would not be privileged under federal evidence law.

[2]  All that 45 C.F.R. § 164.512(e) should be understood to do, therefore, is to **\*926** create a procedure for obtaining authority to use medical records in litigation. Whether the records are actually admissible in evidence will depend among other things on whether they are privileged. And the evidentiary privileges that are applicable to federal-question suits are given not by state law but by federal law, Fed.R.Evid. 501, which does not recognize a physician-patient (or hospital-patient) privilege. Rule 501 in terms makes federal common law the source of any privileges in federal-question suits unless an Act of Congress provides otherwise. We do not think HIPAA is rightly understood as an Act of Congress that creates a privilege.

The purely procedural character of the HIPAA standard for disclosure of medical information in judicial or administrative proceedings is indicated by the procedure for disclosure in response to a subpoena or other process; the notice to the patient must contain "sufficient information about the litigation or proceeding in which the protected health information is requested to permit the individual to raise an objection to the court." § 164.512(e)(1)(iii)(B). The objection in court would often be based on a privilege—the source of which would be found elsewhere than in the regulations themselves.

This conclusion is buttressed by a HIPAA regulation which says that the "more stringent" clause applies only to "individually identifiable health information," § 160.203(b), as opposed to "health information that does not identify an individual and with respect to which there is no reasonable basis to believe that the information can be used to identify an individual." § 164.514(a). Provided that medical records are redacted in accordance with the redaction requirements (themselves quite stringent) of § 164.514(a), they would not

Case 1:23-cv-22629-RAR Document 18-4 Entered on FLSD Docket 12/01/2023 Page 21 of 90

Northwestern Memorial Hosp. v. Ashcroft, 362 F.3d 923 (2004)

58 Fed.R.Serv.3d 173, 64 Fed. R. Evid. Serv. 334

contain "individually identifiable health information" and the "more stringent" clause would fall away.

[3]   As an alternative basis for quashing the subpoena, the district judge undertook to craft a new federal common law privilege for abortion records. He based this ruling on their sensitivity, which he compared to that of psychotherapists' treatment records, held privileged in *Jaffee v. Redmond,* 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996). The creation of new common law evidentiary privileges is authorized by Fed.R.Evid. 501, and *Jaffee* is not the only recent case in which the authority was exercised. *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.,* 332 F.3d 976, 979–81 (6th Cir.2003); *In re Air Crash Near Cali, Colombia,* 959 F.Supp. 1529, 1533–35 (S.D.Fla.1997), and *United States v. Lowe,* 948 F.Supp. 97, 99–100 (D.Mass.1996), all created new privileges on the authority of *Jaffee.* But none relates to medical records and we are reluctant to embark on a case-by-case determination of the relative sensitivity of medical records of different ailments or procedures. Most medical records are sensitive, and many are as sensitive as late-term abortion records, such as the records of AIDS patients. Proceeding down the path taken by the district court would inevitably result in either arbitrary line drawing or the creation of an Illinois-type comprehensive privilege for medical records. Northwestern Memorial Hospital concedes that there is no federal common law physician-patient privilege. It is not for us—especially in so summary a proceeding as this litigation to quash the government's subpoena—to create one, whether all at once or by a process of slow but inevitable additions to the sole category recognized by *Jaffee.* Cf. *University of Pennsylvania v. EEOC,* 493 U.S. 182, 188–89, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990); *United *927 States v. Nixon,* 418 U.S. 683, 707–13, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *In re Witness Before Special Grand Jury 2000–2,* 288 F.3d 289 (7th Cir.2002); *In re Sealed Case,* 148 F.3d 1073, 1078–79 (D.C.Cir.1998) (per curiam).

[4]   The district court did not reach a further ground urged by Northwestern Memorial Hospital for quashing the government's subpoena, which is simply that the burden of compliance with it would exceed the benefit of production of the material sought by it. Fed.R.Civ.P. 45(c)(3)(A)(iv); *Deitchman v. E.R. Squibb & Sons, Inc.,* 740 F.2d 556, 563 (7th Cir.1984); *Roberts v. Shawnee Mission Ford, Inc.,* 352 F.3d 358, 361–62 (8th Cir.2003); *Miscellaneous Docket Matter # 1. v. Miscellaneous Docket Matter # 2,* 197 F.3d 922, 926–27 (8th Cir.1999); *In re Sealed Case,* 162 F.3d 670, 673–74 (D.C.Cir.1998). However, in support of his ruling expanding

the federal common law of privilege to embrace the medical records of abortion patients, the judge made findings that are highly germane to—indeed arguably dispositive of—the Rule 45(c) issue. He pointed out that the "government seeks these records on the *possibility* that it may find something therein which would affect the testimony of Dr. Hammond adversely, that is, for its potential value in impeaching his credibility as a witness. What the government ignores in its argument is how little, if any, probative value lies within these patient records." He contrasted the dearth of probative value "with the potential loss of privacy that would ensue were these medical records used in a case in which the patient was not a party" and concluded that "the balance of harms resulting from disclosure severely out-weighs the loss to the government through non-disclosure."

These findings were solidly based. The hospital had urged both the lack of probative value of the records and the loss of privacy by the patients. The government had responded in generalities, arguing that redaction would eliminate any privacy concern and that since Dr. Hammond had "made assertions of fact about his experience and his patients that plaintiffs are using to support their claim that, without a health exception, the Act is unconstitutional," the government should be permitted to test those assertions; but the government had not indicated what assertions these were or how the records might bear on them. Although on appeal the hospital repeated at length its reasons for believing that the records sought by the government would have little or no probative value, the government's response in both its opening brief and its reply brief remained vague to the point of being evasive.

At the oral argument we pressed the government's lawyer repeatedly and hard for indications of what he hoped to learn from the hospital records, and drew a blank. (Contrary to our usual practice, we did not limit the length of the oral argument.) The lawyer did suggest that if Hammond testified that patients with leukemia are better off with the D & X procedure than with the conventional D & E procedure but the medical records indicate that not all abortion patients with leukemia undergo D & X abortions, this would both impeach Hammond and suggest that D & X is not the only medically safe abortion procedure available to pregnant women afflicted with leukemia. But such information would be unlikely to be found in *Hammond's* records, given his strongly expressed preference for using the D & X method in the case of patients in fragile health. The information would be much more likely to be found in the records of physicians who perform D & E

Case 1:23-cv-22629-RAR   Document 18-4   Entered on FLSD Docket 12/01/2023   Page 22 of 90

Northwestern Memorial Hosp. v. Ashcroft, 362 F.3d 923 (2004)

58 Fed.R.Serv.3d 173, 64 Fed. R. Evid. Serv. 334

rather than D & X abortions on such **\*928** women. Those records, however, the government didn't seek.

We learned at argument for the first time that Dr. Hammond has been deposed in the New York litigation. The questions and answers in his deposition might illuminate the relevance of the medical records for impeachment of his testimony at the trial. But the government has made no effort to make the deposition a part of the record.

Ordinarily when a district judge has not addressed an issue committed to his discretion, such as the balance of benefit and burden in complying with a subpoena, e.g., *Peate v. McCann,* 294 F.3d 879, 884 (7th Cir.2002); *Deitchman v. E.R. Squibb & Sons, Inc., supra,* 740 F.2d at 563; *Pamida, Inc. v. E.S. Originals, Inc.,* 281 F.3d 726, 729 (8th Cir.2002), and the issue becomes critical to the disposition of the appeal, the appellate court must remand to give the judge a chance to exercise his discretion. *Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986). We do not follow that course, here, however, for two reasons. The first is that the judge, in the passages we quoted from his opinion, struck the balance—in other words, "weigh[ed the] competing hardships." *Deitchman v. E.R. Squibb & Sons, Inc., supra,* 740 F.2d at 563. True, he did so in the course of addressing a different issue from whether Rule 45(c) required that the subpoena be quashed; but, realistically, the result of a remand is foreordained.

The second reason is that with the trial in New York scheduled to begin on March 29 and to last only four weeks, the practical effect of a remand would be to moot the issue of compliance with the subpoena. The time factor is unfortunate, and is not the fault of the government (or of anyone else, so far as appears). If time permitted a remand, the judge would on remand examine the records, or at least a sample of them, in camera, as in the parallel subpoena case of *Planned Parenthood Federation of America, Inc. v. Ashcroft,* 2004 WL 432222 (N.D.Cal. Mar.5, 2004), to determine whether they are likely to have any probative value. Time does not permit. The government has not suggested that the case be remanded if we reject the district court's grounds for quashing the subpoena. A remand would be tantamount to mooting its appeal; in the government's words, "a remand would entirely frustrate the Government's interest in preparing a timely defense in the New York trial, which will begin on March 29." We take this as a waiver of any objection to our weighing the hardships ourselves, and we proceed to the weighing. See *Beer Nuts, Inc. v. Clover Club Foods Co.,* 805 F.2d 920, 923

n. 2 (10th Cir.1986); *McCord v. Bailey,* 636 F.2d 606, 613 (D.C.Cir.1980); cf. *International Ins. Co. v. Caja Nacional De Ahorro y Seguro,* 293 F.3d 392, 401 (7th Cir.2002); *Dillard v. City of Greensboro,* 213 F.3d 1347, 1355–57 (11th Cir.2000).

Like the district judge, we think the balance weighs in favor of quashing the subpoena. The government does not deny that the hospital is an appropriate representative of the privacy interests of its patients. *Parkson v. Central DuPage Hospital, supra,* 61 Ill.Dec. 651, 435 N.E.2d at 142. But it argues that since it is seeking only a limited number of records and they would be produced to it minus the information that would enable the identity of the patient to be determined, there is no hardship to either the hospital or the patients of compliance. The argument is unrealistic and incomplete. What is true is that the *administrative* hardship from compliance would be modest. But it is not the only or the main hardship. The natural sensitivity that **\*929** people feel about the disclosure of their medical records—the sensitivity that lies behind HIPAA—is amplified when the records are of a procedure that Congress has now declared to be a crime. Even if all the women whose records the government seeks know what "redacted" means, they are bound to be skeptical that redaction will conceal their identity from the world. This is hardly a typical case in which medical records get drawn into a lawsuit. Reflecting the fierce emotions that the long-running controversy over the morality and legality of abortion has made combustible, the Partial–Birth Abortion Ban Act and the litigation challenging its constitutionality—and even more so the rash of suits around the country in which the Department of Justice has been seeking the hospital records of abortion patients—have generated enormous publicity. These women must know that, and doubtless they are also aware that hostility to abortion has at times erupted into violence, including criminal obstruction of entry into abortion clinics, the firebombing of clinics, and the assassination of physicians who perform abortions.

Some of these women will be afraid that when their redacted records are made a part of the trial record in New York, persons of their acquaintance, or skillful "Googlers," sifting the information contained in the medical records concerning each patient's medical and sex history, will put two and two together, "out" the 45 women, and thereby expose them to threats, humiliation, and obloquy. As the court pointed out in *Parkson v. Central DuPage Hospital, supra,* 61 Ill.Dec. 651, 435 N.E.2d at 144, "whether the patients' identities would remain confidential by the exclusion of their names and identifying numbers is questionable at best. The patients' admit and discharge summaries arguably contain histories of

the patients' prior and present medical conditions, information that in the cumulative can make the possibility of recognition very high." In its opening brief, as throughout the district court proceeding, the government expressly reserved the right, at a later date, to seek the identity of the patients whose records are produced. Pressed at argument, the government's lawyer abandoned the reservation; but we do not know what would prevent reconsideration should the government, the subpoena having been enforced, discover that particular medical records that it had obtained were incomplete, opaque, or ambiguous.

Even if there were no possibility that a patient's identity might be learned from a redacted medical record, there would be an invasion of privacy. Imagine if nude pictures of a woman, uploaded to the Internet without her consent though without identifying her by name, were downloaded in a foreign country by people who will never meet her. She would still feel that her privacy had been invaded. The revelation of the intimate details contained in the record of a late-term abortion may inflict a similar wound.

If Northwestern Memorial Hospital cannot shield the medical records of its abortion patients from disclosure in judicial proceedings, moreover, the hospital will lose the confidence of its patients, and persons with sensitive medical conditions may be inclined to turn elsewhere for medical treatment. It is not as if the government were seeking medical records from every hospital and clinic that performs late-term abortions, in which event women wanting assurance against the disclosure of their records would have nowhere to turn. It is Dr. Hammond's presence in the New York suit as plaintiff and expert that has resulted in the government's subpoenaing Northwestern Memorial Hospital.

**\*930** The concerns that the hospital has articulated do not necessarily justify withholding probative evidence from the government; nor can the possibility that medical records of abortion patients would yield evidence germane to the constitutionality of the Partial–Birth Abortion Ban Act be gainsaid. A nearly identical state predecessor of the Act was invalidated by the Supreme Court in *Stenberg v. Carhart,* 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000), because it did not permit the D & X procedure in cases in which it is required to protect the health of the pregnant woman. *Id.* at 930–38, 120 S.Ct. 2597. In response, the preamble to the Act contains a finding that the procedure is *never* required for health reasons. 117 Stat. 1201, § 2. The government concedes as it must that this finding, although entitled to

respectful consideration, does not bind the courts. E.g., *United States v. Morrison,* 529 U.S. 598, 614, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000); *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 665–66, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (plurality). The issue of medical necessity remains for determination at the trial in New York, where Dr. Hammond will testify that he believes there are situations in which the D & X procedure is medically indicated. The essential difference between that procedure and the conventional D & E procedure is that in the latter procedure the fetus is destroyed while it is still entirely within the womb, while in the former procedure it is destroyed after the lower extremities, and sometimes the torso, have emerged from the womb and only the head remains inside. It is because part of the fetus is outside the womb when the fetus is destroyed that the supporters of the Act describe the D & X procedure as "partial birth" abortion. Dr. Hammond and other D & X practitioners argue that because less of the fetus is in the womb there is less danger of cutting the woman's tissues with the sharp knives used to dismember the fetus's body in the conventional D & E procedure and causing hemorrhaging, and that if the woman is in fragile health avoiding that danger is medically indicated.

The merits of the dispute are for determination at trial. The only issue for us is whether, given that there is a potential psychological cost to the hospital's patients, and a potential cost in lost goodwill to the hospital itself, from the involuntary production of the medical records even as redacted, the cost is offset by the probative value of the records. The district judge presiding at the trial has said that the records are "relevant," and no doubt they are—in the attenuated sense in which non-privileged materials may be sought in discovery. "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1); see *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 350–52, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978); *CSC Holdings, Inc. v. Redisi,* 309 F.3d 988, 995–96 (7th Cir.2002). The trial judge has not opined on the *probative* value of the records, which appears to be meager.

The government has had repeated opportunities to articulate a use for the records that it seeks, and it has failed to do so. What it would like to prove at the trial in New York, to refute Dr. Hammond, is that D & E is always an adequate alternative, from the standpoint of a pregnant woman's health, to the D & X procedure. But the government has failed to explain how the record of a D & X abortion would show this. And it is not as if Hammond had relied on the medical records of his

Case 1:23-cv-22629-RAR Document 18-4 Entered on FLSD Docket 12/01/2023 Page 24 of 90

Northwestern Memorial Hosp. v. Ashcroft, 362 F.3d 923 (2004)

58 Fed.R.Serv.3d 173, 64 Fed. R. Evid. Serv. 334

patients in preparing his expert testimony. (Had he done so, they would have had to be disclosed to the government under Fed.R.Civ.P. 26(a)(2).) He doesn't have the **\*931** records, is not basing his testimony on them, and so far as appears doesn't even remember them.

None of the records is going to state that Dr. Hammond said that he performed a D & X although he believed that a D & E would be just as good. We thought the government might be hoping to find in the records evidence that Hammond had lied when he said he had performed a D & X on a woman who had leukemia or a woman who had breast cancer, but at argument the government disclaimed any such suggestion. We're still at a loss to understand what it hopes to gain from such discovery. (We begged the government's lawyer to be concrete.) Of course, not having seen the records, the government labors under a disadvantage, although it has surely seen other medical records. And of course, pretrial discovery is a fishing expedition and one can't know what one has caught until one fishes. But Fed.R.Civ.P. 45(c) allows the fish to object, and when they do so the fisherman has to come up with more than the government has been able to do in this case despite the excellence of its lawyers.

The Partial–Birth Abortion Ban Act was passed, as we said, in response to the Supreme Court's decision in the *Stenberg* case. *Stenberg* was one of a number of "first generation" partial-birth cases. The others were *Hope Clinic v. Ryan,* 195 F.3d 857 (7th Cir.1999) (en banc); *Planned Parenthood of Wisconsin v. Doyle,* 162 F.3d 463 (7th Cir.1998); *Planned Parenthood of Greater Iowa, Inc. v. Miller,* 195 F.3d 386 (8th Cir.1999); *Little Rock Family Planning Services, P.A. v. Jegley,* 192 F.3d 794 (8th Cir.1999); *Summit Medical Associates, P.C. v. Pryor,* 180 F.3d 1326 (11th Cir.1999); *Richmond Medical Center for Women v. Gilmore,* 144 F.3d 326 (4th Cir.1998); *Women's Medical Professional Corp. v. Voinovich,* 130 F.3d 187 (6th Cir.1997); *Armstrong v. State,* 296 Mont. 361, 989 P.2d 364 (1999); *WomanCare of Southfield, P.C. v. Granholm,* 143 F.Supp.2d 827 (E.D.Mich.2000); *Rhode Island Medical Soc. v. Whitehouse,* 66 F.Supp.2d 288 (D.R.I.1999), affirmed, 239 F.3d 104 (1st Cir.2001) (per curiam); *Richmond Medical Center for Women v. Gilmore,* 55 F.Supp.2d 441 (E.D.Va.1999), affirmed, 224 F.3d 337 (4th Cir.2000) (per curiam); *Causeway Medical Suite v. Foster,* 43 F.Supp.2d 604 (E.D.La.1999), affirmed, 221 F.3d 811 (5th Cir.2000); *A Choice for Women v. Butterworth,* 54 F.Supp.2d 1148 (S.D.Fla.1998); *Planned Parenthood of Central New Jersey v. Verniero,* 22 F.Supp.2d 331 (D.N.J.1998); *Planned Parenthood of Central New Jersey*

*v. Verniero,* 41 F.Supp.2d 478 (D.N.J.1998), affirmed, 220 F.3d 127 (3d Cir.2000); *Eubanks v. Stengel,* 28 F.Supp.2d 1024 (W.D.Ky.1998), affirmed, 224 F.3d 576 (6th Cir.2000) (per curiam); *Midtown Hospital v. Miller,* 36 F.Supp.2d 1360 (N.D.Ga.1997); *Planned Parenthood of Southern Arizona, Inc. v. Woods,* 982 F.Supp. 1369 (D.Ariz.1997); *Evans v. Kelley,* 977 F.Supp. 1283 (E.D.Mich.1997). In one of the cases decided by this court, *Hope Clinic v. Ryan, supra,* Dr. Hammond was both a plaintiff and an expert witness. *Hope Clinic v. Ryan,* 995 F.Supp. 847, 849–850 (N.D.Ill.1998). Yet in *none* of these many cases, so far as either we or the government is aware, was it so much as suggested that patient records might contain information that would help answer the question, crucial then as now, whether the D & X procedure is ever medically necessary.

Although Hammond is a plaintiff in the New York case, presumably because he actually performs D & X abortions and wants to be allowed to continue doing so, he will be testifying as an expert medical witness. Of all experts who testify in court, physicians are probably the most **\*932** common. Yet the government has cited to us no case before this one in which medical experts' patient records were used to impeach the expert (*Langley v. Coughlin,* 1989 WL 436675 (S.D.N.Y. June 19, 1989), rejected the attempt, in a helpful discussion), though in malpractice cases it is not uncommon to use redacted medical records bearing on the defendant's alleged negligence for impeachment, as in *Terre Haute Regional Hospital, Inc. v. Trueblood,* 600 N.E.2d 1358 (Ind.1992), and *Todd v. South Jersey Hospital System,* 152 F.R.D. 676, 684–85 (D.N.J.1993).

Were the government sincerely interested in whether D & X abortions are ever medically indicated, one would have expected it to seek from Northwestern Memorial Hospital statistics summarizing the hospital's experience with late-term abortions. Suppose the patients who undergo D & X abortions are identical in all material respects (age, health, number of weeks pregnant, and so on) to those who undergo procedures not forbidden by the Partial–Birth Abortion Ban Act. That would be potent evidence that the D & X procedure does not have a compelling health rationale. No such evidence has been sought, in contrast to *Planned Parenthood Federation of America, Inc. v. Ashcroft, supra,* at Transcript 26 (Mar. 5, 2004). A variant of the suggested approach would be to obtain a random sample of late-term abortion records from various sources and then determine, through good statistical analysis, whether the patient characteristics that lead Dr. Hammond to perform a

Case 1:23-cv-22629-RAR Document 18-4 Entered on FLSD Docket 12/01/2023 Page 25 of 90

Northwestern Memorial Hosp. v. Ashcroft, 362 F.3d 923 (2004)
58 Fed.R.Serv.3d 173, 64 Fed. R. Evid. Serv. 334

D & X lead other physicians to perform a conventional D & E instead, and whether there are differences in the health consequences for these two groups of women. If there are no differences, the government might have a good defense of the Act. Gathering records from Hammond's patients alone will not be useful; but if the government has *other* records (say, from VA hospitals) already in its files, then records of Hammond's procedures might enable a useful comparison. The government hasn't suggested doing anything like that either. Its motives in seeking individuals' medical records remain thoroughly obscure.

The question whether the D & X procedure is ever medically indicated will be resolved as a matter of legislative fact not requiring the taking of trial-type testimony at all (see *Hope Clinic v. Ryan, supra,* 195 F.3d at 885 (dissenting opinion)), or will pivot on the clash of expert witnesses at the New York trial, or perhaps, as suggested in *Stenberg,* will be answered by some combination of these two approaches to ascertaining facts. The medical records of expert witnesses are irrelevant to the first inquiry; and, so far as we can determine after having listened to the government's arguments at length, those records will not figure significantly in the resolution of experts' disagreements either.

The fact that quashing the subpoena comports with Illinois' medical-records privilege is a final factor in favor of the district order's action. As we held in *Memorial Hospital for McHenry County v. Shadur,* 664 F.2d 1058, 1061 (7th Cir.1981), comity "impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy." See also *United States v. One Parcel of Property Located at 31–33 York Street,* 930 F.2d 139, 141 (2d Cir.1991) (per curiam). Patients, physicians, and hospitals in Illinois rely on Illinois' strong policy of privacy of medical records. They cannot rely completely, for they are not entitled to count on the state privilege's being applied in federal court. But in a case such as this in which, so far as we can determine, applying the privilege would not interfere significantly with federal proceedings, **\*933** comity has required us not to apply the Illinois privilege, but to consider with special care the arguments for quashing the subpoena on the basis of relative hardship under Fed.R.Civ.P. 45(c).

Affirmed.

MANION, concurring in part, dissenting in part.

I agree with the court that HIPPA does not adopt state privilege law in a federal question suit brought in federal court, but rather Rule 501 of the Federal Rules of Evidence governs the evidentiary privileges applicable in such suits. Opinion at 925. I also agree that it is not for us to create a federal common law physician-patient privilege where none exists, and that the redacted medical records are not privileged. Opinion at 926. However, for several reasons, I disagree with the court's conclusion that enforcing the subpoena creates an undue burden under Fed.R.Civ.P. 45(c)(3)(A)(iv). In passing HIPPA, Congress recognized a privacy interest only in "individually identifiable medical records" and not redacted medical records, and HIPPA preempts state law in this regard. The "de-identification" (redaction) of all identifying information from the medical records and the extensive protective order in place also eliminates any privacy interest in the records. Additionally, not only are the records in this case relevant, as the court acknowledges, but they are highly probative of the underlying issue. Finally, contrary to the court's conclusion that quashing the subpoena occurs "at no substantial cost to federal substantive and procedural policy," both suffer greatly. This court should enforce the subpoena. I therefore concur in part and dissent in part.

As the court recognizes, in section 264 of HIPPA, Congress authorized the Secretary of Health and Human Services to promulgate regulations to protect the privacy of medical records. Opinion at 924 (*citing* 42 U.S.C. § 1320d–2). Therefore, HIPPA and the related regulations determine the privacy interests at stake. While tediously detailed, these regulations appear to have thoroughly considered and resolved the privacy concerns expressed by the hospital and the court.

Section 164.502, which sets forth the general rules for the use and disclosure of "protected health information," provides that "[a] covered entity may not use or disclose protected health information, except as permitted or required by this subpart or by subpart C of part 160 of this subchapter." 45 C.F.R. § 164.502(a). Before looking to the various exceptions, the initial question is whether the information sought in this case is "protected health information." The regulations define "protected health information" as "individually identifiable health information." 45 C.F.R. § 160.103. Both Congress and HHS define "individually identifiable health information" as information that "is created or received by a health care provider, health plan, employer, or health care clearinghouse; and relates to the past, present, or future physical or mental health or condition of an individual, the provision of health

care to an individual, or the past, present, or future payment for the provision of health care to an individual, *and-(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe the information can be used to identify the individual.*" 42 U.S.C. 1320d(6); 45 C.F.R. § 160.103 (emphasis added).

In this case, the government seeks only redacted medical records and agrees that all identifying information may be removed before Northwestern makes the records available for its review. Because the records will be redacted, they will not identify the individual. Nor is there a reasonable **\*934** basis to believe that the information can be used to identify the individual. Section 164.514(b) confirms the latter conclusion. Section 164.514(b)(2)(i) sets forth specific identifiers which, if removed, "de-identify," the health records:

(A) Names;

(B) All geographic subdivisions smaller than a State, including street address, city, county, precinct, zip code, and their equivalent geocodes, except for the initial three digits of a zip code if, according to the current publicly available data from the Bureau of the Census:

  (1) The geographic unit formed by combining all zip codes with the same three initial digits contains more than 20,000 people; and

  (2) The initial three digits of a zip code for all such geographic units containing 20,000 or fewer people is changed to 000.

(C) All elements of dates (except year) for dates directly related to an individual, including birth date, admission date, discharge date, date of death; and all ages over 89 and all elements of dates (including year) indicative of such age, except that such ages and elements may be aggregated into a single category of age 90 or older;

(D) Telephone numbers;

(E) Fax numbers;

(F) Electronic mail addresses;

(G) Social security numbers;

(H) Medical record numbers;

(I) Health plan beneficiary numbers;

(J) Account numbers;

(K) Certificate/license numbers;

(L) Vehicle identifiers and serial numbers, including license plate numbers;

(M) Device identifiers and serial numbers;

(N) Web Universal Resource Locators (URLs);

(O) Internet Protocol (IP) address numbers;

(P) Biometric identifiers, including finger and voice prints;

(Q) Full face photographic images and any comparable images; and

(R) Any other unique identifying number, characteristic, or code, except as permitted by paragraph (c) of this section; 45 C.F.R. § 164.514(b)(2)(i).

Once these identifiers are redacted, the medical records are no longer "individually identifiable health information." 45 C.F.R. § 164.514(a).[1] Under HIPPA and the implementing regulations, there is no protected privacy interest in non-identifiable health information. Again, the regulations confirm this conclusion. 45 C.F.R. § 164.502(d)(2) provides:

[1]    The government does not object to the removal of these identifiers and in fact has consented to redaction beyond that required by Section 164.514(b)(2)(i), for instance by agreeing that Northwestern may delete the state of residence. The fact that the regulations allow the disclosure of the patient's state disproves Northwestern's assertion that, because the Hospital is located in Chicago, the patients could be identified since they would be assumed to be from Illinois. Such an assumption is unreasonable given that HIPPA allows for that very disclosure, while still treating the records as de-identified. But in any event, the government does not request that information.

*Uses and disclosures of de-identified information.* Health information that meets the standard and implementation specifications for de-identification under § 164.514(a) and (b) is considered not to be individually identifiable health information, i.e., de-identified. The requirements of this subpart *do not* apply to information that has been de-identified in accordance with the applicable requirements of § 164.514 .... 45 C.F.R. § 164.502(d)(2) (emphasis added).

Northwestern Memorial Hosp. v. Ashcroft, 362 F.3d 923 (2004)

58 Fed.R.Serv.3d 173, 64 Fed. R. Evid. Serv. 334

**\*935**  Because the government seeks only redacted records that are not individually identifiable, under HIPPA there is no privacy interest in those records. However, even if the records were "individually identifiable," they would still be subject to the general privacy rules governing use and disclosure of protected health information set forth in § 164.502. As noted above, the privacy protection afforded in that section provides several exceptions. 45 C.F.R. § 164.502(a) ("A covered entity may not use or disclose protected health information, *except as permitted* or required by this subpart or by subpart C of part 160 of this subchapter.") (emphasis added). Of relevance here is 45 C.F.R. 164.512(e)(1)(i), which authorizes the disclosure of protected health information pursuant to a court order. In this case, the government obtained a court order authorizing the disclosure of the medical records. Under the regulations, such an order negates any need to redact identifying information.[2] 45 C.F.R. § 164.512(e)(1)(i). Yet, as the government stressed at oral argument, it has no need for, nor desire to know, the individual identities of the patients. Therefore, it is only seeking the relevant redacted medical records. Such redacted records are afforded no privacy protection under HIPPA, logically so because the redacted records have no identifiably private information to expose. And although Illinois law has adopted an expansive view of privilege that includes redacted medical records, as the court recognizes, Illinois law does not govern this question.

[2]    As the court also recognizes, the government did not need a court order in this case because it obtained a protective order securing the confidentiality of the redacted records. Opinion at 925. Thus, the government complied with the privacy protections established by HIPPA in three independent ways: by obtaining a court order; by obtaining a protective order; and by seeking only redacted records.

That should end the inquiry. But instead the court resurrects the privacy question through the "undue burden" language of Fed.R.Civ.P. 45(c)(3)(A)(iv). Rule 45(c)(3)(A)(iv) provides that a court may quash or modify a subpoena if it "subjects a person to undue burden." Fed.R.Civ.P. 45(c)(3)(A)(iv). In the court's view, compliance with the subpoena would impose an undue burden (i.e. "potential psychological cost") on the women whose redacted records were subpoenaed. Such an undue burden exists, according to the court, because the potential loss of privacy outweighs the probative value of the medical records. *See* opinion at 927 (stating that the Illinois district court's finding that the "potential loss of privacy that would ensue were these medical records used in a case in which the patient was not a party ... outweighs the loss to the government through non-disclosure" is "solidly based"). This conclusion is wrong on several levels.

Initially, to reiterate, HIPPA and the implementing regulations recognize that there is no loss of privacy where the medical records are redacted (or in HIPPA jargon, "de-identified"). Nor is it reasonable to believe that the unidentified 45 women have "acquaintances ... who will put two and two together, 'out' the 45 women, and thereby expose them to threats, humiliation, and obloquy." Opinion at 929. In fact, there is no reason to believe that the women themselves have any idea that their records are among the few sought by the government in this case.[3] But even if they knew,[4] no one else  **\*936**  ever would, because all of the information that could reasonably be used to identify them will be redacted, *see* 45 C.F.R. § 164.514(b)(2)(i), and none of the information—not even the redacted non-identifying information—will ever be made public, much less paraded in court or placed on the Internet within the reach of "skillful Googlers." Opinion at 929. That is guaranteed by the additional security of the protective order entered in this case in the Southern District of New York. *See, e.g., Reproductive Serv., Inc. v. Walker,* 439 U.S. 1307, 1308, 99 S.Ct. 1, 58 L.Ed.2d 16 (1978) (Brennan, J., in chambers) (dissolving stay of subpoena seeking abortion records of non-party patients on condition that patient names were redacted and parties agreed to a protective order to ensure privacy of all patients).

[3]    Even if some are aware of the subpoena, there is nothing in the record to support the conclusion that "[t]he women whose records these are do not want them collected and examined by the Department of Justice and presented in evidence in the New York trial." Opinion at 927.

[4]    Notwithstanding the court's discussion of the notice procedures of HIPPA, see opinion at 926, HIPPA does not require notice where a court order authorizes disclosure, 45 C.F.R. § 164.512(e)(1), where there is a protective order in place, 45 C.F.R. § 164.512(e)(1)(ii)(B), or where the records are redacted, 45 C.F.R. § 164.502(d)(2).

The court's erroneous conclusion that a privacy interest exists in the redacted documents leads to the unnecessary attempt to assess the probative value of the evidence. Notably, the district court (Judge Kocoras) did not reach the undue burden of compliance issue of Fed.R.Civ.P. 45(c)(3)(A)(iv). In the interest of time, with the trial date at hand, the court bypassed a remand and accepted the district court's findings on the privilege issue and applied them to the undue burden question.

Case 1:23-cv-22629-RAR   Document 18-4   Entered on FLSD Docket 12/01/2023   Page 28 of 90

Northwestern Memorial Hosp. v. Ashcroft, 362 F.3d 923 (2004)

58 Fed.R.Serv.3d 173, 64 Fed. R. Evid. Serv. 334

It then in effect agrees with the district court that there is little if any probative value in the requested documents. Based on the complaint, Dr. Hammond's declaration, the congressional findings when it passed the law, and the arguments made by the government and the hospital (both very limited since privilege, not probative value, was the issue argued below), there is significant probative value. But that is not for us to decide, as the probative value of the evidence has already been determined. District Court Judge Casey, who is presiding over the underlying case, believes the information is relevant, so much so, that he has indicated that if it is not produced, he would consider lifting the stay and dismissing the case (or at least dismissing Dr. Hammond from the case). This should also make clear that Judge Casey believes the evidence is not just relevant "in the attenuated sense," opinion at 930, but highly probative to the difficult question he will face starting on March 29. If any deference is owed, it is to the presiding judge—the judge who handled this case pre-trial and who knows the arguments presented by both sides, and the judge who will need all (non-privileged) relevant evidence available to allow him to make the necessary factual findings to determine this difficult and contentious constitutional case.

However, while recognizing that "[t]he merits of the dispute are for determination at trial," opinion at 927, the court nonetheless interjects its own theory of the case and its own judgment of the probative value of the evidence. For instance, the court states: "What the government would like to show, in refutation of Dr. Hammond's impending testimony, is that D & E is always an adequate alternative, from the standpoint of a pregnant woman's health, to the D & X procedure. The government has failed to explain how the record of a D & X abortion would show this." Opinion at 930. But the government's document request was not so structured: The government did not ask for the records of the D & X abortions identified by Dr. Hammond, but rather requested the redacted medical records of patients who had abortions—both the D & E and D **937 & X variety—for the reasons asserted by Dr. Hammond as justifying a partial-birth abortion. For instance, Dr. Hammond stated that he sometimes performed abortions for women to protect their health after they learned that "their fetuses have anomalies that are often quite severe." Declaration ¶ 4. The government requested the patient records for 2003 of any women who had an abortion during their 19th or 20th week of pregnancy, (whether partial-birth or D & E) for that reason. Interrogatories 1 At 3; Document Request at 7. As the government explained at oral argument, those records are highly relevant to the question of medical necessity because, if they show that Dr. Hammond did not regularly

perform partial-birth abortions under those circumstances, that would demonstrate that Dr. Hammond does not believe a partial-birth abortion is necessary to protect the women's health. Of course, there could be some variations in the medical conditions of the individual cases that explain why Dr. Hammond used a different method, but Dr. Hammond remembers few, if any, of the circumstances surrounding the abortions. Opinion at 928. Thus, the only way the government (and the trial judge) can assess Dr. Hammond's contention that partial-birth abortions are medically necessary to protect the women's health is to review the medical records of the patients with the conditions that Dr. Hammond referenced.

The court rejects this theory, stating: "But such information would be unlikely to be found in *Hammond's* records in view of his strongly expressed preference for using the D & X method on patients in fragile health. It would be much more likely to be found in the records, not sought by the government, of physicians who perform D & E rather than D & X abortions on such women." Opinion at 927. But that is exactly the point: The government does not know what is to be found in Dr. Hammond's medical records. It only knows what could be found there—evidence that, notwithstanding Dr. Hammond's declaration that he strongly prefers using the D & X method of abortion on patients in fragile health, in practice, he does not use that procedure. Such evidence would be highly probative, as the court itself implies by recognizing it "would be unlikely to be found in *Hammond's* records in view of his strongly expressed preference for using the D & X method."

In fact, the relevance here cannot be overstated: Congress made explicit findings that a partial-birth abortion is never medically necessary to protect a women's health. Yet, Dr. Hammond claims Congress is wrong. The court concisely lays out Dr. Hammond's argument: In a D & X (partial-birth) abortion, "the fetus is destroyed after the lower extremities, and sometimes the torso, have emerged from the womb and only the head remains inside," and this, according to Dr. Hammond is safer then the D & E procedure, where "the fetus is destroyed while it is still entirely within the womb .... Opinion at 927. Dr. Hammond seeks to testify accordingly, and it is therefore imperative that the government be able to determine the veracity of his testimony. There is no better way than by determining if Dr. Hammond's actual practice supports his testimony. And this is not a question only of impeachment, but rather concerns the heart of this case.

Case 1:23-cv-22629-RAR Document 18-4 Entered on FLSD Docket 12/01/2023 Page 29 of 90

Northwestern Memorial Hosp. v. Ashcroft, 362 F.3d 923 (2004)

58 Fed.R.Serv.3d 173, 64 Fed. R. Evid. Serv. 334

Moreover, as the government explained during oral argument, the medical records are highly relevant to its case because its experts must be able to review Dr. Hammond's files to determine whether, in their expert opinion, a D & X procedure was the most appropriate procedure, as Dr. Hammond claims. The court recognizes that "[t]he need for a health exception to the ban in the Partial–Birth Abortion Ban Act will pivot on the clash of expert witnesses **\*938** in the New York trial." Opinion at 931. Yet, the court refuses to recognize the importance of the redacted records to the government's case, even after the government explained the need for its experts to review the files to form independent expert opinions.

The medical records are also highly relevant to a second congressional finding, namely, that a "partial-birth abortion poses serious risks to the health of a woman undergoing the procedure." 117 Stat. 1201. Congress detailed numerous risks it found posed by partial-birth abortions. Although the government did not point this out during oral argument, Northwestern's attorney alerted the court to the fact that the medical records will show whether there were any complications from the abortion, and this evidence is highly probative to the underlying constitutional challenge.[5]

[5]    Northwestern also acknowledged another point of relevancy during questioning: When asked whether the records could possibly demonstrate that the woman's life —and not just her health—was at risk, Northwestern's attorney responded, "yes, but that would help the other side." This case is not about sides, but about the document request, and providing the district court with the evidence it needs to resolve the constitutional question before it.

The court also questions whether the government sincerely wants to determine "whether D & X abortions are ever medically indicated," because the government did not seek summary statistics of all circumstances in which such abortions are performed. Opinion at 929. But as the government pointed out at oral argument, it was trying to limit the burden on Northwestern by confining its document request to those specific situations where Dr. Hammond claimed a partial birth abortion was necessary to preserve the mother's health. *See* Fed.R.Civ.P. 45(c)(1) ("A party or attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena."). And it succeeded, maybe even better than the government had hoped: During oral argument, the government learned for the first time that there are only 45 records that satisfy

its document request. Given that Dr. Hammond stated in his declaration that he performs, teaches or supervises about 300 abortions a year, and that the government sought the records for a two- to three-year time frame, it probably surprised the government to learn that there were only 45 relevant records, with the rest apparently unrelated to the mother's or fetus's health.

In any event, the limited scope of the document request, and the government's agreement to redact the records—something not required by HIPPA—if anything, refutes any questioning of the government's motives or the court's implication that the government is on a fishing expedition. Opinion at 930. Although contradictory, the court also chastises the government for not asking for enough records, implying that since the government did not ask for all relevant documents, the documents it did request were somehow less than relevant. Granted, there were many more relevant records that the government did not seek, but the government should not be impugned for prudently limiting its document request to those few medical records Dr. Hammond directly referenced.[6]

[6]    The court also charges the government with being evasive on the question of the probative value of the medical documents. Opinion at 927. It is true that the government's main focus was not on the probative value of the medical records, but that is neither surprising nor nefarious, given the arguments below and the district court's ruling. The district court in this case ruled that Illinois privilege law governed and not HIPPA. The question of the relevance and probative value of the documents was not central to the question of whether Illinois privilege law applied. This court appropriately reversed the district court on the privilege issue without delving into the question of relevance. Thus, it is not surprising that the government's opening brief did not focus on the relevancy of the documents. Moreover, although Northwestern argued below that the documents were not relevant, it did so in the context of arguing for a federal common law doctor-patient privilege. On appeal, the government did not need to argue relevancy to address that legal issue, and in fact, this court again appropriately rejected the idea of a federal common law privilege without addressing the question of relevance. Relevance only became relevant once the court discounted the import of HIPPA *de*-identification and looked to a balancing test under Rule 45(c)(3) (A)(iv). Again, that the government's opening brief did not focus on this question is not surprising given that Northwestern's Rule 45(c)(3)(A)(iv) undue burden argument below was limited to three short paragraphs,

and the only tangential reference to relevance in its opening brief came from this sentence: "The Attorney General's subpoena is an unacceptable intrusion into the privacy of the Hospital's patients, promising no significant contribution to the ascertainment of truth in *NAF v. Ashcroft.*" Memorandum in Support of Northwestern Memorial Hospital's Motion to Quash Subpoena at 20. After Northwestern changed direction on appeal, to argue that the production of the records constituted an undue burden because the records were not relevant, the government responded at length in its reply brief. *See* Appellant's Reply Brief at 8—11. At oral argument, the government also elaborated on the relevance of the documents, not in a vague or evasive way, but by specifically demonstrating that the medical records are *both* relevant and highly probative of the issues in the underlying case. *See supra* at 8—10.

 **\*939** That brings us back to the question of undue burden, which, along with HIPPA, should have been the focus of the narrow question before the district court and this court in this case. Under Rule 45, a court may quash a subpoena where it creates an undue burden. There is no such burden in this case because HIPPA establishes that there is no privacy interest in redacted records and those records are highly relevant to the constitutional challenge to the Partial Birth Abortion Ban Act. The only burden identified by the court seems to be a "potential psychological cost." Opinion at 927. Even assuming that is the kind of "burden" Rule 45 contemplates, reliance on that as a burden in effect creates a privilege where none exists.[7]

[7]      Northwestern does not claim that it is an undue burden to comply with the subpoena because it is too costly, difficult or time consuming to produce the redacted records, only that it may negatively impact its reputation with past and future patients. The court agrees, calling

it a "potential cost in lost goodwill," opinion at 930, because Northwestern "will lose the confidence of its patients, and persons with sensitive medical conditions may be inclined to turn elsewhere for medical treatment." Opinion at 929. However, this is not an authentic "cost," because the same federal regulations apply equally to all hospitals. These regulations put all hospitals on the same footing, thus negating any basis for a patient rejecting a hospital's care because a federal court orders the production of redacted records pursuant to a federal regulatory standard.

Finally, contrary to the court's conclusion, quashing the subpoena in this case does come at a "substantial cost to federal substantive and procedural policy." The court's ruling may well be the death knell for Dr. Hammond's claim, as the district court made clear that it believed the records relevant and that it would consider dismissing the case if the records were not produced. Given that the government cannot adequately cross-examine Dr. Hammond, the district court would be well within its rights to bar Dr. Hammond's testimony, which will not only harm his case, but also the other plaintiffs'. The court's decision also comes at a substantial cost to the federal policy adopted by HIPPA. Lastly, and most significantly, it comes at a cost to the truth of Congress' **\*940** findings that a partial-birth abortion is never necessary to protect a woman's health and poses significant health risks, and to the constitutionality of such a law. For these and the foregoing reasons, I would enforce the subpoena to produce the designated records.

**All Citations**

362 F.3d 923, 58 Fed.R.Serv.3d 173, 64 Fed. R. Evid. Serv. 334

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

229 F.Supp.3d 1277
United States District Court, S.D. Florida,
Miami Division.

Anitra SHERLOCK, Plaintiff,

v.

FONTAINEBLEAU, Defendant.

Donna Incardone, et al., Plaintiffs,

v.

Royal Caribbean Cruises, Ltd., Defendant.

CASE NO: 15–CIV–24593 LENARD/GOODMAN,
CASE NO: 16–CIV–20924–MARTINEZ/GOODMAN
|
Signed 01/18/2017

**Synopsis**
**Background:** In first of two unrelated cases, former employee brought action against employer under Title VII, alleging national origin discrimination and retaliation, and seeking damages for emotional distress. In second case, cruise passengers brought putative class action alleging that ship negligently sailed into path of storm, and seeking damages for permanent bodily injuries or impairments, aggravation of pre-existing mental or physical conditions, and mental and emotional harm and distress. In both cases, defendants sought discovery of plaintiffs' medical records.

**[Holding:]** The District Court, Jonathan Goodman, United States Magistrate Judge, held that plaintiffs and defendants would be required to jointly prepare proposed orders for third-party medical providers' disclosure of plaintiffs' medical records under the steps outlined in the Health Insurance Portability and Accountability Act (HIPAA), and plaintiffs' use of medical evidence in the proceedings would be limited to topics included in jointly submitted HIPAA orders.

Submission of joint orders required in each case.

West Headnotes (4)

**[1]** **Federal Civil Procedure** 🔑 Medical and hospital reports and records

During discovery, a defendant is entitled to the production of medical records that have a logical connection to the plaintiff's claim of injuries. Fed. R. Civ. P. 34.

6 Cases that cite this headnote

**[2]** **Privileged Communications and Confidentiality** 🔑 Health information statutes and regulations

Under the Health Insurance Portability and Accountability Act (HIPAA), the filing of a lawsuit does not waive the confidentiality of health information, and unless the patient gives written consent the medical provider may only disclose confidential health information under the steps outlined in the HIPAA. 45 C.F.R. § 164.512(e)(1).

1 Case that cites this headnote

**[3]** **Privileged Communications and Confidentiality** 🔑 Health information statutes and regulations

Plaintiffs who placed their physical or mental health in issue, i.e., a former employee who brought a Title VII action seeking damages for emotional distress and cruise passengers seeking damages for physical and mental injuries arising from alleged negligence in sailing into a storm, and defendants, would be required to jointly prepare a proposed order for third-party medical providers' disclosure of plaintiffs' medical records under the steps outlined in the Health Insurance Portability and Accountability Act (HIPAA), and plaintiffs would not be able to use at trial, or for any other purpose in the lawsuits, any medical records or testimony, including expert testimony, unless the topic was included in the jointly submitted HIPAA order; in that way, plaintiffs would not be tempted to adopt an unreasonably tight scope of the issues

relating to their alleged injuries. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 45 C.F.R. § 164.512(e)(1); Fed. R. Civ. P. 34.

5 Cases that cite this headnote

**[4]    Privileged Communications and Confidentiality ☞ Acts constituting waiver**

Former employee, by waiving, with respect to three health care providers, her privacy rights under the Health Insurance Portability and Accountability Act (HIPAA) with respect to her medical records, did not waive those privacy rights with respect to medical records from all of her health care providers, in action against employer under Title VII, seeking damages for emotional distress. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1278** Dwon Anaise–Anaise I. Huggins, South Florida, FL, for Plaintiff.

Christopher Patrick Hammon, Gregory Robert Hawran, Ogletree Deakins Nash Smoak & Stewart PC, Miami, FL, for Defendant.

## ORDER CONCERNING COURT'S ABILITY TO REQUIRE PLAINTIFFS TO SIGN HIPAA MEDICAL AUTHORIZATION FORMS

Jonathan Goodman, UNITED STATES MAGISTRATE JUDGE

The parties in both cases designated above are simultaneously involved in an identical discovery issue: whether the Court can require Plaintiffs to sign a HIPAA[1] medical authorization form for the release of medical records from third party healthcare providers because they have placed the physical and/or mental conditions at issue. In fact, the discovery hearings in these two otherwise unrelated cases fortuitously occurred on the very same afternoon. All parties in both cases filed supplemental legal memoranda analyzing **\*1279**

the same issue. Rather than write two separate opinions discussing the same legal issues, the Undersigned decided it would be more efficient to simply issue one order applicable to both cases.

[1]    HIPAA refers to the Health Insurance Portability and Accountability Act of 1996.

As all parties recognize, there is no binding legal authority. Neither the United States Supreme Court nor the Eleventh Circuit Court of Appeals has decided the issue. This results in a scenario where the parties are relying on non-binding cases (from district courts both within and out of this Circuit and from different circuit courts as well). Some courts say that federal trial courts lack authority to require a plaintiff to sign a HIPAA authorization even when the plaintiff's physical or mental condition is at issue; some say that Federal Rules of Civil Procedure 34 and 37 collectively generate the requisite authority; some hold that courts are appropriately authorized without analyzing the specific reasons underlying the order compelling compliance; and some hold that trial courts are empowered to issue a HIPAA order pursuant to 45 C.F.R. 164.512(e)(1)—which is distinct from an order requiring a plaintiff to sign a broad HIPAA authorization.

The plaintiffs and the defendants, in both cases, have both offered sound policy reasons to support their positions. Given the lack of precedent and the competing policy rationales, the Undersigned is adopting a practical result. As outlined below, this result avoids the need to conclusively decide whether a federal trial court can force a plaintiff to waive the plaintiff's HIPAA-based right to medical records privacy by compelling a signed HIPAA authorization. However, the ruling here also simultaneously provides protection to defendants (who will be able to obtain relevant medical records and who will not be sandbagged at trial or other stages of the litigation with alleged medical or emotional/mental damages which cannot be adequately probed through a medical records assessment).

By way of summary, the parties will jointly submit a proposed order which the Undersigned will execute pursuant to the federal HIPAA regulation. The order will encompass the relevant medical records at issue in the specific lawsuit but will not be a broad and sweeping authorization for all medical records dating back to an unreasonably old date for each plaintiff's medical history. The defendants, in each case, will be able to attach this court order to subpoenas issued to the healthcare providers. The subpoenas will be limited to the specific topics permitted by the order.

In addition, the plaintiffs, in each case, will not be permitted to introduce evidence at trial or other stages of the case concerning medical/emotional/mental health issues beyond the topics authorized by the HIPAA order. Likewise, they will not be permitted to use any expert testimony on those beyond-the-HIPAA-order issues for any purpose. Therefore, the plaintiffs will, in effect, be the master of the discovery obtained from third party healthcare providers concerning their alleged damages.

If the plaintiffs, in each case, permit only a crabbed and blinkered inquiry into their records and refuse to agree to an order providing broader discovery, then they will undermine their ability to collect damages. If, on the other hand, they agree to the submission of a comparatively broad HIPAA order permitting discovery into myriad medical and mental health issues, then they will not risk an order foreclosing them from pursuing damages for certain alleged injuries.

### Factual Background

*Sherlock v. Fontainebleau, Case No. 15–24593*

Plaintiff Anitra Sherlock field a lawsuit against her former employer, Defendant Fontainebleau Florida Hotel, LLC, alleging national origin discrimination and retaliation **\*1280** under Title VII and 42 U.S.C. § 1981. Plaintiff Sherlock's Complaint seeks damages, *inter alia*, for "suffering, mental anguish, loss of enjoyment of life, and other non-pecuniary losses." [ECF No. 32, p. 13]. During discovery, on July 22, 2016, Defendant Fontainebleau asked Plaintiff Sherlock to identify medical providers from whom she sought treatment and for production of medical records related to the treatment. Plaintiff Sherlock objected based on relevance.

Following a discovery hearing, the Court issued a post-hearing administrative Order on November 1, 2016 and instructed Plaintiff Sherlock to clarify whether her claim for emotional distress/mental anguish was limited to the normal embarrassment and humiliation associated with being harassed at work or whether Plaintiff Sherlock was seeking other types of damages (such as depression, anxiety, high blood pressure, inability to sleep well, etc.). [ECF No. 48, pp. 1–2]. If the latter, then Plaintiff Sherlock would be required to disclose her medical history. On November 11, 2016, Plaintiff Sherlock served her supplemental interrogatory answer, identifying seventeen providers from whom she sought treatment during the relevant period. Plaintiff Sherlock

also produced approximately sixty pages of medical records related to these seventeen providers.

Seeking to ensure that it had *all* records related to Plaintiff Sherlock's treatment, Defendant Fontainebleau asked Plaintiff Sherlock to execute HIPAA releases for each of the providers. In response, Plaintiff Sherlock executed only three waivers and refused to sign the remaining fourteen. Defendant Fontainebleau contends that the Court has legal authority to compel Plaintiff Sherlock to sign HIPAA authorizations and that, even if it does not, then Plaintiff Sherlock waived her medical records privacy interest by signing three waivers. Plaintiff Sherlock disagrees with both contentions.

*Incardone v. Royal Caribbean, Case No. 16–20924*

There are twenty-three plaintiffs to this personal injury action, which arises from a cruise aboard the "Anthem of the Seas" and is brought by a group of forty families with children that have Autism Spectrum Disorder ("ASD"). According to the Amended Complaint, Defendant Royal Caribbean decided to sail the cruise ship into the path of a storm with hurricane force winds even though the National Ocean/Land Atmospheric Administration warned of severe conditions in the ship's route. [ECF No. 30, p. 4]. Also, the amended complaint describes itself as a class action and the plaintiffs allege that they were permanently "injured about their bodies and extremities," suffered "permanent physical disability," "impairment," the "aggravation of pre-existing neurological conditions," "suffered additional physical handicap," and that they will need "life care" as a result. [ECF No. 30, pp. 10–13].

The plaintiffs collectively claim that Defendant Royal Caribbean's negligence caused them severe mental and emotional harm and distress, resulting in physical manifestations such as "sickness, nausea, exhaustion, fatigue, headaches, insomnia, lack of sleep, poor sleep, nightmares and aggravation of pre-existing neurological conditions." [ECF No. 30, p. 11]. Many of the plaintiffs have stated in written discovery that they were diagnosed with Post–Traumatic Stress Disorder ("PTSD") as a result of the incident, as well as anxiety, depression, and insomnia.[2] Others have indicated **\*1281** that they are unsure of whether they have been diagnosed with a condition.[3] And the majority of the plaintiffs have indicated that they suffer from a pre-existing mental or physical condition.[4]

2      Plaintiffs Jenaire Feimster, Casey Haus, Angella
       Capurro, and Fernando Capurro claim to have been
       diagnosed with PTSD as a direct result of the incident.
       Casey Haus also claims a diagnosis of anxiety,
       depression, and insomnia as a result. Plaintiff Panagoula
       Efthimiou claims a diagnosis of anxiety disorder as a
       result of the incident.

3      Plaintiffs Briana Garland, Christopher Garland,
       Christian Savage–Pietz, Ricky Savage–Pietz, Shaden
       Savage–Pietz, Teriana Savage Pietz are unsure of
       whether or not they have received a diagnosis as a result
       of the incident.

4      The pre-existing conditions run the gamut of ASD,
       mental anguish, anxiety, pervasive developmental
       disorder, attention-deficit hyperactive disorder, severe
       autism, fetal alcohol syndrome, cerebral palsy, asthma,
       depression, and thyroid disorder.

Defendant Royal Caribbean requested medical records from the plaintiffs in Requests for Production. The records were not produced because the plaintiffs do not have them. Defendant Royal Caribbean sent records subpoenas to the plaintiffs' out-of-state medical providers and Defendant Royal Caribbean represents that several of them have been rejected for failure to contain a signed HIPAA authorization. Defense counsel asked opposing counsel for HIPAA authorizations for each plaintiff, as he believes it is the most reasonable, convenient, judicially expeditious, and fair method to obtain records for the twenty-three plaintiffs. Plaintiffs' counsel refused.

At a January 6, 2017 discovery hearing, Plaintiffs' counsel argued that Defendant Royal Caribbean is not entitled to a court order requiring them to sign HIPAA authorizations and that Defendant Royal Caribbean should not be able to review them in any event without the plaintiffs having an advance opportunity to screen and selectively produce certain documents and records. In their post-hearing memorandum, though, the plaintiffs appear to have abandoned the "we-want-to-first-review-the-documents-before-they-are-sent-to-defense-counsel" position, as it is not mentioned at all. Nevertheless, the Court is not convinced by the argument and would not have adopted it.

## Applicable Legal Principles and Analysis

All parties in both lawsuits agree that the plaintiffs have placed their physical and mental health at issue. But the plaintiffs in the Royal Caribbean lawsuit contend that they "have not brought every facet of their medical history

from birth into question." [ECF No. 48, p. 2]. In addition, the plaintiffs challenge the efforts which Defendant Royal Caribbean has made, arguing that it attempted only four subpoenas and that the record does not reflect actual refusals from the healthcare providers themselves—only written notice from the process servers summarizing the position of the particular health care provider served with a subpoena.

All parties agree that there is no binding precedent in the Eleventh Circuit. In addition, the parties acknowledge that there is a split of authority across the country. *See generally Cameron v. Supermedia, LLC,* No. 4:15cv315-MW/CAS, 2016 WL 1572952, at *3 (N.D. Fla. Apr. 19, 2016) ("The law governing discovery of a plaintiff's medical records for purposes of emotional distress damages ... is, frankly, all over the map"); *see also Cupp v. United States,* No. CV512-005, 2015 WL 510134, at *3 (S.D. Ga. Feb. 6, 2015) (noting no on-point ruling from the Eleventh Circuit but further noting that several district courts have recognized that a court has authority to require a plaintiff to sign HIPAA authorization form); *cf. Chase v. Nova Se. Univ., Inc.* No. 11-61290-CIV, 2012 WL 1936082, at *1 (S.D. Fla. May 29, 2012) **\*1282** (denying motion to compel execution of medical release forms, and explaining that "[t]his Court agrees with the courts that have ruled that they do not possess the authority to routinely require a plaintiff to execute a release for medical records") (citations omitted);[5] *Wymore v. Nail,* No. 5:14–CV–3493, 2016 WL 1452437, at *3 (W.D. La. Apr. 13, 2016) ("Rule 34, along with rule 37, empowers federal courts to copel parties to sign written authorizations consenting to the production of various document.s").

5      Defendant Royal Caribbean contends that *Chase* is
       inapplicable because it was an ADA discrimination
       action seeking declaratory and injunctive relief,
       not a personal injury action, which "did not
       contemplate claims of negligent infliction of emotional
       distress." [ECF No. 49, p. 6].

From the practical perspective, some courts have recognized that "federal courts have held that obtaining a party's written consent for the release of medical records 'represents the least expensive and most efficient means of procuring information from medical or counseling providers.'" *Equal Emp't Opportunity Comm'n v. Sheffield Fin. LLC,* No. 1:06CV00889, 2007 WL 1726560, at *6 (M.D.N.C. June 13, 2007) (citation omitted). On the other hand, some courts are not persuaded by the efficiency argument. *See e.g., Miller v. Kastelic,* No. 12-cv-02677, 2013 WL 4431102, at *3 (D. Colo. Aug. 16, 2013) ("authorization for the

release of medical records should not be routinely compelled, even when it may be the most efficient manner for such discovery").

**[1]** To be sure, "[a] defendant is entitled to the production of medical records that have 'a logical connection to the Plaintiff's claim of injuries.' " *Cameron,* 2016 WL 1572952, at *3 (citation omitted). But Federal Rule of Civil Procedure 34[6] "does not expressly authorize a court to order a party to sign a release concerning any kind of record." *Echon v. Sackett,* 14–cv–03420, 2016 WL 1732708, at *1 (D. Col. May 2, 2016) (regarding analogous demand that party sign a Freedom of Information Act release). Nevertheless, some courts still rely on Rule 34 while others hold that it is insufficient to justify an order compelling a HIPAA authorization. *Compare Doye v. Martin,* No. CV408-174, 2010 WL 3463614, at *2 n.2 (S.D. Ga. Aug. 31, 2010) (compelling execution of medical release), *with Klugel v. Clough,* 252 F.R.D. 53, 54–55 (D.D.C. 2008) (finding that a Rule 34 request for production of documents cannot be used as a vehicle to compel a party to sign a medical records release).

[6]   Some courts rely upon Rule 34 as authority providing a trial court with power to require a plaintiff to sign a HIPAA release authorization. *Zaffis v. City of Altamonte Springs,* No. 6:06-cv-385, 2007 WL 1796255, at *2–4 (M.D. Fla. May 10, 2007).

Given the absence of controlling authority and the broad discretion afforded to trial courts in discovery matters, the Undersigned is persuaded by the approach used by the magistrate judge in *Graham v. S Carroll,* No. 5-10-cv-65, 2011 WL 855331, at *2 (N.D. Fla. Mar. 9, 2013).

**[2]** In *Graham,* the plaintiff refused the defendants' request to sign a HIPAA release. While ruling on the defendants' motion to compel the execution of the HIPAA release, the *Graham* court acknowledged that the plaintiff placed his medical condition at issue by alleging he suffered injuries due to the defendants' actions—yet also emphasized that, "under HIPAA the filing of a lawsuit does not waive the confidentiality of health information, and unless the patient gives written consent the medical provider may only disclose confidential health information under the steps outlined in HIPAA." *Id.* According to *Graham,* the defendants could "obtain a **\*1283** court order which allows the health care provider to disclose 'only the protected health information

expressly authorized by such order.' " *Id.* (citing 45 C.F.R. 164.512(e)(1)(i)).[7]

[7]   This regulation provides, in part, as follows:

(e)  Standard: Disclosures for judicial and administrative proceedings—

(1)  Permitted disclosures. A <u>covered entity</u> may disclose <u>protected health information</u> in the course of any judicial or administrative proceeding:

(i) In response to an order of a court or administrative tribunal, provided that the <u>covered entity</u> discloses only the <u>protected health information</u> expressly authorized by such order; or

(ii) In response to a subpoena, discovery request, or other lawful process, that is not accompanied by an order of a court or administrative tribunal[.]

45 C.F.R. 164.512(e) (emphasis added).

Similar to *Graham,* the *Cameron* Court held that "[i]f a party refuses to sign a release for discoverable medical records, a requesting party must comply with the procedures set forth in [HIPAA] and implementing regulations.... **A court order** under that provision would issue from this Court. *See* Fed. R. Civ. P. 45(a)(2)." 2016 WL 1572952 at *6 n. 9 (emphasis added).

**[3]** Under the HIPAA regulations, a health care provider is authorized to produce records in response to a subpoena accompanied by a court order. Therefore, the plaintiffs' healthcare providers in both lawsuits should produce records when served with a records subpoena accompanied by a court order. The parties are more familiar than the Undersigned with the specific medical and mental health issues involved in this case, so they are in the best position to craft the order under 45 C.F.R. 164.512(e)(1).

**[4]** Once the Undersigned uploads an order in each case, then each defendant will be able to successfully serve a records subpoena on the health care providers. Because there will be a specific court order pinpointing the precise information to be produced, the health care provider should **not** refuse to produce records by saying a further HIPAA authorization signed by the plaintiff patient is required.[8] Serving a records subpoena, the to-be-issued order and (if necessary) a copy this order on a healthcare provider should be more than sufficient to cause a provider to turn over the responsive medical records.

[8]   The Court rejects the argument that Plaintiff Sherlock waived her medical records privacy rights for all

health care providers by signing authorizations for three providers. In *Cameron*, for example, the plaintiffs executed a medical release for one health care provider but the court still held that it would not compel her to sign a release for other medical records. 2016 WL 1572952, at *6. Just like the defendant in *Cameron*, the defendants in both of the instant cases will not be unduly prejudiced by the absence of a signed HIPAA authorization because they will be receiving records from the providers through a HIPAA-authorized court order.

To provide the defendants with protection, the Undersigned is also ordering that consequences flow from any plaintiff-initiated narrowing of the medical and mental health issues surrounding the alleged damages. Specifically, the plaintiffs will not be able to use at trial (or for any other purpose in these lawsuits) any medical records or testimony, including expert testimony, unless the topic is included in the jointly submitted HIPAA order which the Court will be asked to sign. That way, the plaintiffs will not be tempted to adopt an unreasonably tight scope of the issues relating to the alleged injuries.

If Plaintiffs restrict the scope of the court order because they do not want certain medical records produced, then they will not be allowed to present records or documents concerning those specific topics. If, for example, the court order omits records relating to complaints about difficulty **1284** sleeping, then the plaintiffs would not be able to testify that they have difficulty sleeping.

If plaintiffs refuse to agree to an issue to be included in the court order and the issue is negative or likely negative to the plaintiffs' claims, then the defendants can revisit the issue with the Court and I will determine whether to expand the list of topics in the HIPAA order. For purposes of illustration, assume that the defendants want the order to include medical records evidencing the plaintiffs' alcohol or substance abuse, but the plaintiffs refuse to agree (presumably because that sub-issue would adversely affect their damages claims and they might decide to not discuss it on their own at trial in any event). The ruling outlined above would, in the absence of any further action, generate an unfair advantage to the plaintiffs (because they would be barred from testifying about their substance abuse, a result which would hardly be detrimental to them).

To avoid this technically conceivable scenario, the Undersigned is permitting the defendants to raise with me the plaintiffs' refusal to include a topic, such as substance abuse, in the proposed agreed HIPAA order (so that I can amend the proposed order to include medical records about an abuse, even if the plaintiffs do not agree to it).

### Conclusion

The plaintiffs in these two cases are not required to sign medical records authorization forms, but the parties will by January 30, 2017 jointly submit a proposed HIPAA order under 45 C.F.R. 164.512(e)(1) and the defendants will be able to obtain relevant medical records from the healthcare providers through that mechanism and will also have protection in case the plaintiffs are not reasonable about the scope of the order. If the defendants contend that the proposed order is unfairly limited, then they may raise the issue with me within five (5) days of the submission of the joint proposed order. Alternatively, they can allow the plaintiffs to restrict the issues and sub-issues without interposing an objection, knowing that the plaintiffs will not be able to introduce evidence on omitted issues and sub-issues.[9]

[9]    In other words, this would be a litigation version of the proverb, "You've made your bed, now lie in it." The American rock band 3 Doors Down invoked this very sentiment in their "Ticket to Heaven" song (on the "Away from the Sun" album), where they musically explained that "all they gave me was this ticket to heaven / But that ticket to heaven said to lie in the bed that you make." 3 Doors Down, *Ticket to Heaven*, *on* Away from the Sun (Universal Records 2002).

**DONE AND ORDERED** in Chambers, in Miami, Florida, on January 18, 2017.

### All Citations

229 F.Supp.3d 1277

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Prior Version Held Unconstitutional by  Laro v. New Hampshire,  1st Cir.(N.H.),  Aug. 06, 2001

United States Code Annotated
  Title 29. Labor
    Chapter 28. Family and Medical Leave (Refs & Annos)
      Subchapter I. General Requirements for Leave (Refs & Annos)

29 U.S.C.A. § 2617

§ 2617. Enforcement

Effective: January 28, 2008

Currentness

**(a) Civil action by employees**

**(1) Liability**

Any employer who violates section 2615 of this title shall be liable to any eligible employee affected--

**(A)** for damages equal to--

**(i)** the amount of--

**(I)** any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or

**(II)** in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks (or 26 weeks, in a case involving leave under section 2612(a)(3) of this title) of wages or salary for the employee;

**(ii)** the interest on the amount described in clause (i) calculated at the prevailing rate; and

**(iii)** an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii), except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title, such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii), respectively; and

**(B)** for such equitable relief as may be appropriate, including employment, reinstatement, and promotion.

**(2) Right of action**

An action to recover the damages or equitable relief prescribed in paragraph (1) may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of--

**(A)** the employees; or

**(B)** the employees and other employees similarly situated.

**(3) Fees and costs**

The court in such an action shall, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant.

**(4) Limitations**

The right provided by paragraph (2) to bring an action by or on behalf of any employee shall terminate--

**(A)** on the filing of a complaint by the Secretary in an action under subsection (d) in which restraint is sought of any further delay in the payment of the amount described in paragraph (1)(A) to such employee by an employer responsible under paragraph (1) for the payment; or

**(B)** on the filing of a complaint by the Secretary in an action under subsection (b) in which a recovery is sought of the damages described in paragraph (1)(A) owing to an eligible employee by an employer liable under paragraph (1),

unless the action described in subparagraph (A) or (B) is dismissed without prejudice on motion of the Secretary.

**(b) Action by Secretary**

**(1) Administrative action**

The Secretary shall receive, investigate, and attempt to resolve complaints of violations of section 2615 of this title in the same manner that the Secretary receives, investigates, and attempts to resolve complaints of violations of sections 206 and 207 of this title.

**(2) Civil action**

The Secretary may bring an action in any court of competent jurisdiction to recover the damages described in subsection (a)(1)(A).

**(3) Sums recovered**

Any sums recovered by the Secretary pursuant to paragraph (2) shall be held in a special deposit account and shall be paid, on order of the Secretary, directly to each employee affected. Any such sums not paid to an employee because of inability to do so within a period of 3 years shall be deposited into the Treasury of the United States as miscellaneous receipts.

**(c) Limitation**

**(1) In general**

Except as provided in paragraph (2), an action may be brought under this section not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought.

**(2) Willful violation**

In the case of such action brought for a willful violation of section 2615 of this title, such action may be brought within 3 years of the date of the last event constituting the alleged violation for which such action is brought.

**(3) Commencement**

In determining when an action is commenced by the Secretary under this section for the purposes of this subsection, it shall be considered to be commenced on the date when the complaint is filed.

**(d) Action for injunction by Secretary**

The district courts of the United States shall have jurisdiction, for cause shown, in an action brought by the Secretary--

**(1)** to restrain violations of section 2615 of this title, including the restraint of any withholding of payment of wages, salary, employment benefits, or other compensation, plus interest, found by the court to be due to eligible employees; or

**(2)** to award such other equitable relief as may be appropriate, including employment, reinstatement, and promotion.

**(e) Solicitor of Labor**

The Solicitor of Labor may appear for and represent the Secretary on any litigation brought under this section.

**(f) Government Accountability Office and Library of Congress**

In the case of the Government Accountability Office and the Library of Congress, the authority of the Secretary of Labor under this subchapter shall be exercised respectively by the Comptroller General of the United States and the Librarian of Congress.


### CREDIT(S)

(Pub.L. 103-3, Title I, § 107, Feb. 5, 1993, 107 Stat. 15; Pub.L. 104-1, Title II, § 202(c)(1)(B), Jan. 23, 1995, 109 Stat. 9; Pub.L. 108-271, § 8(b), July 7, 2004, 118 Stat. 814; Pub.L. 110-181, Div. A, Title V, § 585(a)(3)(G), Jan. 28, 2008, 122 Stat. 131.)


Notes of Decisions (512)

29 U.S.C.A. § 2617, 29 USCA § 2617
Current through P.L. 118-22. Some statute sections may be more current, see credits for details.

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   4

## III.   DISCOVERY OBJECTIONS

A. **Vague, Overly Broad, and Unduly Burdensome:**   Blanket, unsupported objections that a discovery request is "vague, overly broad, or unduly burdensome" are, by themselves, meaningless and shall be disregarded by the Court.   A party objecting on these bases must explain the specific and particular ways in which a request is vague, overly broad, or unduly burdensome.   *See* Fed. R. Civ. P. 33(b)(4).   If a party believes that the request is vague, the party shall attempt to obtain clarification prior to objection on this ground.   Sworn testimony or evidence may be necessary to show that a particular request is in fact burdensome.

B. **Objections Based on Scope:**   If there is an objection based upon an unduly broad scope, such as time frame or geographic location, discovery should be provided as to those matters within the scope that is not disputed.   For example, if discovery is sought nationwide for a ten-year period and the responding party objects on the grounds that only a five-year period limited to activities in Florida is appropriate, the responding party shall provide responsive discovery falling within the five-year period of activity in Florida.

C. **Irrelevant:**   An objection that a discovery request is not relevant to a party's claim or defense must include a specific explanation describing why the request lacks relevance.

D. **Formulaic Objections Followed by an Answer:**   Parties should avoid reciting a formulaic objection followed by an answer to the request.   It has become common practice for a party to object and then state that "notwithstanding the above," the party will respond to the discovery request, subject to or without waiving such objection.   Such an objection and answer preserve nothing and constitute only a waste of effort and the resources of both the parties and the Court.   Further, such practice leaves the requesting party uncertain as to whether the question has been fully answered, or only a portion of it has been answered.   Federal Rule of Civil Procedure 34(b)(2)(c) specifically requires an objection to state whether any responsive materials are being withheld.   As such, counsel shall include in its answer a clear statement that all responsive documents/information identified have in fact been produced/provided or otherwise describe the category of documents/information that has been withheld based on the objection.

E. **Objections Based on Privilege:**   Generalized objections asserting attorney-client privilege or work product doctrine do not comply with the Local Rules.   *See* S.D. Fla. L.R. 26.1(e)(2)(B).   The party with the burden of persuasion on a privilege claim has the obligation to present to the Court, no later than at the time the Notice of Hearing is filed, sworn evidence, if necessary, to satisfy that burden.   The failure to present that sworn evidence as an Exhibit to the Notice

under this rule, or lack of notice, will not serve as a substitute for, or as a waiver of, any pleading requirements set forth in the Federal Rules of Civil Procedure or statutes.

Effective December 1, 1994. Amended effective April 15, 2007; April 15, 2010; December 1, 2015.

### Authority

(1993) Former Local Rule 9; Model Rule 24.1.

## RULE 26.1 DISCOVERY AND DISCOVERY MATERIAL (CIVIL)

**(a)  Generally**. Parties may stipulate in writing to modify any practice or procedure governing discovery hereunder unless doing so would violate a Court-ordered deadline, obligation, or restriction.

**(b)  Service and Filing of Discovery Material**. Initial and expert disclosures and the following discovery requests, responses, objections, notices or any associated proof of service shall not be filed until they are used in the proceeding or the court orders their filing: (1) deposition transcripts; (2) interrogatories; (3) requests for documents, electronically stored information or things, or to permit entry upon land; (4) requests for admission; (5) notices of taking depositions or notices of serving subpoenas; and (6) privilege logs.

**(c)  Discovery Material to Be Filed at Outset of Trial or at Filing of Pre-trial or Post-trial Motions**. If any written discovery is to be used at trial or is necessary to a pre-trial or post-trial motion, the portions to be used shall be filed with the Clerk of the Court, and served on all parties, at the outset of the trial or at the filing and service on all parties of the motion insofar as their use can be reasonably anticipated by the parties having custody thereof.

**(d)  Completion of Discovery**. Party and non-party depositions must be scheduled to occur, and written discovery requests and subpoenas seeking the production of documents must be served in sufficient time that the response is due on or before the discovery cutoff date. Failure by the party seeking discovery to comply with this paragraph obviates the need to respond or object to the discovery, appear at the deposition, or move for a protective order.

**(e)  Interrogatories and Production Requests**.

  (1) Each interrogatory objection and/or response must immediately follow the quoted interrogatory, and no part of an interrogatory shall be left unanswered merely because an objection is interposed to another part of the interrogatory.

  (2) Assertion of Privilege:

   (A) Where an objection is made to any interrogatory or subpart thereof or to any production request under Federal Rule of Civil Procedure 34, the objection shall state with specificity all grounds. Any ground not stated in an objection within the time provided by the Federal Rules of Civil Procedure, or any extensions thereof, shall be waived.

CASE NO. 08-60623-CIV-DIMITROULEAS/ROSENBAUM
United States District Court, S.D. Florida.

# Bank of Mong. v. M&P Glob. Fin. Servs., Inc.

258 F.R.D. 514 (S.D. Fla. 2009)
Decided Apr 24, 2009

James R. Halperin, Delray Beach, FL, pro se.

515 *514 *515

**ORDER**

ROBIN S. ROSENBAUM, United States Magistrate Judge.

This matter is before the Court upon Plaintiff's Motion to Compel Response to Plaintiff's Request for Documents From Defendants M & P Global Financial Services, Inc., M & P Global Financial Services Europe, AG, Burton D. Greenberg, and Joel E. Greenberg (" M & P Defendants") [D.E. 51, 52]. A hearing was held on April 20, 2009, where the parties to the Motion appeared and presented argument. The Court considered Plaintiff's Motion, all opposing and responsive filings and briefs, and the parties'
516 arguments at the April 20th hearing, and *516 orally granted Plaintiff's Motion. This Order memorializes the Court's oral holdings regarding the Motion.

## I. Background

Plaintiff Bank of Mongolia filed its Complaint on April 28, 2008, alleging that the M & P Defendants, along with Defendant James R. Halperin, conspired to defraud Plaintiff of $23 million dollars, in violation of the Racketeer Influenced and Corrupt Organization Act (" RICO" ). [D.E. 1]. Specifically, Plaintiff claims that the M & P Defendants were a part of a RICO enterprise that fraudulently induced Plaintiff to issue financial instruments for the benefit of Defendants, which Defendants asserted were necessary to secure funding for an " Affordable Housing Initiative" in Ulaanbaatar, Mongolia. *Id.* According to the Complaint, the financial instruments were never actually supposed to be negotiated. *Id.* Once the financial instruments were issued by Plaintiff, however, Defendants and other members of the RICO enterprise caused them to be diverted and negotiated for Defendants' own benefit. *Id.*

During the course of discovery, Plaintiff served the M & P Defendants with a Request for Documents. [ *See* D.E. 51, 52, 62]. Defendants' response was due on February 11, 2009, but Defendants did not respond. *Id.* According to Plaintiff, on February 12, 2009, Plaintiff's counsel sent an e-mail to the M & P Defendants' counsel requesting information regarding when Plaintiff could expert a response, but, again, Plaintiff received no response. *Id.* Plaintiff's counsel then left a voice mail for the M & P Defendants' counsel on February 17, 2009, requesting the same information, but Defendants once again failed to respond. *Id.*

In view of the absence of a discovery response and an explanation for the lack of a response, Plaintiff filed the Motion to Compel before the Court on February 19, 2009, requesting that the M & P Defendants be required to provide all responsive information to Plaintiff's document requests and that Plaintiff be granted fees and costs for having to file the Motion. [D.E. 51, 52]. Defendants' response to Plaintiff's Motion was due on March 9, 2009, but Defendants filed no

Bank of Mong. v. M&P Glob. Fin. Servs., Inc.   258 F.R.D. 514 (S.D. Fla. 2009)

response. As a result, on March 16, 2009, the Court issued an Order to Show Cause directing that the M & P Defendants file their response by March 23, 2009. [D.E. 57].

On March 20, 2009, the M & P Defendants served Plaintiff with their one-page Response to Plaintiff's Request for Production. This Response stated, in its entirety,

1. The document requests in paragraph(s) 1, 2, 4, 5, 8, 11 (a through g), 12, 13, 14 and 17 were previously provided with [Defendants'] Initial Disclosure.

2. The documents requested in paragraph(s) 3, 9, 10 and 15 are not in our possession.

3. The documents requested in paragraph(s) 6 and 7 will be provided in the near future, obtaining them from [a] foreign country.

4. In response to the documents requested in paragraph(s) 16-objection as too vague and burdensome.

[D.E. 58]. Defendants served no documents on Plaintiff with this Response.

The M & P Defendants then filed their Response to the Court's Order to Show Cause on March 23, 2009. In their Response to the Court's Order, Defendants assert that they incorrectly assumed that their Initial Disclosure, which was filed on January 22, 2009, was a response to Plaintiff's Request for Production. [D.E. 59]. In light of their service of a Response to Plaintiff's Request for Production on March 20, 2009, Defendants argue, Plaintiff's Motion should be denied. *Id.*

Plaintiff filed its Reply on March 30, 2009. [D.E. 62]. In its Reply, Plaintiff argues that it is entitled to attorney's fees and costs for the M & P Defendants' failure to provide a valid explanation for not timely responding to Plaintiff's document requests. *Id.* Plaintiff also asserts that Defendants

should be sanctioned for only partially producing responsive documents (in their January 22, 2009, Initial Disclosures) and for not otherwise addressing Plaintiff's other document requests. *Id.* Furthermore, Plaintiff claims that documents produced by third parties that are responsive *517 to Plaintiff's document requests and were not produced by the M & P Defendants demonstrate that the M & P Defendants withheld or engaged in spoliation regarding document requests 9, 12, and 11. *Id.* Additionally, Plaintiff contends that while some of Defendants' responses indicate that responsive documents have been previously produced to Plaintiff, Plaintiff is unable to identify such documents in response to document requests 4, 12, and 13. *Id.* Plaintiff further urges that Defendants have waived all objections to Plaintiff's request for documents as a result of their failure to object in a timely fashion. *Id.* In light of the M & P Defendants' failure to produce all responsive documents and the lack of a valid excuse, Plaintiff requests that Defendants be sanctioned for their conduct by allowing Plaintiff access to Defendants' electronic records and computer hardware to allow Plaintiff to locate all responsive documents. *Id.*

On April 20, 2009, Plaintiff and the M & P Defendants presented argument at a hearing on Plaintiff's Motion. At the hearing, the Court inquired of the M & P Defendants as to whether they had provided all responsive documents to Plaintiff, as Defendants had indicated in paragraph 1 of Defendants' Response to Plaintiff's Request for Production. The M & P Defendants conceded that they had not performed a search of all deleted and unsaved electronic documents and requested twenty days for Defendants' own computer expert do a thorough search of all electronic documents, including deleted and unsaved documents. When the Court requested information regarding the steps that Defendants had taken to conduct a search for responsive documents, counsel for the M & P Defendants was not in a position at that time to set forth Defendants' search methodology.

Counsel for the M & P Defendants asserted, however, that some documents have been produced to Plaintiff in response to document requests 4 and 12.

The Court asked Plaintiff about the types of documents it believed where missing from the production made in response to document requests 4 and 12. Plaintiff explained that it had received documents from other entities that appeared should have been produced by the M & P Defendants but were not, including for example, responsive documents reflecting transactions to which the M & P Defendants were a party. Moreover, in view of the significance of the transactions involved, as represented by the documents obtained from the other parties, Plaintiff elaborated, the nature of the transactions involved, as a general rule, should have generated additional documentation. For example, whereas a document might show an invoice for the purchase of a commodity, Defendants produced no shipping documents or other related transactional documents.

Next, the Court addressed the M & P Defendants' assertions in paragraph 2 of their Response to Plaintiff's Request for Production, which stated " that documents requested in paragraph(s) 3, 9, 10 and 15 are not in our possession." Defendants' counsel stated that documents responsive to requests 3 and 10 have never been in their possession. The M & P Defendants' counsel, however, acknowledged that it is possible that documents located in a foreign country are responsive to documents requests 9 and 15, but they are not currently in counsel's possession.

With respect to the M & P Defendants' assertions in paragraph 3 regarding document requests 6 and 7, " that [responsive documents] will be provided in the near future, obtaining them from [a] foreign country," when the Court asked Defendants the specific time frame for when these documents would be produced, counsel for

Defendants responded that his client, Defendant Burton Greenberg, informed him that these documents would " be coming shortly" and " soon." Defendants did not advise their counsel of any specific steps taken to obtain the financial documents responsive to document requests 6 and 7, so Defendants' counsel, in turn, could not enlighten the Court with regard to efforts made to obtain the documents at issue.

As set forth in further detail below, the Court orally granted Plaintiff's Motion to Compel, including awarding attorney's fees and costs. *518

### II. Analysis

Rule 26(b), Fed.R.Civ.P., sets forth the permissible parameters of discovery. Under that rule,

> " Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party ... [that] appears reasonably calculated to lead to the discovery of admissible evidence ..., [as long as the Court does not find that] (i) the discovery sought is unreasonably cumulative or duplicative, or ... obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues...."

R. 26(b), Fed.R.Civ.P. The Advisory Committee Notes to Rule 26 indicate that " [t]he purpose of discovery is to allow a **broad** search for facts, the names of witnesses, or any other matters which may aid a party in the preparation or presentation of his case." Adv. Com. Notes, 1946 Amendment,

R. 26, Fed.R.Civ.P. (citations omitted) (emphasis added). Indeed, the Advisory Committee Notes approvingly cite language from a case stating that " the Rules ... permit ' fishing for evidence as they should.' " *Id.* (citation omitted); *see also Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947) (" No longer can the time-honored cry of ' fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case." ).

The courts have long recognized the wide scope of discovery allowed under the Federal Rules of Civil Procedure. As the Eleventh Circuit's predecessor court noted,

> The discovery provisions of the Federal Rules of Civil Procedure allow the parties to develop fully and crystalize concise factual issues for trial. Properly used, they prevent prejudicial surprises and conserve precious judicial energies. The United States Supreme Court has said that they are to be broadly and liberally construed.

*Burns v. Thiokol Chem. Corp.,* 483 F.2d 300, 304 (5th Cir.1973)[1] (citing *Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *Schlagenhauf v. Holder,* 379 U.S. 104, 114-115, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964)). Of course, the scope of permissible discovery is not unbounded. Requested discovery must be relevant, and it must not impose undue burden, under the tests described in Rule 26(b)(2)(C).

> [1] Pursuant to *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

In this case, no issue exists regarding the scope of Plaintiff's document requests. With the exception of the M & P Defendants' objection to document request 16 " as too vague and burdensome," the M & P Defendants do not contest the relevance of Plaintiff's production requests. As for their objection to document

request 16, the Court concluded that the M & P Defendants' objections were waived, in light of Defendants' untimely response to Plaintiff's document requests and their repeated failures to respond to Plaintiff's inquiries regarding the whereabouts of Defendants' responses. *See Williams v. Bridgestone/Firestone, Inc.,* 2008 WL 4755675, *1 (S.D.Fla. Oct.28, 2008); *United Steelworkers of America, AFL-CIO-CLC v. Ivaco,* 2002 WL 31932875, *4 (N.D.Ga. Jan.13, 2003) (citing *Marx v. Kelly, Hart & Hallman, P.C.,* 929 F.2d 8,12 (1st Cir.1991) and *In re United States,* 864 F.2d 1153, 1156 (5th Cir.1989)); *Pitts v. Francis,* 2008 WL 2229524, *2 (N.D.Fla. May 28, 2008) (noting that the Advisory Committee Notes to Rule 34, Fed.R.Civ.P., explain that Rule 34's requirement that objections be made timely and stated with reasons " is essentially the same as that in Rule 33" that provides that " ' [a]ny ground [for an objection to an interrogatory] not stated in a timely objection [ *i.e.,* thirty days] is waived unless the court, for good cause, excuses the failure.' " ). *519 Moreover, even if Defendants' objections were timely or Defendants could provide good cause for their failure to file their objections timely-neither of which occurred in the instant case, the M & P Defendants' objections were entirely conclusory and contained no explanation as to why Defendants viewed document request 16 as " vague or burdensome." Such objections do not comply with Local Rule 26.1 G.3.(a) which provides, " Where an objection is made to any interrogatory or sub-part thereof or to any document request under Federal Rule of Civil Procedure 34, the objection shall state with specificity all grounds." Objections that state that a discovery request is " vague, overly broad, or unduly burdensome" are, standing alone, meaningless and fail to comply with both the Local Rules and Rule 34's requirement that objections contain a statement of reasons. *See Pitts v. Francis,* 2008 WL 2229524, *2. A party objecting on these grounds must explain the specific and particular way in which a request is vague, overly broad, or unduly burdensome. In

addition, claims of undue burden should be supported by a statement (generally an affidavit) with specific information demonstrating how the request is overly burdensome. *See Benfatto v. Wachovia Bank, N.A.,* 2008 WL 4938418, *4 (S.D.Fla. Nov.19, 2008) (citing *Convertino v. U.S. Dept. of Justice,* 565 F.Supp.2d 10, 14 (D.D.C.2008)). In view of the lack of any statement of reasons why Defendants viewed request 16 as overly burdensome or vague, the Court cited these shortcomings as an additional basis for overruling Defendants' objections. Thus, the Court found that all of Plaintiff's document requests fell within the permissible scope of discovery.

The Court now considers the standards applicable to a motion to compel. If a party fails to answer a request for production, the discovering party may move for an order compelling a response. Fed.R.Civ.P. 37(a)(2). Motions to compel discovery under Rule 37(a) are committed to the sound discretion of the trial court. *See Commercial Union Ins. Co. v. Westrope,* 730 F.2d 729, 731 (11th Cir.1984).

In this case, the M & P Defendants' response to Plaintiff's document requests were due originally on February 11, 2009, but Defendants did not file their one-page Response to Plaintiff's Request for Production until March 20, 2009, at least six weeks after repeated attempts by Plaintiff to solicit a response from Defendants following the expiration of the deadline for Defendants' response, as well as the filing of Plaintiff's Motion to Compel on February 19, 2008, and the issuance of the Court's Order to Show Cause to Defendants on March 16, 2009. Even then, the M & P Defendants' March 20th Response failed to provide a valid excuse for not making a timely response to Plaintiff's document requests. Furthermore, as indicated by the M & P Defendants' admissions during the hearing, some of Defendants' assertions in their Response to Plaintiff's Request for Production are questionable. Nor did Defendants' Response to the Court's Order

to Show Cause filed on March 23, 2009, provide any valid excuse for failing to respond to Plaintiff's document requests or Motion to Compel. Accordingly, at the April 20th hearing, the Court found that the M & P Defendants failed to provide a sufficient reason for failing to respond timely to Plaintiff's document requests or Motion to Compel.

Additionally, the Court held that the M & P Defendants failed to produce to Plaintiff all documents responsive to Plaintiff's document requests or to offer a reasonable basis for their lack of production of certain documents. At the hearing, the M & P Defendants' counsel forthrightly acknowledged that he was unable to identify the steps taken to identify responsive documents, and conceded that more responsive documents may well exist in Defendants' possession, as Defendant had not attempted to search deleted computer records. Deleted computer files, however, whether e-mails or otherwise, are discoverable. *See, Wells v. Xpedx,* 2007 WL 1200955, *1-2 (M.D. Fla. April 23, 2007) (" producing party has the obligation to search available electronic systems for deleted emails and files" ) (citing to Advisory Committee Notes, Fed.R.Civ.P. 34) (internal citations omitted); *see, e.g., Antioch Co. v. Scrapbook Borders, Inc.,* 210 F.R.D. 645, 652 (D.Minn.2002) (citing *520 *Rowe Entertainment, Inc. v. The William Morris Agency, Inc.,* 205 F.R.D. 421, 427, 431 (S.D.N.Y.2002); *Simon Property Group, L.P. v. mySimon, Inc.,* 194 F.R.D. 639, 640 (S.D.Ind.2000); *Playboy Enterprises, Inc. v. Welles,* 60 F.Supp.2d 1050, 1053 (S.D.Cal.1999) (other citations omitted)).

The M & P Defendants similarly did not provide an affidavit or other specific evidence regarding the scope of the rest of Defendants' search for responsive documents, and counsel was not able to articulate what Defendants had done in order to search for responsive documents. Further, Defendants' counsel conceded that other responsive documents located in an unidentified

foreign country may exist and have not yet been produced to Plaintiff. Nor could his client indicate a specific time frame within which the Court could expect that Defendants would provide such documents to Plaintiff. Moreover, the identification by Plaintiff of third-party documents that appear to be responsive to some of Plaintiff's document requests but were not produced to Plaintiff by Defendants further supports the possibility of the existence of additional responsive documents that have not been produced to Plaintiff by Defendants. In light of these findings, the Court granted Plaintiff's Motion to Compel.

The Court further directed the M & P Defendants to serve Plaintiff with a signed affidavit from their custodian of records detailing all steps taken to identify all documents responsive to Plaintiff's document requests. This affidavit shall also specifically identify any production requests for which Defendants assert that they have found no responsive records within their possession, custody, or control, despite a thorough search. **The M & P Defendants shall provide Plaintiff the signed affidavit by April 30, 2009.**

Additionally, based on the discrepancies between Defendants' Response to Plaintiff's Requests for Production and their concession at the hearing that not all documents have yet been produced, and particularly in light of the recovery of apparently responsive documents by the Plaintiffs from third-party sources, the Court determined that an independent expert should be appointed to retrieve any deleted responsive files from Defendants' computers. *See U & I Corp. v. Advanced Medical Design, Inc.,* 251 F.R.D. 667, 676-77 (M.D.Fla.2008) (authorized use of independent computer expert to sample information on hard drives for responsive information); *see e.g., Antioch Co.,* 210 F.R.D. at 652-53 (setting forth procedure for independent expert to " mirror image" party's hard drive to retrieve deleted files, as set forth in *Playboy*

*Enterprises, Inc.,* 60 F.Supp.2d at 1054-55*); Simon Property Group, L.P.,* 194 F.R.D. at 641-42 (following basic structure for an independent expert paid by party requesting information to " mirror image" other party's hard drives to identify deleted files, and following procedure set forth in *Playboy Enterprises, Inc.* ). The Court declined Defendants' suggestion instead that they receive an additional twenty days for their own in-house computer expert to look for responsive information, in view of the M & P Defendants' past lack of response to Plaintiff's request for information, the questionability of some of the M & P Defendants' responses in their Response to Plaintiff's Request for Production, and Plaintiff's presentation of documents responsive to the Plaintiff's Request for Production to the M & P Defendants, but obtained from third parties, which appear to be records that the M & P Defendants should have had. To accomplish the review of Defendants' computer records, the Court sets forth following procedure:

1. An independent third party computer expert shall be appointed by the Court and shall mirror image M & P Defendants' computer system.

2. **The parties have until April 30, 2009, to meet and confer regarding their designation of an independent computer expert.** If the parties cannot agree on an independent computer expert, each party shall submit its recommendation for an independent expert to the Court, and the Court shall select the expert.

3. The appointed independent computer expert shall serve as an Officer of the Court. Thus, to the extent that this *521 computer expert has direct or indirect access to information protected by attorney-client privilege, such disclosure will not result in any waiver of the M & P Defendants' privilege.

4. The independent expert shall sign a confidentiality order. Additionally, the expert shall be allowed to hire other outside support if necessary in order to mirror image M & P Defendants' computer system. Any outside support shall be required to sign the same confidentiality order.

5. The expert shall mirror image the M & P Defendants' computer system.

6. **Plaintiff shall provide a list of search terms to the Court to identify responsive documents to Plaintiff's document requests by April 30, 2009. After Plaintiff has submitted the search terms to the Court, the M & P Defendants shall have 5 days to submit their objections to the Court regarding any of the search terms,** which the Court will rule upon. The Court will provide the search terms to the independent expert.

7. Once the expert has mirror imaged the M & P Defendants' computer system, the expert shall search the mirror image results using the search terms. The results of the search terms will be provided to the M & P Defendants and to the Court, along with an electronic copy of all responsive documents (also to be provided to both the M & P defendants and the Court).

8. The M & P Defendants shall review the search term results provided by the Court's expert and identify all responsive documents. **The M & P Defendants shall either produce all responsive documents to Plaintiff or identify those responsive documents not produced on a privilege log to Plaintiff within 20 days of the date that the M & P Defendants receive the search term results from the independent expert.** *Any privilege log produced shall comply strictly with the Local Rules for the Southern District of Florida.*

9. Plaintiff shall pay for all fees and costs of hiring the independent expert at this time. However, if at a later time there is evidence of the M & P Defendants' improper deletion of electronic documents or any other associated improper conduct, the Court will revisit this issue and consider charging the M & P Defendants for the fees and costs of the independent expert or imposing the fees and costs on the parties in a duly appropriate proportioned manner.

10. The independent expert shall provide a signed affidavit detailing the steps he or she took in mirror imaging the M & P Defendants' computer system and searching the mirror image for the search terms within 5 days of providing the M & P Defendants and the Court with the results of the search for search terms in the mirror image.

*See id.*

While this procedure does not provide Plaintiff access to the M & P Defendants' documents as Plaintiff requested, the M & P Defendants' failure to adequately respond to Plaintiff's request for documents is not sufficient grounds to give Plaintiff unfettered access to Defendants' computer system. *See In re Ford*

*Motor Company,* 345 F.3d 1315, 1317 (11th Cir.2003). The court anticipates, however, that the procedure set forth above should ensure that all responsive electronic documents will be identified, while minimizing the intrusion into the M & P Defendants' records.

With respect to the Court's ruling regarding the payment of the expert's fees, the Court found that although it is clear that Defendants have not produced all responsive documents at this point in time, with respect to any deleted computer files- which is the reason for incurring the costs of the expert-Plaintiff has not demonstrated at this juncture that the M & P Defendants intentionally or improperly deleted documents or otherwise omitted documents from their production made from the M & P Defendants' computer files. Consequently, as noted in the procedure outlined above, the Court directed *522 Plaintiff to pay the costs of the computer expert at this point. As noted above, however, the Court will entertain any evidence of misconduct or intentional deletion by the M & P Defendants if found at a later point in the discovery process and consider adjusting the imposition of the costs of the computer expert should such evidence arise.

Regarding documents responsive to document request 16, as discussed above, at the hearing, the Court denied the M & P Defendants' objections and granted Plaintiff's Motion to Compel. As a result, **the M & P Defendants shall provide Plaintiff with responsive documents to document request 16 by April 30, 2009.**

Moreover, the Court held that the M & P Defendants' explanation, or lack thereof, regarding their efforts to retrieve documents located in a foreign country and responsive to document requests 6 and 7 were insufficient. Hence, the Court directed the **M & P Defendants to produce all responsive documents to document requests 6 and 7 to Plaintiff by April 30, 2009.**

After granting Plaintiff's Motion to Compel, the Court considered Plaintiff's request for sanctions in the form of attorney's fees and costs. Rule 37(a)(4), Fed.R.Civ.P., provides that the court shall require reasonable expenses incurred in making the motion, including attorney's fees, to be paid by the opposing party, unless the opposing party's opposition to the motion to compel was " substantially justified, or ... other circumstances make an award of expenses unjust." " The Supreme Court has clarified that [a party's] discovery conduct should be found ' substantially justified' under Rule 37 if it is a response to a ' genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.' " *Devaney v. Continental Amer. Ins. Co.,* 989 F.2d 1154, 1163 (11th Cir.1993) (quoting *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)); *Maddow v. Procter & Gamble Co., Inc.,* 107 F.3d 846, 853 (11th Cir.1997).

In the case at hand, at the April 20th hearing, the M & P Defendants' counsel frankly conceded that there was no substantial justification for Defendants' failure to comply with Plaintiff's documents requests, nor did other circumstances make an award of expenses unjust. The Court agreed.

Consequently, the Court requested information from Plaintiff regarding its costs for preparation of the Motion to Compel, its Reply and counsel's appearance at the hearing. Counsel appearing on Plaintiff's behalf at the hearing, David B. Mankuta, stated that his hourly rate was $425 an hour, but noted that his co-counsel, Edward Baldwin, prepared the Motion to Compel and Reply, and charged an hourly rate of $562 an hour. Mr. Mankuta represented that Plaintiff's co-counsel, Mr. Baldwin was a seven-year attorney who specialized in international arbitration and litigation. Based on the Court's own expertise, the Court held that a rate of $562 an hour was unreasonable under the circumstances.

Defendants' counsel then stipulated that the spending of eight hours on the tasks relating to the Motion to Compel, at an hourly rate of $425 was reasonable under the circumstances of this case. After the Court reviewed the Plaintiff's Motion to Compel and 15-page Reply, which included detailed review and analysis of documents and exhibits, and the Court considered the time necessary to attend the April 20th hearing, the Court agreed and granted Plaintiff attorney's fees and costs in the amount of $3,400 ($425 an hour x 8 hours) against the M & P Defendants. **The M & P Defendants shall pay Plaintiff the amount of $3,400 by May 20, 2009.**

### III. Conclusion

Based on the foregoing, the Court **GRANTED** Plaintiff's Motion to Compel Response to Plaintiff's Request for Documents From Defendants M & P Global Financial Services, Inc., M & P Global Financial Services Europe, AG, Burton D. Greenberg, and Joel E. Greenberg [D.E. 51, 52]. The Court directs that the M & P Defendants and Plaintiff comply with all requirements and deadlines as set forth in this Order.

 casetext

2017 WL 878704
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

SREAM, INC., a California corporation, Plaintiff,

v.

HASSAN HAKIM & SARWAR,

INC., a Florida corporation, Defendant.

Civil No. 16-CV-81600-MARRA/MATTHEWMAN

|

Signed 03/06/2017

**Attorneys and Law Firms**

Jamie Alan Sasson, Ticktin Law Group PA, Deerfield Beach, FL, for Plaintiff.

Kenneth Louis Minerley, Minerley Fein PA, Boca Raton, FL, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTIONS TO COMPEL [DEs 28,29]

WILLIAM MATTHEWMAN, United States Magistrate Judge

**\*1 THIS CAUSE** is before the Court upon Defendant, Hassan Hakim & Sarwar, Inc.'s ("Defendant") Motion to Compel Documents Responsive to Its First Request for Production of Documents [DE 28] and Defendant's Motion to Compel Complete Answers to Its First Set of Interrogatories [DE 29]. These matters were referred to the undersigned by United States District Judge Kenneth A. Marra. *See* DE 14. Plaintiff, Sream, Inc. ("Plaintiff") has filed responses to the motions to compel [DEs 32, 33], and Defendant has filed replies [DEs 34, 35]. The motions are now ripe for review, and the Court finds that a discovery hearing on the motions is unnecessary.

## I. DEFENDANT'S MOTION TO COMPEL DOCUMENTS [DE 28]

In its motion to compel documents [DE 28], Defendant argues that Plaintiff's objections to Requests #8, 10, 13, 14, 15, 16, and 20 should all be overruled. Defendant is seeking reasonable attorney's fees and costs incurred in filing the

motion. *Id.* In response, Plaintiff argues that the only requests that it continues to object to are Requests #8, 14, 15 and 16. [DE 32]. Plaintiff also seeks attorney's fees for having to respond to the motion. *Id.* In Defendant's reply, it contends that Plaintiff has cited no legal authority in support of its arguments that Plaintiff's objections to Requests #8, 14, 15, and 16 should be sustained. [DE 33]. Defendant also asserts that, while Plaintiff did serve a revised response on February 24, 2017, after the filing of Defendant's motion to compel, the revised responses to Requests #7, 11, and 18 are still deficient and are still at issue since Plaintiff refuses to produce the documents without a protective order in place that provides for attorney's fees (which Defendant will not agree to). [1] *Id.*

### Request #8

With regard to Request #8, Defendant seeks documents pertaining to the terms of engagement of Plaintiff's investigators retained by Plaintiff in this matter or who investigated the violations alleged in the Complaint. Plaintiff's sole objection in its revised response to Request #8 [DE 35-1, p. 2] is "Objection, Work Product Doctrine and Attorney Client Privilege." Plaintiff asserts attorney-client privilege and work-product privilege, but Plaintiff has not produced a privilege log or set forth any facts to support its position. Defendant contends that Plaintiff's objection to Request #8 is boilerplate based on an asserted privilege without a required privilege log.

The Court makes the following findings regarding Request #8. First, Plaintiff failed to complete a privilege log as required by Local Rule 26.1(e)(2)(C). Second, Plaintiff failed to include in its objection the detailed information required by Local Rule 26.1(e)(2)(B)(i) and (ii)(a). In effect, Plaintiff made an improper boilerplate objection with no specifics and which did not comply with the Federal Rules of Civil Procedure and the Local Rules. "This District does not recognize generalized boilerplate objections." *Walinbay S.A. v. Fresh Results, LLC,* No. 13-CIV-60844, 2014 WL 1267170, at \*2 (S.D. Fla. Feb. 26, 2014); *see also Taylor v. Bradshaw,* No. 11-80911-CIV, 2014 WL 6459978, at \*7 (S.D. Fla. Nov. 14, 2014) (improper cut and paste, boilerplate objections are not permitted); *Adelman v. Boy Scouts of America,* 276 F.R.D. 681 (S.D. Fla. 2011) ("Judges in this District typically condemn boilerplate objections as legally inadequate or 'meaningless.' "); *Benfatto v. Wachovia Bank, N.A.,* No. 08-CIV-60646, 2008 WL 4938418, at \*2 (S.D.

Case 1:23-cv-22629-RAR   Document 18-4   Entered on FLSD Docket 12/01/2023   Page 53 of 90

Sream, Inc. v. Hassan Hakim & Sarwar, Inc., Not Reported in Fed. Supp. (2017)

Fla. Nov. 19, 2008) ("[G]eneralized objections, which purport to object to each and every category of documents, are not recognized by this Court.").

**\*2** Pursuant to Federal Rule of Civil Procedure 34(b)(2)(B), Plaintiff was required to produce the documents requested "or state with specificity the grounds for objecting to the request, including the reasons." Plaintiff did neither. As noted by United States Magistrate Judge Andrew J. Peck, parties must state grounds for objections with specificity, and language such as " 'overly broad and unduly burdensome' is meaningless boilerplate. Why is it burdensome? How is it overly broad? This language tells the Court nothing." Fischer v. Forrest, 14 Civ. 1304 (PAE) (AJP), 14 Civ. 1307 (PAE, AJP), 2017 WL 773694 (S.D.N.Y. Feb. 28, 2017) (court advises parties that the December 1, 2015 amendments to the Federal Rules of Civil Procedure are now 15 months old, and it is time for all counsel to learn the new Rules and comply).

Accordingly, in light of Plaintiff's deficient response to Request #8, its failure to prepare a privilege log, and its deficient response to the Defendant's motion to compel in which Plaintiff provided no legal authority for its position and no facts to support its position, the Court orders Plaintiff to produce all documents responsive to Request #8 within ten (10) days from the date of this Order. Because Plaintiff has not prepared a privilege log and has not provided any support for its claims of privilege, it has failed to make a prima facie showing that any information in response to Request #8 is privileged, and Plaintiff has waived any such asserted privilege. *Zamperla, Inc. v. I.E. Park SRL,* No. 613CV1807ORL37KRS, 2015 WL 12836001, at \*1 (M.D. Fla. Sept. 22, 2015). However, as per Local Rule 26.1(e)(2)(C), Plaintiff shall not be required to produce any attorney-client communications created after commencement of this action or any work-product material created after commencement of this action.

The Court further notes that, in Plaintiff's response to Defendant's motion to compel [DE 32], Plaintiff argues a lack of relevance as to Request #8. However, Plaintiff never asserted that objection in its revised response to Defendant's First Request for Production [DE 35-1, p. 2]. As stated in Local Rule 26.1(e)(2)(A), Plaintiff's failure to raise the relevancy objection in its response to the request for production deems that any relevancy objection has been waived. Accordingly, Defendant's motion to compel is granted as to Request #8 of Defendant's First Request for Production.

Requests #14, 15, and 16

Next, as to Requests #14, 15 and 16, Plaintiff's revised response to Defendant's First Request for Production merely states as to all three requests: "Objection, overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence." [DE 35-1, p. 2]. Defendant asserts that Plaintiff's objections to Requests #14, 15 and 16 are boilerplate and improperly allege overbreadth without a supporting affidavit. Plaintiff maintains that is it is "self evident" how overbroad, burdensome and irrelevant the requests are, again providing no facts to support its statement. [DE 32, p. 2]. [2]

The Court finds that Plaintiff's responses to Requests #14, 15, and 16 are improper boilerplate objections per Local Rule 26.1(e)(2)(A). Further, Plaintiff's response to the motion to compel contains no specifics as to Plaintiff's overbreadth claim or lack of relevance claim and includes no affidavit, declaration, or even proffer of facts stating how the production would be burdensome. Accordingly, Defendant's motion to compel [DE 28] is granted as to Requests #14, 15 and 16. Plaintiff shall produce all responsive documents within ten (10) days from the date of this Order.

Requests #7, 11, and 18

**\*3** As to Requests #7, 11 and 18, Plaintiff responded by stating that production of responsive documents is "pending" the parties' agreement on a non-disclosure, confidentiality and privacy agreement. The parties have been unable to agree upon the exact terms of such an agreement. Moreover, Plaintiff did not address Requests #7, 11, and 18 in its response to Defendant's motion to compel. Accordingly, the Court orders that Plaintiff shall produce all responsive documents to Requests #7, 11 and 18 within ten (10) days from the date of this Order.

The Court hereby orders that all documents produced by Plaintiff in response to Requests #7, 11 and 18 shall be governed by the following confidentiality provision: all documents produced by Plaintiff shall be used by the parties solely in this proceeding and all such documents shall remain confidential and private, and shall not be distributed or shown to any non-parties other than experts utilized by any party to this case or counsel's staff. No such documents shall be

produced in the public record or filed in this case without prior leave of court. If either party believes that it is necessary to file the allegedly confidential information produced by Plaintiff in response to Requests #7, 11, or 18 in the public court record, it shall follow the procedure for seeking an order to seal such documents as laid out in the Local Rules.[3]

## II. DEFENDANT'S MOTION TO COMPEL ANSWERS TO INTERROGATORIES [DE 29]

In Defendant's Motion to Compel Complete Answers to Its First Set of Interrogatories [DE 29], Defendant contends that Plaintiff's responses to the interrogatories were incomplete, evasive, vague, and included legally insufficient boilerplate objections. Defendant argues that Plaintiff has set forth insufficient responses to Interrogatories #5, 6, and 7 and that Plaintiff's objections to Interrogatories #13 and 14 should be overruled. *Id.* Defendant is seeking reasonable attorney's fees and costs incurred in filing the motion. *Id.*

In response, Plaintiff states that it agrees with Defendant in part, and Plaintiff has, accordingly, withdrawn its objections to Interrogatories #13 and 14 and has provided responses. [DE 33]. Plaintiff contends, however, that is has provided sufficient responses to Interrogatories #5, 6, and 7. Plaintiff also seeks attorney's fees for having to respond to the motion. *Id.*

In Defendant's reply, it contends that Plaintiff has cited no legal authority in support of its argument that Plaintiff's responses to Interrogatories #5, 6, and 7 are sufficient. [DE 35]. Defendant also asserts that, while Plaintiff did serve a revised response on February 24, 2017, (after the filing of Defendant's motion to compel) the revised responses to Interrogatories #5, 6, and 7 are still deficient, and now Interrogatories #3, 8, and 11 are deficient as a result of the revised responses. *Id.* Defendant additionally argues that the revised responses must be verified. *Id.*

## Verification of Interrogatory Responses

The Court first notes Plaintiff's Revised Unverified Response to Defendant's First Set of Interrogatories [DE 34-1] is not verified and is, therefore, in violation of Federal Rule of Civil Procedure 33(b). Defendant's motion to compel is granted in this regard. Plaintiff shall file properly verified responses to

the interrogatories within ten (10) days of the date of this Order.

## Interrogatory #3

**\*4** Interrogatory #3 seeks the specific nature and substance of the knowledge that Plaintiff believes the person(s) identified in response to Interrogatory #2 may have. In Plaintiff's revised response, it provided the requested information for Jay Farraj and Rosaire Badger, but not for Richard Gregory, who is also listed in Plaintiff's response to Interrogatory #2. [DE 34-1, p. 2]. Defendant argues in its Reply [DE 34], that the revised response to Interrogatory #3 does not state the substance of knowledge for Richard Gregory, an individual who Plaintiff has named as a witness.

With regard to Interrogatory #3, the Court finds that Plaintiff's response is insufficient as it does not specify the nature and substance of knowledge of Richard Gregory. Defendant's motion to compel [DE 29] is granted as to Interrogatory #3. Plaintiff shall file a complete response to Interrogatory #3 within ten (10) days from the date of this Order providing the nature and substance of the knowledge of Richard Gregory.

## Interrogatory #5

Interrogatory #5, requests that Plaintiff "state in detail the substance of the opinions to be provided by each person who [Plaintiff] may use as an expert at trial." Plaintiff's response states, "[p]ursuant to Rule 33(d), please see attached Tod Weston affidavit." [DE 34-1, p. 2]. Defendant argues that Plaintiff's response is insufficient as Plaintiff simply referred to the Affidavit of Tod Weston, which affidavit is vague, self-serving, and fails to state in detail the substance of his opinions. Defendant also points out that the affidavit of Tod Weston is not attached to the responses, but only to Plaintiff's initial disclosures. Plaintiff argues that it has provided Defendant with all necessary information to identify and explain the damages it seeks and asserts that the affidavits, including an affidavit by Plaintiff's expert, provided specific facts, figures, and the basis for the conclusions presented in the affidavits.

With regard to Interrogatory #5, which asks for expert opinions, the Court notes that Plaintiff's response does not specifically state which affidavit is being referred to by date, and the Court does not known if there is more

Case 1:23-cv-22629-RAR   Document 18-4   Entered on FLSD Docket 12/01/2023   Page 55 of 90

Sream, Inc. v. Hassan Hakim & Sarwar, Inc., Not Reported in Fed. Supp. (2017)

than one affidavit of Tod Weston. Defendant's motion to compel [DE 29] is granted in that respect as to Interrogatory #5. Accordingly, Plaintiff shall revise its response to Interrogatory #5 to specifically state the date of the Tod Weston affidavit that it is referring to and provide a complete copy of the affidavit to Defendant so that there is no question as to which affidavit Plaintiff is referring. With regard to Defendant's argument that the Tod Weston affidavit (or at least the affidavit to which Defendant assumes Plaintiff is referring in Plaintiff's interrogatory responses) is vague and self-serving, the Court agrees that part of the affidavit appears to be self-serving, argumentative, and vague. However, Interrogatory #5 requested the substance of the opinions that Tod Weston would give, and Plaintiff has provided it. Although Tod Weston's opinions may be subject to a *Daubert* [4] challenge, a motion to strike, or a motion *in limine* at a later date, the Court need not concern itself with those issues now. Plaintiff has stated its expert's opinions, and the Court can consider the propriety of those opinions at the proper time in this case. That time is not now within the context of a discovery dispute. Further, Defendant is free to take the deposition of Tod Weston and file motions addressed to Tod Weston's alleged improper opinions at a later date pursuant to the Scheduling Order entered in this case.

### Interrogatories #6 and 7

 **\*5** Interrogatory #6, requests "each item of damages" claimed by Plaintiff, along with the "count or defense to which the item of damages relates; the category into which each item of damages falls, i.e. general damages, special or consequential damages (such as lost profits), interest, and any other relevant categories; the factual basis for each item of damages; and an explanation of how [Plaintiff] computed each item of damages, including any mathematical formula used." Plaintiff's revised response states, "Statutory Damages, General Damages, and Attorney's Fees. See previously provided affidavit of Tod Weston, Esq and Jarrir Farraj." [DE 34-1, 3]. Interrogatory # 7 requests "each item of loss(es) and the dollar amount of such loss(es) as alleged in paragraph 79 of the Complaint." Plaintiff's revised response states, "See previously provided affidavits of Jarrir Farraj and Tod Weston." [DE 34-1, p. 3]. Defendant argues that Plaintiff's responses to these interrogatories are insufficient as Plaintiff simply referred to the Affidavits of Tod Weston and Jay Farraj. Defendant contends that the affidavits reference one another and simply set forth an estimate of sales lost in Florida for 2014. Defendant claims that it is entitled to know

much more specific information regarding Plaintiff's alleged damages. Plaintiff argues that it has provided Defendant with all necessary information to identify and explain the damages it seeks and asserts that the affidavits, including an affidavit by Plaintiff's expert, provided specific facts, figures, and the basis for the conclusions presented in the affidavits.

As to Interrogatory #6, the Court finds that Plaintiff's response is insufficient and that the affidavits of Tod Weston and Jay Farraj do not sufficiently describe the information sought by Defendant. Defendant's motion to compel [DE 29] is granted as to Interrogatory #6. Plaintiff shall revise its response to Interrogatory #6 within ten (10) days of the date of this Order and shall specifically identify to the best of its ability the following: (1) the type of damages sought for each count of the Complaint; (2) the specific amount of general damages sought, the factual basis for the general damages claimed, and how the general damages amount was calculated; and (3) the specific amount of statutory damages sought, the factual basis for the statutory damages sought, and how the statutory damages amount was calculated.

Next, with regard to Interrogatory #7, the Court finds that Plaintiff's response is insufficient and that the affidavits of Tod Weston and Jay Farraj do not sufficiently describe the information sought by Defendant. Defendant's motion to compel [DE 29] is granted as to Interrogatory #7. Plaintiff shall revise its response to Interrogatory #7 within ten (10) days of the date of this Order and shall specifically state to the best of its ability the losses and dollar amount of losses as alleged in paragraph 79 of the Complaint.

### Interrogatory #8

Interrogatory #8, requests that Plaintiff "identify each document (including electronically stored information) pertaining to each item of damages stated in [Plaintiff's] response to interrogatory no. 6 above." [DE 34-1, p. 3]. Defendant argues that Plaintiff's response is insufficient as Plaintiff simply referred to the Affidavit of Tod Weston, which is vague, self-serving, and fails to state in detail the substance of his opinion. Defendant also points out that the affidavit of Tod Weston is not attached to the responses, but only to Plaintiff's initial disclosures.

With regard to Interrogatory #8, the Court finds that Plaintiff's response is insufficient. Defendant's motion to compel [DE 29] is granted as to Interrogatory #8. Plaintiff shall revise

Case 1:23-cv-22629-RAR Document 18-4 Entered on FLSD Docket 12/01/2023 Page 56 of 90

Sream, Inc. v. Hassan Hakim & Sarwar, Inc., Not Reported in Fed. Supp. (2017)

its response to Interrogatory #8 within ten (10) days of the date of this Order and shall specifically identify to the best of its ability the documents or ESI pertaining to each item of damages stated in response to Interrogatory #6.


Interrogatory #11

Interrogatory #11 requests that Plaintiff identify the "volume dollar of sales of [Plaintiff's] product or services with the trademark at issue in the United States for the following years: 2013, 2014, 2015 year to date, and the percentage of those sales as to the total sales for [Plaintiff's] company." Plaintiff's revised response states, "See previously provided affidavit of Jarrir Farraj for information on 2014, 2015 and 2016. There are no materials responsive to 2013." [DE 34-1, p. 4]. Defendant claims that Plaintiff's reference to the affidavit of Jarrir Fraraj does not constitute a sufficient response because the affidavit does not provide the dollar volume of sales for 2013 or 2014 or the percentage of those sales to overall sales volume.

 *6 Finally, with regard to Interrogatory #11, the Court finds that Plaintiff's response is insufficient. Defendant's motion to compel [DE 29] is granted as to Interrogatory #11. Plaintiff shall revise its response to Interrogatory #11 within ten (10) days of the date of this Order and shall specifically identify to the best of its ability the dollar amount of sales for 2013 and 2014 and the percentage of these sales as to the total sales of the company. If there are no sales for 2013, Plaintiff shall state so in its response.

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Compel Documents Responsive to Its First Request for Production of Documents [DE 28] is **GRANTED.** Plaintiff is required to produce all documents responsive to Requests #7, 8, 11, 14, 15, 16, and 18 within ten (10) days from the date of this Order as explained in more detail above.

2. Defendant's Motion to Compel Complete Answers to Its First Set of Interrogatories [DE 29] is **GRANTED.** Defendant is required to provide better responses to Interrogatories #3, 5, 6, 7, 8, and 11 within ten (10) days from the date of this Order as explained in more detail above.

3. Plaintiff's request for an award of attorney's fees and costs for having to respond to Defendant's motions is DENIED.

4. In Defendant's Motion to Compel Documents Responsive to Its First Request for Production of Documents [DE 28] and Defendant's Motion to Compel Complete Answers to Its First Set of Interrogatories [DE 29], Defendant sought an award of attorney's fees pursuant to Federal Rule of Civil Procedure 37(a)(5)(A). Plaintiff failed to address Defendant's request for fees and costs in either of its responses, although Plaintiff did seek attorney's fees and costs for having to respond to Defendant's motions. [DE 32, p. 2; DE 33, pp. 3-4]. Federal Rule of Civil Procedure 37(a)(5)(A) provides that, if a motion to compel discovery is granted, the Court must require the party whose conduct necessitated the motion or the attorney advising that conduct, or both, to pay the movant's reasonable fees in making the motion unless (1) the movant filed the motion before attempting in good faith to obtain the discovery with court action, (2) the opposing party's response or objection was substantially justified, or (3) other circumstances make an award of expenses unjust. Fed. R. Civ. P. 37(a)(5)(A).

5. In light of the fact that the Court has granted both of Defendant's motions to compel, and in light of the fact that Plaintiff withdrew its objections to Interrogatories #13 and 14 and provided responses to those interrogatories after Defendant's motion to compel was filed, the Court must now address whether the Court should require Plaintiff and its counsel to pay Defendant's reasonable costs and attorney's fees incurred in this discovery dispute pursuant to Rule 37(a)(5)(A). The Court, therefore, directs Defendant to file, within five (5) days of the date of this Order, a memorandum in support of its request for an award of Rule 37(a)(5)(A) expenses which addresses Defendant's entitlement to an award of attorney's fees and costs and also addresses the amount of reasonable attorney's fees and costs that Defendant requests to be awarded by this Court. The memorandum shall be no longer than seven (7) pages and, as to amount of attorney's fees and costs sought, shall address the hourly rate of counsel, time expended, and costs incurred. Defendant may attach an affidavit regarding its attorney's fees and costs incurred if it wishes to do so. Plaintiff shall then have five (5) days to file a memorandum in opposition to Defendant's request for an award of Rule 37(a)(5)(A) expenses which

shall address Defendant's entitlement to an award of attorney's and costs against Plaintiff and its counsel and the amount of attorney's fees and costs sought, including the hourly rate of counsel and time claimed to have been expended by Defendant's counsel on this discovery matter. Plaintiff's memorandum shall be no longer than seven (7) pages. Defendant shall be permitted to file a reply memorandum of no more than three (3) pages within three (3) days of the filing of Plaintiff's memorandum. Thereafter, the Court will enter a further order on Defendant's request for Rule 37(a)(5)(A) expenses.

**\*7**  6. The parties are encouraged to confer and resolve this Rule 37(a)(5)(A) expense issue without court

intervention if they are able to do so. If the parties are able to resolve this issue by agreement, they shall submit a proposed agreed order on Defendant's request for Rule 37(a)(5)(A) expenses for the Court's review. If the parties cannot resolve this issue, the Court will resolve it after reviewing the parties' memoranda.

**DONE and ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 6 th day of March, 2017.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 878704

## Footnotes

1    Defendant's motion to compel notes that the parties were engaged in conferral to try and resolve these disputes. Defendant further noted that Plaintiff advised that it was going to file revised responses as to the requests, and Defendant reserved the right to address Plaintiff's revised responses if they remained deficient. [DE 28, p. 2, f.n. 2].

2    The Court notes that its reasoning and analysis regarding Request #8 above applies with equal force to all of Plaintiff's responses to the requests for production at issue in Defendant's motion to compel [DE 28].

3    Should the parties desire a more comprehensive non-disclosure, confidentiality and privacy agreement, they can either confer as professionals in good faith and file a proposal for the Court's review or either party may seek entry of a more comprehensive order via motion. However, the documents shall be produced within ten (10) days of the date of this Order regardless.

4    *See* *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993).

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 11610728
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

Pleadro J. SCOTT, Plaintiff,

v.

MIAMI-DADE DEPT. OF CORR., et al., Defendants.

CASE NO. 13-CIV-23013-GAYLES
|
Signed 04/13/2017

**Attorneys and Law Firms**

Ariel Tai Ryan Nichol Lett, Lett Law, PLLC, Raquel M. Fernandez, Benjamin Mitchel, Brianna Heather Sainte, Bilzin Sumberg Baena Price and Axelrod LLP, Miami, FL, for Plaintiff.

Bernard Pastor, Daija Page Lifshitz, Leigh Carolyn Kobrinski, Miami-Dade County Attorney's Office, Miami, FL, for Defendant Miami Dade County.

Bernard Pastor, Daija Page Lifshitz, Erica Sunny Shultz Zaron, Leigh Carolyn Kobrinski, Miami-Dade County Attorney's Office, Miami, FL, for Defendants R. Gomez, C. Weston.

Bernard Pastor, Leigh Carolyn Kobrinski, Miami-Dade County Attorney's Office, Miami, FL, for Defendant Jane Doe.

Bernard Pastor, Miami-Dade County Attorney's Office, Miami, FL, for Defendant CMDR John Prats.

**ORDER ON DEFENDANTS' MOTION TO COMPEL PLAINTIFF TO SIGN A RELEASE FOR MEDICAL RECORDS AND ORDER ON DEFENDANT GOMEZ'S MOTION TO COMPEL PLAINTIFF TO PROVIDE COMPLETE RESPONSES TO DEFENDANT'S DISCOVER REQUESTS**

Patrick A. White, UNITED STATES MAGISTRATE JUDGE

**\*1** Plaintiff has filed a civil rights action pursuant to § 1983. The cause is before the Court upon Defendants' Motion to Compel Plaintiff to Sign a Release for Medical RecordS (DE#182) and Defendant Gomez's Motion to Compel

Plaintiff to Provide Complete Responses to Defendant's Discovery Requests (DE#188).

The thrust of Plaintiff's claim in this action is that Miami-Dade County officers and employees failed to protect him from assault by another inmate. Pertinent here, Plaintiff alleges that another inmate struck plaintiff in the face and on the top of his head with his fist, and then allegedly grabbed Plaintiff and slammed him against a toilet and the wall. Plaintiff further alleges that he was eventually taken to medical, at which time he did not feel any pain, but that the following day, he felt severe pain in his jaw, head, neck, back and shoulder. According to Plaintiff, he complained to the nurse and was provided Advil for a short period of time.

When Plaintiff first filed this action in August of 2013, he requested $10,000 for pain and suffering and emotional distress. (DE#1). In the operative, second amended complaint, Plaintiff now seeks $50,000 in compensatory and punitive damages, plus another $5,000 for mental and emotional distress. (DE#65). Additionally, in his answers to interrogatories, as a basis for his demand for damages, Plaintiff claims that he suffers from lower back pain and experiences paranoia, mental anguish, and emotional distress, all resulting from the alleged incident. (DE#182, Exh.5, answers to interrogatory numbers 10 and 11).

*Medical Release*

In their Motion to Compel Plaintiff to Sign a Release of Medical Records (DE#182), Defendants explain that they requested that Plaintiff produce all documents related to his damages, and that Plaintiff responded that he did not have the documents in his possession but that they could be obtained from another source. (Id. at Exh.1, 2). Defendants sought to obtain these documents from other sources by requesting that Plaintiff execute a medical records release form for JHS, which provides health services to the Miami-Dade Department of Corrections, and the FDOC, where Plaintiff was transferred within a year of the incident in question and is currently incarcerated. (Id. at Exh.3). The authorization form stated that the information disclosed would only be used by Defendants for the purpose of defending this litigation. (Id.). Plaintiff objected to the release of any medical records from FDOC on the basis that the "allegations in this case is of an assault in the Miami Dade Corrections and Rehabilitation Department and not for anything to do with the Florida Department of Corrections" and thus those medical records are "irrelevant to the facts of this case and inadmissible at trial." (Id. at Exh.4). As for JHS, Plaintiff only agreed

to a limited release of medical records that specifically corresponded to five separate incidents that took place while he was in the custody of the Miami-Dade Department of Corrections, including the May 15, 2013 incident at issue in this case and four other unrelated incidents. (Id.).

**\*2** In response to Defendants' motion (DE#190), Plaintiff states that Defendants are not entitled to his medical records from the FDOC because the incident that forms the basis of his action took place in the Miami-Dade Department of Corrections. (Id. at ¶3). Plaintiff also argues that because "Plaintiff has not asserted an intent to use any medical documents from [FDOC] as to any of his damages claims such information is immaterial and/or irrelevant to the facts of this case and/or any parties [sic] defense." (Id. at ¶11).

Federal Rule of Civil Procedure 26(b)(1) specifies that:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

By claiming compensatory and punitive damages in the amount of $50,000, plus $5,000 for mental and emotional distress in this case, Plaintiff has put his physical and mental condition directly at issue in this case. His medical records are, "at a minimum, reasonably calculated to lead to the discovery of admissible evidence concerning his alleged injuries for which he seeks compensation through this action." Cupp v. United States, No. CV512-005, 2015 WL 510134, at \*2 (S.D. Ga. Feb 6, 2015). Defendants must be able to access Plaintiff's medical records in order to evaluate the nature and extent of any injuries sustained by Plaintiff in the May 15, 2013 incident, as well as any of Plaintiff's pre-existing

physical and mental conditions. This is particularly warranted given that, as set forth above, Plaintiff's claim to damages has had an over 5-fold increase since the inception of this case.

However, the record reflects that Plaintiff is attempting to strategically pick and choose what medical records Defendants can obtain and rely on to defend themselves. For example, Plaintiff apparently claims on the one hand that medical records from the FDOC—where he was transferred within a year of the May 15, 2013 incident at issue—are not relevant to the instant action, and on the other hand Plaintiff requests that Defendants expand his HIPAA **authorization** form to JHS to include **medical records** relating back to a fight he was involved in five years prior to the incident in question.

Plaintiff cannot use his medical condition and the psychotherapist-patient privilege as a sword and a shield. By claiming that the May 15, 2013 incident in question has caused Plaintiff "severe discomfort, paranoia, mental anguish, and emotional distress" (DE#182, Exh.5 at Int. Resp. No. 11), and that Plaintiff has suffered a "loss of capacity for enjoyment and/or quality of life" (Id. at ¶ 9), Plaintiff is seeking more than just damages for " 'garden variety' emotional distress." N.D. ex rel. Dorman v. Golden, No. 2:13cv540-MEF-TFM, 2014 WL 1764714, at \*5 (M.D. Ala. May 1, 2014) (discussing five conditions identified by courts in which a plaintiff's mental health is placed " 'in controversy,' " including where a plaintiff alleges "a specific mental or psychiatric injury or disorder," and also where a plaintiff alleges "unusually severe emotional distress"). So long as Plaintiff maintains his entitlement to damages on these grounds, Defendants are entitled to inquire about his psychological condition, and upon matters that would impact or shape that condition which do not involve Defendants.

See Bridges v. Eastman Kodak Co., 850 F. Supp. 216, 223 (S.D.N.Y. 1994) ("Although having to answer questions about their personal histories is to some extent an intrusion in their privacy, and may in fact inhibit some plaintiffs from proceeding with their claims, such an inquiry is warranted since plaintiffs are seeking compensation for their mental anguish."). As such, Defendants' motion is due to be granted. See Cupp, 2015 WL 510134 at \*3 (citing cases and joining the district courts in the Eleventh Circuit that "have recognized a party's ability to request the production of a signed HIPAA authorization and the court's ability to order compliance therewith"); McMullen v. Charter Sch. USA, Inc., Case No. 09-61578-CIV, 2011 WL 56065, at \*5 (S.D. Fla. Jan. 7, 2011)

(recognizing the court's ability to order the production of a signed HIPAA authorization form).

*Responses to Discovery Requests*

**\*3** On December 29, 2016, Defendant Gomez served his First Request for the Production of Documents and his First Set of Interrogatories. (DE#188, Exh.1 and 2). Defendant received Plaintiff's response to the request for production of documents on January 31, 2017. (Id. at Exh.3). Plaintiff did not produce a single document. Rather, in response to almost every request for documents, Plaintiff objected that he would supplement the response pursuant to FED. R. CIV. P. 26(e) and/or that the documents were not relevant. On February 8, 2017, Defendant received Plaintiff's response to interrogatories. (Id. at Exh.4). Plaintiff objected to answering nearly every interrogatory, claiming the requests were "irrelevant and [sic] waste of time" (Id. at Resp. No. 1), the information sought is protected by the psychotherapist-patient privilege (Id. at Resp. No. 12), or refusing to answer because he "pleads the Fifth Amendment." (Id. at Resp. Nos. 5, 6, 8.). The questions and Plaintiff's responses are laid out in Defendant's motion, and need not be detailed here. But by way of example, Plaintiff "pled the Fifth" in response to questions such as what previous lawsuits he had filed, objected to a question that asked him to identify individuals with whom he has discussed the case on the basis of vagueness, objected to a question that asked for his 10-year employment history on the basis that he "has not made a damage claim at this time," objected to a question that he describe his physical injuries on the basis that they were "an intrusion on his personal security and/or bodily liberty," and objected to a question asking if he has ever visited or been diagnosed or treated by a mental health professional on the basis of privilege when, as set forth above, Plaintiff is claiming mental and emotional injuries. And the list goes on. The Court thus finds that Plaintiff has repeatedly refused to answer straightforward and relevant questions on frivolous bases, and that there is an indication that Plaintiff has a full understanding of his discovery obligations and has refused in bad faith to comply. Plaintiff's response to the motion (DE#196) has done nothing to alter the Court's conclusion in this regard and, as such, this motion is also due to be granted.

*Failure to Participate in Discovery*

For the reasons set forth above, Plaintiff's refusal to sign the medical release, as well as his refusal to provide complete responses to Defendant Gomez's discovery requests, are frivolous and demonstrate an intentional pattern of obstructionist behavior. A district court has broad discretion to control discovery. Dismissal for discovery violations may be appropriate when a plaintiff's recalcitrance is due to willfulness, bad faith or fault. Phipps v. Blakeney, 8 F.3d 788, 790 (11th Cir. 1193) (citing National Hockey League v. Metro. Hockey Club, Inc., 427 U.S. (1976)). Further, dismissal as a sanction under Rule 37(d) is appropriate when a plaintiff's failure to comply with discovery has involved either repeated refusals or an indication of full understanding of discovery obligations coupled with a bad faith refusal to comply. Griffin v. Aluminum Co. of America, 564 F.2d 1171 (5th Cir. 1977) (citing Durgin v. Graham, 372 F.2d 130 (5th Cir. 1967)).

Accordingly, it is hereby

ORDERED AND ADJUDGED

1. Defendants' Motion to Compel Plaintiff to **Sign** a Release for **Medical Record** (DE#182) is GRANTED. Plaintiff shall **sign** the medical release.

2. Defendant Gomez's Motion to Compel Plaintiff to Provide Complete Responses to Defendant's Discovery Requests (DE#188) is GRANTED. Plaintiff shall file complete responses to Defendant's Interrogatories Nos. 2, 3, 5, 6, 8, 9, 12–18, and 21, and to Defendant's Requests for the Production of Documents Nos. 1, 2, 3, 4, 8, 10, 11, 12, and 15.

**PLAINTIFF IS HEREBY ADVISED THAT FURTHER MISCONDUCT IN THE DISCOVERY PROCESS MAY RESULT IN THE IMPOSITION OF APPROPRIATE SANCTIONS, INCLUDING DISMISSAL OF THIS CASE.**

DONE AND ORDERED at Miami, Florida, April 13, 2017.

**All Citations**

Slip Copy, 2017 WL 11610728

---

                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:23-cv-22629-RAR   Document 18-4   Entered on FLSD Docket 12/01/2023   Page 61 of 90

Stevens v. ACR Sales and Service, Inc., Not Reported in Fed. Supp. (2009)

2009 WL 10670163
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Orlando Division.

David STEVENS,

v.

ACR SALES AND SERVICE, INC., Defendant.

Case No. 6:08-cv-421-Orl-31KRS
|
Signed 01/14/2009

| MOTION: | PLAINTIFF'S MOTION TO DETERMINE DAMAGES (Doc. No. 20) |
|---|---|
| FILED: | October 30, 2008 |

## I. INTRODUCTION.

Plaintiff David Stevens was employed by ACR Sales and Service, Inc. ("ACR"), a company specializing in the sale and service of air conditioning units. On March 21, 2008, Stevens filed suit against ACR alleging that ACR violated Stevens' rights pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA"). Doc. No. 1. Stevens filed a return of service showing that ACR's registered agent was personally served with the summons and complaint on March 26, 2008. Doc. No. 7. When ACR failed to respond to the complaint within 20 days, Stevens moved for entry of default. Doc. No. 8. The Clerk of Court entered a default against ACR on April 17, 2008. Doc. No. 9.

Stevens next moved for entry of final judgment on default and for attorney's fees and costs. Doc. Nos. 14, 15. I issued a Report and Recommendation that noted certain deficiencies in both the evidence presented and legal argument submitted. Doc. No. 18. I recommended that the presiding judge grant both motions in part, find ACR liable for violating the FMLA, find Stevens entitled to damages, attorney's fees and costs, and direct Stevens to file a motion to determine damages, fees and costs. *Id.* The presiding judge adopted my Report and Recommendation, directed Stevens to file a motion to determine damages, and directed me to conduct an evidentiary hearing to determine an appropriate award.

Stevens previously filed with the Court an Affidavit of David Stevens ("Stevens' Aff."), doc. No. 15. Stevens also testified

### Attorneys and Law Firms

Lindsay N. Oyewale, DeBaubien, Knight, Simmons, Mantzaris & Neal, LLP, Orlando, FL, for David Stevens.

### REPORT AND RECOMMENDATION

KARLA R. SPAULDING, UNITED STATES MAGISTRATE JUDGE

***1 TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration following an evidentiary hearing and oral argument held on December 15, 2008:

at the hearing held on December 15, 2008. Stevens' attorney, Lindsay N. Oyewale, Esq., has submitted an affidavit in support of attorney's fees. Doc. No. 25 ("Oyewale Aff."). Stevens also submitted untimely an Affidavit of Reasonable Attorney Fees signed by Gary D. Wilson, Esq., doc. no. 26-2 ("Wilson Aff."). Pursuant to Court order, Stevens filed an Amended Affidavit of Lindsay N. Oyewale. Doc. No. 28-2 ("Oyewale Amended Aff.").

## II. EVIDENCE IN SUPPORT OF DAMAGES. [1]

On or about July 31, 2006, Stevens' wife was admitted to the hospital. Stevens' Aff. ¶ 10. At the time, Stevens was employed by ACR as a sales manager. *Id.* ¶ 4. Stevens informed his immediate supervisor, Terry Whittemore, of his wife's illness and that he was taking time off from work. *Id.* ¶ 10. Stevens remained in constant contact with his supervisor to inform him of his wife's condition and his continued need to be absent from work to care for her. Stevens was absent from work from July 31, 2006, through October 30, 2006.

***2** On August 11, 2006, while Stevens was on leave, he was demoted from sales manager to salesperson. Stevens Aff. ¶ 14. Stevens returned to work on October 31, 2006, and was terminated from employment on November 24, 2006. *Id.* ¶¶ 18, 19.

*Wages.*

Case 1:23-cv-22629-RAR   Document 18-4   Entered on FLSD Docket 12/01/2023   Page 62 of 90

Stevens v. ACR Sales and Service, Inc., Not Reported in Fed. Supp. (2009)

Base Salary.

While working as a manager, Stevens received a base salary of $650.00 per week. After his demotion to a salesperson, his base salary was $400.00 per week.

Commissions.

Stevens also was entitled to a percentage commission based on sales, 6% for existing accounts and 9% for new accounts. In both the manager and sales person positions, Stevens received commissions for both new and existing accounts. The existing accounts portion was regularly $3,500.00 per month. The total commission was approximately $4,100.00 per month. Commissions ordinarily were paid the first week of the month following the month in which the commissions were earned.

At some point while he was on leave, ACR lost two of the existing accounts, resulting in Stevens losing $400.00 per month in commissions. Stevens did not generate any new business after beginning his FMLA leave.

Stevens was not paid any commissions for the months August, September, October, or November 2006. Based on the figure of $3,500.00 per month from existing accounts, Stevens estimates he is owed $14,000.00 for unpaid commissions for 2006. [2]

Mitigation.

After being terminated, Stevens applied to approximately forty employers, twenty in person and twenty through electronic mail. As December is a slow period in the air conditioning sales business, he was unable to obtain other employment. In April 2007, Stevens began working for a vacation travel company. He was hired initially as a sales representative, and his earnings averaged $500.00 per week. He was promoted to manager in August 2007, and his base salary increased to $700.00 per week, with total net earnings (including commissions) of $1,120.00 per week. Due to the economic downturn, his employer reduced his salary in the middle of July 2008 to a base rate of $600.00 per week. Since that time, his total weekly earnings have fluctuated but he

does not predictably earn bonuses or commissions. His new job does not provide any benefits.

*Manager's Bonus.*

Stevens became eligible for a manager's bonus in November 2005 that was to be paid every other quarter if certain criteria were met. To determine whether a manager's bonus would be paid, ACR's total profit and loss statements were analyzed. If there was at least a 22% increase from the previous period, he would receive a $4,000.00 bonus. If a 22% increase had not been achieved, he would receive a prorated bonus if the accounts were "in the black." Stevens received a $4,000.00 manager's bonus for the first half of 2006, which was paid. He was not paid a bonus for the second half of 2006. No evidence of profit or loss was introduced, other than the loss of the two aforementioned existing sales accounts. Stevens testified that ACR has not determined whether he was entitled to a manager's bonus for the second half of 2006 before he was terminated.

*Health Benefits.*

 **\*3**  As sales manager, Stevens was eligible for the executive health policy, which covered family members, and which had employee premiums of $350.00 per month. The executive policy paid 100% of Stevens' medical, dental, and vision expenditures after Stevens satisfied a $2,000.00 deductible. Following his demotion, ACR made available to Stevens a different health policy, which had employee premiums of $950.00 per month. ACR cancelled Stevens' health insurance policy effective October 1, 2006, when Stevens was late in submitting his premium payment for the month of September.

Stevens testified that he satisfied the $2,000.00 deductible prior to August 2006. Stevens testified that he incurred medical expenses in the amount of $3,646.95 after his health policy was cancelled. [3]

*Company Car and Car Allowance.*

At some point in 2006, Stevens was given the use of a company-owned car. There were no restrictions on personal use of the car, and he was not required to complete any reports detailing how he used the car. In addition to use of the car, he also was given a $500.00 month car allowance to use for car maintenance, upkeep and gas. Again, he was not required to account for the use of these monies.

ACR stopped paying the car allowance on August 6, 2006. Stevens was required to return the car at the end of August 2006. Although Stevens testified that the company car was a 2002 or 2003 Ford Explorer, he provided no other evidence of the value of the company car benefit. Stevens purchased a 2003 Mitusbishi Montero for $11,998.00 to replace the lost personal use of the company car.

### III. ANALYSIS.

An employer who retaliates against an employee for exercise of FMLA rights is liable for damages equal to any wages, salary, employment benefits, or other compensation denied or lost due to the violation, and an additional equal amount as liquidated damages. ⚑ 29 U.S.C. § 2617. I will review the damages claimed by category.

### A. Wages.

The Court having previously found that ACR retaliated against Stevens for taking FMLA leave, Stevens is entitled to lost wages following his return to work [4] and back pay following his termination to the date of entry of judgment. I will calculate the wages by category.

### 1. Base Salary.

The evidence supports a finding that Stevens' demotion was part of the retaliation for taking FMLA leave. Therefore, Stevens' wages should be based on those he received as a sales manager.

Stevens is entitled to the difference from his base salary as a manager and his base salary as a salesperson from October 31, 2006, when he returned to work following his FMLA leave, through November 26, 2006, the date he was terminated. This period is approximately four weeks. Stevens received a $650.00 per week base salary as a sales manager, but he was paid only $400.00 per week during this period. Thus, Stevens is entitled to the $250.00 per week difference between the two salaries for the four weeks in this time period, for a total base salary of $1,000.00 (4 weeks x $250.00 = $1,000.00).

After his termination, Stevens is entitled to receive of his base salary of $650.00 through December 31, 2008, which is the last date on which Stevens seeks an award of damages. *See* Doc. No. 15 at 8. The period from November 27, 2006

and December 31, 2008 is approximately 109 weeks. For this period, Stevens is entitled to a total base salary of $70,850.00.

### 2. Commissions.

**\*4** Regarding lost commissions, Stevens presented no evidence that ACR paid commissions to its employees when the employees were on a leave of absence. *Cf. Estes v. Meridian One Corp.*, 6 Fed. Appx. 142, 147 (4th Cir. 2001)(discussing sufficiency of evidence supporting jury's award of unpaid commissions while on FMLA leave). As noted above, the FMLA is unpaid leave. Therefore, I conclude that Stevens was not entitled to commissions from July 31 through October 30, 2006, which was the period he was on FMLA leave.

Although Stevens routinely earned $3,500.00 per month commissions from existing accounts, two accounts were lost during his leave, reducing the commissions by $400.00 per month. There is no evidence to determine the new accounts Stevens might have obtained after he returned to work. Stevens, therefore, is entitled to commissions of $3,100.00 for November 2006 through December 2008, for a total of $80,600.00 (26 months x $3,100.00 per month = $80,600.00).

### 3. Mitigation.

Courts have concluded that "[i]n FMLA cases, as in other employment discrimination cases, a plaintiff has a duty to reasonably mitigate damages." *Knox v. Cessna Aircraft Co.*, Civil Action No. 4:05-CV-131(HL), 2007 WL 2874228, at * 11. (M.D. Ga., Sept. 26, 2007), and cases cited therein. In this case, Stevens partially mitigated his damages through subsequent employment. It is proper to deduct Stevens' subsequent earnings from his lost wages. *See* ⚑ *Nord v. U.S. Steel Corp.*, 758 F.2d 1462, 1471-72 (11th Cir. 1988)(district court erred in failing to deduct interim earnings from back pay award under Title VII); *see also* ⚑ *Franzen v. Ellis Corp.*, 543 F.3d 420, 429-30 (7th Cir. 2008)(failure to mitigate by diligently searching for comparable employment resulted in denial of FMLA claim).

Stevens began working at his vacation travel job in April 2007 and received a salary of $500.00 per week through July 2007. During this 17 week period, Stevens earned $8,500.00 (17 weeks x $500.00 per week = $8,500.00).

Case 1:23-cv-22629-RAR  Document 18-4  Entered on FLSD Docket 12/01/2023  Page 64 of 90

Stevens v. ACR Sales and Service, Inc., Not Reported in Fed. Supp. (2009)

Stevens' wages, now including commissions, increased on August 1, 2007 to $1,120.00 per week and continued at that level through sometime in July 2008. Therefore, from August 1, 2007 – July 12, 2008,[5] Stevens earned wages of $54,880.00 ($1,120.00 per week x 49 weeks = $54,880.00).

In mid-July 2008, Stevens' wages reduced to $600.00 per week and he does not regularly receive commissions. Therefore, from July 13, 2008 through December 31, 2008, Stevens earned wages of $15,000.00 ($600.00 per week x 25 weeks = $15,000.00).

Therefore, Stevens' back pay award must be reduced by the wages he earned in his vacation travel job in the total amount of $78,380.00.

### 4. Back Wage Summary After Mitigation.

Based on the above, Stevens' back wages since his termination through December 31, 2008 are:

| Time Period | Base Wages | Commissions | Total |
| --- | --- | --- | --- |
| 10/31/06–11/24/06 | $1,000.00 | $3,100.00 | $4,100.00 |
| 11/27/06–12/31/08 | $70,850.00 | $77,500.00 | $148,350.00 |
| **Less Wages Earned in Subsequent Job** | | | ($78,380.00) |
| **GRAND TOTAL** | | | $74,070.00 |

### B. Management Bonus.

Stevens asserts that he is entitled to management bonuses of $4,000.00 paid every other quarter. Stevens testified that the management bonus depended on the amount of profit generated. As there was no evidence introduced regarding ACR's profits, Stevens has not sustained his burden of proof regarding entitlement to this benefit.

### C. Health Benefits.

**\*5** Stevens seeks repayment of $3,646.95 in medical expenses that he paid out-of-pocket after his health insurance was cancelled. To have received the medical reimbursement benefit, Stevens would have been required to maintain his insurance by paying his portion of the premium. *See* Sherman v. AI/FOCS, Inc., 113 F. Supp. 2d 65, 76 (D. Mass. 2000)(employee terminated in violation of FMLA allowed to recover damages she sustained because of the termination of her health insurance benefits, minus any deductibles, copayments or premiums that she would have been required to pay); *cf.* 29 U.S.C. § 2614(c)(1); 29 C.F.R. § 825.100(b) ("An employee on FMLA leave is ... entitled to have health benefits maintained while on leave as if the employee had continued to work instead of taking the leave. If an employee was paying all or part of the premium payments

prior to leave, the employee would continue to pay his or her share during the leave period.").

From the date of his termination through December 31, 2008, Stevens would have had to pay $8,750.00 in premiums to maintain the health insurance benefit ($350.00 per month for the executive health plan x 25 months = $8,750.00). Even if the Court were to assume that Stevens would have cancelled his policy following the last date medical expenses were incurred, Stevens still would have had to pay $5,950.00 in premiums ($350.00 per month through April 2008).[6] As the premiums would have exceeded any benefit due, Stevens has failed to establish entitlement to repayment of his medical expenses.

### D. Company Car and Car Allowance.

There is no precedent in this circuit that addresses whether the loss of use of a company car is recoverable as a lost benefit. Even if recoverable, Stevens' evidence fails to show the economic value of the benefit. *See* Kolb v. Goldring, Inc., 694 F.2d 869, 874 (1st Cir. 1982)(denying award for loss of company car where there was no evidence regarding make and model of car provided, or the cost to lease or maintain such a car). Stevens has presented no authority that the value of the lost company car should be measured by the purchase price of another car. Given the lack of evidence and lack of

authority, I find that Stevens has failed to prove the value of the lost company car benefit.

The evidence did establish, however, that Stevens received $500.00 per month as a car allowance, which is a benefit subject to calculation. Therefore, I find that Stevens is entitled to the lost car allowance from August 2006, when he lost the car allowance, through December 2008 in the amount of $14,500.00 ($500.00 per month x 29 months = $500.00).

### E. Liquidated Damages.

The FMLA provides that an employee is entitled to liquidated damages in an equal amount to his lost compensation and benefits due to the violation. 29 U.S.C. § 2617. General employment law cases provide that liquidated damages are based on the amount of mitigated loss, not the gross amount of the loss prior to mitigation. *See E.E.O.C. v. White and Son Enter.,* 881 F.2d 1006, 1013 (11th Cir. 1989).

Stevens' mitigated loss consisting of his lost wages and car allowance benefit totals $88,570.00 ($74,070.00 lost earnings + $14,500.00 car allowance = $88,570.00). This is the amount that should be awarded as liquidated damages.

### F. Front Pay.

Although Plaintiff's Motion to Determine Damages made no request for front pay, Stevens' counsel made such a request during oral argument. [7] Usually, front pay is limited to cases where reinstatement of the employee is not possible due to extenuating circumstances and front pay is necessary to provide make whole relief to the victim of discrimination.

*See E.E.O.C. v. W&O, Inc.,* 213 F.3d 600, 619 (11th Cir. 2000). As the FMLA provides for "equitable relief as may be appropriate" and front pay is a form of equitable relief, front pay theoretically is available. *See Quitto v. Bay Colony Golf Club, Inc.,* No. 2:06-cv-286-FtM-29DNF, 2007 WL 4098847, *2 (M.D. Fla. Nov 15, 2007) (interpreting § 2617(a)(1)(B) of the FMLA as allowing front pay).

**\*6** Awarding front pay is discretionary. *See W&O, Inc.,* 213 F.3d at 618. The failure to mitigate is a factor that the court may consider in determining whether to award front pay. *See Castle v. Sangamo Weston, Inc.,* 837 F.2d 1550, 1562 (11th Cir. 1988)("The duty to mitigate damages by seeking

employment elsewhere will, of course, limit the amount of front pay available.")

In this case, Stevens does not seek reinstatement and he has presented no evidence establishing extenuating circumstances that would prevent reinstatement. Furthermore, the Court may take judicial notice of the current economic recession and the widely publicized layoff of employees and downturn in sales in a large number of industries. In light of general economic conditions, it is speculative that Stevens could have continued employment at ACR earning the same amounts that he earned in 2005 and 2006. Given all of these factors, I recommend that the Court find that it would be inequitable to award Stevens front pay, particularly in light of his failure to request such relief in his papers.

### G. Attorneys' Fees.

A plaintiff who receives a judgment under the FMLA is entitled to receive reasonable attorneys' fees and other costs of the action. 29 U.S.C. § 2617(a)(3). Stevens seeks to recover $9,150.00 in attorneys' fees and $579.05 in costs. Oyewale Amended Aff. ¶ 9.

In Hensley v. Eckerhart, 461 U.S. 424, 433 (1983), the Supreme Court stated that "the most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." This amount, which is commonly referred to as the lodestar, is then adjusted to reflect the "results obtained." *Id.* at 434; *accord Norman v. Hous. Auth.,* 836 F.2d 1292, 1299-1302 (11th Cir. 1988).

The " 'fee applicant bears the burden of establishing entitlement and documenting the appropriate hours and hourly rates.' " *Am. Civil Liberties Union v. Barnes,* 168 F.3d 423, 427 (11th Cir. 1999) (quoting *Norman,* 836 F.2d at 1303). Thus, the applicant must produce satisfactory evidence that the requested rate is within the prevailing market rates and supports the number of hours worked and the rate sought. *Hensley,* 461 U.S. at 433. "Satisfactory evidence at a minimum is more than the affidavit of the attorney performing the work.... [S]atisfactory evidence necessarily must speak to rates actually billed and paid in similar lawsuits." *Norman,* 836 F.2d at 1299 (citations omitted). Further, "[t]he parties ought to provide the court with a range of market rates for lawyers of different skill

levels ... involved in similar cases with similar clients, so that the court may interpolate the prevailing market rate based on an assessment of the skill demonstrated in the case at bar."

📖 *Id.* at 1300.

Where documentation is inadequate, the court is still obligated to award a reasonable fee, and it may make such an award without further pleadings or an evidentiary hearing. 📖 *Id.* at 1303. It is well established that the Court may use its discretion and expertise to determine the appropriate hourly rate to be applied to an award of attorney's fees. *Id.;* 📖 *Scelta v. Delicatessen Support Servs., Inc.,* 203 F. Supp. 2d 1328, 1331 (M.D. Fla. 2002).

### 1. Hourly Rate.

Oyewale avers that she has practiced in the field of labor and employment law for the past eight years, and this experience gives her knowledge of reasonable market rates. Oyewale Amended Aff. ¶¶ 5, 7. Oyewale attests that a reasonable hourly rate for her services is $250.00 per hour. *Id.* ¶ 7. Oyewale provided no evidence that any court has awarded her fees at the requested hourly rate, or that any client has paid her fees at this rate.

**\*7** In his affidavit, Gary D. Wilson, Esq., avers that he has been an active member of the Florida Bar since 1990, that he is engaged in civil trial practice in the area of labor and employment law, and that his hourly rate as a partner representing FMLA clients is $300.00 per hour. Wilson Aff. ¶ 2. Wilson examined the file and time records of Oyewale and opines generally that $250.00 is a reasonable fee for Oyewale's time in the Central Florida market. Wilson does not state what are the billing rates are for other attorneys at his firm whose experience is more closely matched to Oyewale,

| Attorney | Hourly Rate |
|---|---|
| Lindsay N. Oyewale | $250.00 |

Oyewale has neither presented any evidence of a contingent fee agreement between her law firm and Stevens, nor has she made any argument that the lodestar should be adjusted due to a contingent fee agreement. In the absence of such evidence or argument, Oyewale and her firm should limited to those fees and costs awarded by the Court without reduction of the damages awarded to Stevens by application of a fee agreement.

or whether any courts have awarded $250.00 per hour to an attorney with similar qualifications in this type of case.

In 📖 *Weil v. Vescovi,* No. No. 6:05-cv-319-Orl-22KRS, 2007 WL 2827697 (M.D. Fla. Sept. 27, 2007), I analyzed the hourly rates of attorneys with 8-9 years of experience in labor and employment law. I found that a reasonable rate for such an attorney in the Central Florida market was $225.00 per hour. *Id.* at \*4. I note that attorneys' hourly rates have increased since I performed that analysis. Therefore, I find that $250.00 is a reasonable hourly rate for Oyewale in the absence of objection.

### 2. Reasonable Number of Hours.

Oyewale avers that she spent a total of 36.6 hours working on this matter. Oyewale Amended Aff. ¶ 8. Based on a review of the itemized time records submitted by Oyewale, I find that the time she spent working on the case was reasonable, with the following two exceptions.

First, Oyewale recorded .4 hours on 4-17-2008 to review the entry of clerk's default. The clerk's default consists of a single sentence. I find .1 hours is a reasonable amount of time for this task.

Second, Oyewale recorded 2.5 hours on 5-14-2008 to prepare the first motion for default. As I found this motion to be deficient, Oyewale's time for this task should be excluded.

Therefore, I find that Oyewale reasonably spent 33.8 hours working on the case.

The lodestar for attorney's fees is as follows:

| Reasonable Hours | Total |
|---|---|
| 33.8 | $8,450.00 |

### H. Costs.

Stevens seeks an award of costs in the amount of $350.00 for reimbursement for the filing fee and $45.00 for the costs of serving process in this case. Doc. No. 15 at 61-62. "Costs for service of process and the filing fee are ... properly awarded under 28 U.S.C. § 1920 ...." *Perrin v. John B. Webb & Assocs.,*

Case 1:23-cv-22629-RAR   Document 18-4   Entered on FLSD Docket 12/01/2023   Page 67 of 90

Stevens v. ACR Sales and Service, Inc., Not Reported in Fed. Supp. (2009)

No. 604CV399ORLKRS, 2005 WL 2465022, at *5 (M.D. Fla. Oct. 6, 2005).

Stevens also seeks $19.50 in photocopy charges. Doc. No. 15 at 63. "Copies attributable to discovery, copies of pleadings, correspondence, documents tendered to the opposing party, copies of exhibits, and documents prepared for the Court's consideration are recoverable." *Desisto Coll., Inc. v. Town of Howey-In-The-Hills*, 718 F. Supp. 906, 913 (M.D. Fla. 1989)(citing *Fressell v. AT&T Technologies, Inc.*, 103 F.R.D. 111, 115-16 (N.D. Ga. 1984)), *aff'd sub nom. Desisto Coll., Inc. v. Line*, 914 F.2d 267 (11th Cir. 1990). Copies obtained for the convenience of counsel, including extra copies of filed papers, correspondence, and copies of cases, are not allowed. *Desisto*, 718 F. Supp. at 913 (citing *Allen v. Freeman*, 122 F.R.D. 589, 591 (S.D. Fla. 1988) and *Fressell*, 103 F.R.D. at 116). The burden of proof of the necessity of copying expenses is on the moving party because the cost is within the exclusive knowledge of the moving party. *Desisto*, 718 F. Supp. at 910 n.1. As Oyewale's affidavit fails to detail for what purpose the photocopies were made, these costs should be denied.

**\*8** Stevens also seeks $62.06 in postage charges, $1.01 in reimbursement for a runner's mileage, and $98.95 for internet research. Doc. No. 15 at 67-68. These charges are not recoverable as costs. improper. *Duckworth v. Whisenant*, 97 F.3d 1393, 1399 (11th Cir. 1996); *Scelta v. Delicatessen Support Servs., Inc.*, 203 F. Supp. 2d 1328, 1329 (M.D. Fla. 2002). Stevens also requests unspecified costs of $2.53. Doc. No. 15 at 69. Without knowing the basis of this cost, it is unrecoverable.

Therefore, I recommend that the Court award costs in the total amount of $395.00.

## IV. RECOMMENDATION.

Based on the above, I recommend that the Court do the following:

**GRANT in part and DENY in part** Plaintiff's Motion to Determine Damages, doc. no. 20;

**AWARD** damages to David Stevens in the amount of $177,140.00; [8]

**AWARD** attorney's fees in the amount of $8,450.00;

**AWARD** costs in the amount of $395.00;

**ORDER** counsel not to collect from the damages awarded to Stevens any attorneys' fees or expenses other than those found to be reasonable in the Court's order;

**DIRECT** the Clerk to enter judgment in favor of David Stevens and against ACR Sales and Service, Inc. in the amount set forth above and thereafter to close the case.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on January 14, 2009.

### All Citations

Not Reported in Fed. Supp., 2009 WL 10670163

## Footnotes

1    I cite the evidence that is in documentary form. As no transcript of the hearing has been prepared, other facts included herein are based on my recollection of the evidence presented. Should Stevens object to the factual findings, he must order the transcript of the evidentiary hearing and cause it to be filed in the Court's record.

2    In 2005, Stevens' total wages consisting of base salary and commissions equaled $54,898.48. Stevens Aff. ¶ 6. Stevens was the Salesman of the Year for 2005. *Id.* ¶ 5. In 2006, Stevens earned $27,221.81 prior to being terminated.

3 Stevens speculated that he had paid health expenses in excess of this amount, but he did not present testimony or evidence establishing any additional health expenses.

4 Stevens is not entitled to compensation during the time he was on FMLA leave. The FMLA requires an employer to allow an employee to take 12 weeks of *unpaid* leave in a 12-month period. 29 U.S.C. § 2612(a), (c).

5 As Stevens testified that his salary was reduced in mid-July 2008, I selected the date of July 12, 2008, for purposes of calculating the lost wages.

6 See Doc. No. 15 at 31.

7 Front pay is money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement. *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001). It appears that counsel may have confused front pay with back pay, which is the measure of lost compensation up to the time of judgment. Out of an abundance of caution, I have addressed the request for front pay.

8 This amount is the sum of $74,070.00 back wages after mitigation, $14,500.00 car allowance, and $88,570.00 liquidated damages.

---

**End of Document**        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Breneisen v. Motorola, Inc., Not Reported in F.Supp.2d (2009)
2009 WL 1759575, 158 Lab.Cas. P 35,596

2009 WL 1759575
United States District Court,
N.D. Illinois,
Western Division.

James BRENEISEN, Jr. et al., Plaintiff,
v.
MOTOROLA, INC. et al., Defendant.

No. 02 C 50509.
|
June 22, 2009.

West KeySummary

**1**    **Labor and Employment** 🔑 **Admissibility**

Employee's medical evidence may have been
relevant to the calculation of employee's back
pay damages in employee's Family Medical
Leave Act (FMLA) claims against employer,
and therefore employer's motion in limine with
respect to that evidence was denied. Employee
may have accumulated medical bills during a
time period relevant to back pay, and the unpaid
bills may have been paid under employer's
health plan. Employer did not demonstrate why
evidence accumulated during the back time pay
should have been barred, as the medical bills
accumulated during that time period may have
been relevant to an award of past employment
health benefits. Family and Medical Leave Act
of 1993, § 107(a) (1)(A)(i)(I), 📁 29 U.S.C.A. §
2617(a) (1)(A)(i)(I).

6 Cases that cite this headnote

**Attorneys and Law Firms**

George S. Bellas, Robert A. Clifford, Clifford Law Offices,
P.C., Mark J. Vogg, Williams, Montgomery & John,
Ltd., Patrick E. Mahoney, Patrick Mahoney & Associates,
Chicago, IL, Peter Thomas Shovlain, Peter T. Shovlain,
Attorney at Law, San Diego, CA, for Plaintiffs.

Michael A. Warner, Joan E. Gale, Noah A. Finkel, Scott
A. Carlson, Susan F. Gallagher, Theresa Robbins Shea,
Seyfarth Shaw LLP, Chicago, IL, Christopher Lawrence
Casazza, Morgan Lewis, Attorneys at Law, New York, NY,
for Defendants.

*MEMORANDUM OPINION AND ORDER*

P. MICHAEL MAHONEY, United States Magistrate Judge.

*I. Introduction*

**\*1** Before the court is Motorola's motion in limine seeking
to bar evidence of James Breneisen, Jr.'s ("James") medical
condition, expert evidence of the same, and evidence of
the medical bills he has paid or is obligated to pay. Parties
consented to the magistrate judge's jurisdiction on March 18,
2009. The court grants in part and denies in part Motorola's
motion in limine.

*II. Facts*

James was one of six original plaintiffs in this suit. He was
employed at various Motorola facilities between 1994 and
2003. In 1999, he began working on an hourly basis in
Motorola's Factory Express Program at the Rockford facility,
where he received merchandise for the program. He was
given more responsibilities as the program grew, including
tracking down outgoing packages, filing claims with UPS
and Federal Express, devising shipping solutions, developing
packaging materials, and formulating process improvements
for the assembly line. By February 2000, he was given the
title of Process Analyst.

In June 2000, Bobbi Cooper, the Director of Human
Resources, allegedly told James that she felt he could
be salaried. On January 15, 2001, before discussions on
salary could go further, James took leave under the Family
Medical Leave Act ("FMLA") to receive treatment for gastro-
esophageal reflux.

James returned twelve weeks later on April 9, 2001. He
was reassigned to the keypad line. The keypad line is a
production line position where James had to lift heavy boxes
and manually press buttons on phone keypads to ensure that
the phones properly functioned. James was told that while he
was on leave his position had been eliminated and its duties
disbursed among other positions. His pay and benefits had

been the same as they were when he was a Process Analyst, but he considered the move a demotion. [1]

James worked on the keypad line until April 20, 2001 before again taking medical leave, this time for esophageal surgery. [2] *Breneisen et al. v. Motorola, Inc. et al.,* No. 02-C50509 (N.D.Ill. Feb. 7, 2005) (Crt.Doc. 141). James returned to work on September 4, 2001. (Pl.'s Resp. 4.) He was put back on the keypad line and given the title of Technician Assistant. This leave does not appear to have been protected by the FMLA. [3] (Def.'s Mot. 2.)

Approximately three weeks after his return on September 4, 2001, James accepted a position as Contract Coordinator in the Contracts Department. *Breneisen et al. v. Motorola, Inc. et al.,* No. 02-C50509 (N.D.Ill. Feb. 7, 2005) (Crt.Doc. 141). With the position came a raise. *Id.* Darlene Patterson was his supervisor. James alleges that Patterson made work unpleasant by calling him into 30 to 45 minute meetings multiple times per week. At those meetings, she allegedly accused him of creating a hostile work environment and violating company policy. According to James, this treatment caused him to suffer from severe stress, high blood pressure, and stomach reflux. (*See* Pl.'s Resp. 14.) He worked as a Contract Coordinator until February 5, 2002, when he began another medical leave to undergo a total esophagectomy. James alleges that this procedure and leave were necessary because Patterson's treatment exacerbated his existing medical condition. He never returned from this leave, and Motorola eventually terminated his employment on June 27, 2003. (Defs.' Reply 5.)

*III. Procedural History*

**\*2** James filed suit in March 2002 alleging intentional infliction of emotional distress ("IIED") and violations of the FMLA. James's amended complaint, filed on December 30, 2002, alleged that Motorola violated the FMLA in one or more of the following ways:

> (a) Failed to return the Plaintiff, James P. Breneisen, Jr., to his former employment position or an equivalent employment position following his return to work after his medical leaves in 2001; (b) Failed to return the Plaintiff, James P. Breneisen, Jr., to an employment position having the same

> or equivalent working conditions, privileges and status as his former employment position after his return to work from his medical leaves in 2001; (c) Failed to return the Plaintiff, James P. Breneisen, Jr., to an employment position requiring the same skills, duties, responsibilities, and authority as his former position after his return to work from his medical leaves in 2001; (d) Wrongfully demoted the Plaintiff, James P. Breneisen, Jr., because of his medical leaves in 2001; (e) Wrongfully harassed the Plaintiff, James P. Breneisen, Jr., because of his absences from work while on medical leave in 2001; (f) Wrongfully harassed the Plaintiff, James P. Breneisen, Jr., in order to discourage him from future use of medical leave pursuant to the [FMLA]; (g) Wrongfully took intimidating actions against the Plaintiff, James P. Breneisen, Jr., after his medical leaves taken pursuant to the [FMLA]; (h) Wrongfully gave the Plaintiff, James P. Breneisen, Jr., poor evaluation reports, in retaliation for his absences while on medical leave; and (j) Wrongfully denied the Plaintiff, James P. Breneisen, Jr., promotion in retaliation for his absences from work while on medical leave under the [FMLA].

(Amended Compl. 2-3.) In a separate count, James alleged that Motorola committed each of the above violations willfully. (Amended Compl. 4-6.)

Boiled down, the above claims represent allegations that Motorola failed to reinstate James after he took FMLA leave. The claims also represent allegations that Motorola retaliated and discriminated against him for exercising his FMLA rights. The discriminatory and retaliatory actions allegedly suffered by James were his demotion to the keypad line and the harassment he experienced at the hands of Patterson. To show pretext, James cites to a string of emails produced that indicate potential discriminatory animus. [4]

**Breneisen v. Motorola, Inc., Not Reported in F.Supp.2d (2009)**

2009 WL 1759575, 158 Lab.Cas. P 35,596

Motorola removed the case to federal court on April 18, 2002. On February 7, 2005, Judge Reinhard granted Defendants' motion for summary judgment on James's IIED claim finding it preempted by the FMLA. *Breneisen et al. v. Motorola, Inc. et al.,* No. 02-C50509 (N.D.Ill. Feb. 7, 2005) (Crt.Doc. 141).

Judge Reinhard also granted Motorola's motion for summary judgment on James's FMLA failure to reinstate claims. *Id.* Judge Reinhard found that James's right to reinstatement had expired before he returned to work on September 4, 2001. *Id.* Thus, James's failure to reinstate claim was limited to the two weeks he worked in April. *Id* Judge Reinhard held that James failed to present evidence that he would not have been reassigned when he returned to work on April 9, 2001 had he not taken FMLA leave. *Id.* at 2. Having not made that showing, James's failure to reinstate claim could not survive Defendants' motion for summary judgment. *Id.* (*citing Vasquez v. Northern Illinois Hosp. Servs., Inc.,* 2002 WL 457185, 2002 U.S. Dist. LEXIS 5257 (N.D.Ill. Mar.15, 2002)).

 *3 Judge Reinhard further found that, even if the court considered James eligible for reinstatement when he returned on September 4, 2001, James was encouraged on his first day back to apply for the Contracts Department job, which is an administrative position. *Id.* at 2 n. 2. He was transferred to that position within three weeks and received a raise. *Id.* Under these facts, according to Judge Reinhard, James's failure to reinstate claim was valid at most for the interim period of approximately five weeks (two weeks in April and three weeks in September) before he was transferred to the Contracts Department. *Id.* Regardless of whether he could recover on a failure to reinstate claim for two weeks or five, though, Judge Reinhard found that he failed to produce evidence sufficient to show that he would not have been reassigned upon returning in either April or September. *Id.* Accordingly, his failure to reinstate claims could not survive Defendants' motion for summary judgment either way.

Judge Reinhard also granted Motorola's motion for summary judgment regarding James's FMLA discrimination and retaliation claims. *Id.* at 2. Judge Reinhard found that James did not present any evidence that he suffered an adverse employment action. *Id.* In so stating, Judge Reinhard held that James's move to the keypad line did not amount to discrimination or retaliation under the FMLA. *See id.* Judge Reinhard also discussed that although James may have been harassed by Patterson, he suffered no disciplinary action, demotion, termination or pay cut. *Id.* Although the

treatment was unpleasant, according to Judge Reinhard, it did not amount to an adverse employment action. *Id.* Because there was no adverse employment action, any discriminatory animus was nondeterminative. *Id.* Thus, Judge Reinhard held that James's discrimination and retaliation claims failed. *Id.*

On January 15, 2008, the Seventh Circuit affirmed the district court's rejection of James's IIED claim. *Breneisen et al. v. Motorola, Inc. et al.,* 512 F.3d 972, 983 (7th Cir.2008). The court held that, even if viable alongside the FMLA, James's claim lacked merit because Motorola's alleged conduct was not extreme and outrageous. *Id.*

The court of appeals reversed the district court's holding regarding James's claim for failure to reinstate under FMLA. The Seventh Circuit found that Motorola may have violated the FMLA's failure to reinstate requirement when it transferred James to the keypad line upon his return to work on April 9, 2001. *Id.* at 977. This failure may have resulted in lost opportunities for promotion within the company, and lost corresponding pay and benefits. In analyzing James's failure to reinstate claim, the circuit court first found that James had offered evidence that his position on the keypad line was not equivalent to his old position, notwithstanding the fact that he received the same pay and benefits. *Id.* at 977. Secondly, the Seventh Circuit found that James had "provided sufficient evidence that his position would not have been eliminated (or, more accurately, his duties would not have been distributed to others) if he had not taken [FMLA] leave." *Id.* at 978. Because James offered evidence that Motorola lacked a business justification for eliminating his position while he was on leave, and because Motorola placed James in a position that was not equivalent to his previous position when he returned from leave, the Seventh Circuit held that James had offered enough evidence to survive a motion for summary judgment on his failure to reinstate claim.

 *4 Lastly, the Seventh Circuit reversed the district court's holding regarding James's discrimination and retaliation claims under the FMLA. *Id.* at 979. The Seventh Circuit's analysis began by describing the different standards under which discrimination and retaliation claims are adjudicated. *Id.* The direct method of proving discrimination requires a showing that the plaintiff suffered an "adverse employment action." *Id.* To prove retaliation, a plaintiff must show that she suffered a "materially adverse action." *Id.* The "materiality" required for a retaliation claim, which is not required for a discrimination claim, indicates that an employer's action must pass a higher threshold to satisfy the standard for

Brehelsen v. Motorola, Inc., Not Reported in F.Supp.2d (2009)

2009 WL 1759575, 158 Lab.Cas. P 35,596

retaliation. But, the Seventh Circuit was careful to explain that "[m]aterially adverse actions are not limited to employment-related activites[;]" discrimination claims are. *Id.*

The distinction between discrimination and retaliation claims is important because the district court found that James did not satisfy the standard for discrimination; it did not address whether James's claims satisfied the "materially adverse action" standard for retaliation. *Id.* The Seventh Circuit noted that there were documents offered by the plaintiffs as evidence of discriminatory and retaliatory intent. *Id.* Those documents included declarations by former Motorola employees and emails that allegedly indicate a scheme to retaliate against employees who used FMLA leave. *Id.* Patterson, the woman who allegedly harrassed James in the Contract Department, engaged in those email correspondences. *Id.*

The Seventh Circuit found that the existence of these documents should have been sufficient for the district court to deny Defendants' motion for summary judgee regarding James's discrimination and retaliation claims. *Id.* The court specifically pointed out that if James's transfer to the keypad position on April 9, 2001 was a demotion or reduced James's opportunities for promotion, it would qualify as an adverse employment action and a materially adverse action. *Id.* The documents offered by James, if authentic, would help to establish those claims. *Id.* The Seventh Circuit directed the district court, on remand, to determine the authenticity of the emails allegedly proving discriminatory animus. *Id.*

The Seventh Circuit did not explicitly address whether Patterson's conduct could constitute an adverse employment action or a materially adverse action. *See id.* The circuit court held only that her conduct was not extreme and outrageous as alleged in James's IIED claim. *Id.* at 983. The Seventh Circuit did, however, specifically mention Patterson's email correspondence when evaluating whether James had a cognizable discrimination or retaliation claim. *Id.* at 979. Particularly because the district court did not evaluate any claims under the retaliation standard, the Seventh Circuit's discussion indicates that Patterson's conduct should be re-evaluated in light of James's discrimination and retaliation claims.

 **\*5** After the Seventh Circuit's opinion, James has three surviving claims. The first is that Motorola failed to reinstate James to the position of Process Analyst or an equivalent position when he returned to work on April 9, 2001. The

second surviving claim is that Motorola discriminated and retaliated against James by transferring him to the keypad line when he returned to work on April 9, 2001. The last surviving claim is that Motorola retaliated against James by way of Patterson's alleged harassment while he worked in the Contracts Department from late September until he left for his final medical leave on February 5, 2002. [5]

Under James's surviving FMLA claims, he seeks recovery of back pay, payment of medical bills, lost employment benefits, and front pay. (Pl.'s Resp. 8.) James argues that Patterson's retaliatory conduct exacerbated his medical condition such that he is now permanently unable to return to work at his former Process Analyst position. (Pl.'s Resp. 13.) Because Patterson's FMLA violations directly caused James's condition, James argues that he qualifies for damages under the FMLA to compensate for those violations. This includes equitable remedies of front pay and future health benefits.

Front pay, according to James, should extend to his projected time of retirement because Patterson's harassment rendered him permanently unable to perform his old job. James argues that the proper measure of equitable damages with regard to health benefits are the actual medical expenses incurred during the time that James was not covered by Motorola's health plan.[6] (*Id.* at 11.) (*citing* 🏳️ *Lubke v. City of Arlington,* 455 F.3d 489 (5th Cir.2006)).[7] Again, because his disability is permanent, that time extends to at least his retirement age.

To prove that Motorola's FMLA violations exacerbated James's condition and caused a permanent disability, thereby justifying equitable damages equal to front pay and medical expenses, James intends to introduce evidence of his current medical condition, expert evidence of the same, and evidence of the medical bills he has paid or is obligated to pay. (Def.'s Mot. 1, 3.) That evidence allegedly will show that Patterson's actions to some extent caused James's condition, which is permanent, and that he is unable to work or receive health benefits at the level for which his previous position allowed.

Motorola moves in limine to bar evidence of James's medical condition, expert evidence of the same, and evidence of the medical bills he has paid or is obligated to pay. Motorola argues that this evidence is not relevant because James's exacerbation theory is inconsistent with the FMLA. According to Motorola, the cause or severity of James's FMLA-qualifying condition is irrelevant.

*Brehelsen v. Motorola, Inc.*, Not Reported in F.Supp.2d (2009)

2009 WL 1759575, 158 Lab.Cas. P 35,596

## IV. Discussion

Motions in limine aid in the efficient management of litigation by sharpening "the focus of later trial proceedings and permitt[ing] the parties to focus their preparation on those matters that will be considered by the jury." *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir.1997). "It performs a gatekeeping function and permits the trial judge to eliminate from further consideration evidentiary submissions that clearly ought not to be presented to the jury because they clearly would be inadmissible for any purpose." *Id.* "Some evidentiary submissions, however cannot be evaluated accurately or sufficiently by the trial judge in such a procedural environment." *Id.* In those cases, it is better to defer ruling until trial. *Id.*

**\*6** "If a motion in limine is denied, that does not mean all the evidence within the scope of the motion will be admitted at trial." *Tzoumis v. Tempel Steel Co.*, 168 F.Supp.2d 871, 874 (N.D.Ill.2001). "The court should entertain objections to proffers as they occur at trial, even for areas that fall in the scope of a denied motion in limine." *Id.*

The FMLA allows for back pay equal to the amount of "any wages, salary, employment benefits, or other compensation denied or lost" to an employee by reason of an FMLA violation. 29 U.S.C. § 2617(a) (1)(A)(i)(I). Where "wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks or salary," can be recovered by the employee. *Id.* § 2617(a)(1)(A)(i)(II).

In addition, an employee may recover interest, liquidated damages, attorneys' fees and costs, and "equitable relief as may be appropriate, including employment, reinstatement, and promotion." *Id.* § 2617(a)(1)(A)-(B). Front pay may be an appropriate equitable relief where reinstatement is infeasible. *Franzen v. Ellis Corp.*, 543 F.3d 420, 426 (7th Cir.2008); *see Avita et al. v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1231 (7th Cir.1995) ( "[W]hen reinstatement is infeasible [in a case brought under the Fair Labor Standards Act ("FLSA") ], the plaintiff is free to seek in lieu of that remedy an award of 'front pay,' designed to put him in the identical financial position that he would have occupied had he been reinstated.")

The trial court has broad discretion in awarding front pay. *Downes v. Volkswagen of Am.*, 41 F.3d 1132, 1142 (7th Cir.1994) (discussing front pay as an equitable award under the ADEA). The Seventh Circuit has stated that district courts should consider the following factors when deciding whether front pay is appropriate: "whether the plaintiff has a reasonable prospect of obtaining comparable employment, whether the time period for the award is relatively short, whether the plaintiff intended to work or was physically capable of working and whether liquidated damages have been awarded." *Id.* at 1141. A front pay award must also be "grounded in available facts, acceptable to a reasonable person and not highly speculative." *Id.* at 1142; *McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir.1992) ("[F]ront pay awards, while often speculative, cannot be unduly so. The longer a proposed front pay period, the more speculative the damages become."); *see also Dotson v. Pfizer, Inc.*, 558 F.3d 284, 300 (4th Cir.2009) (upholding the district court's finding that front pay from the date of termination until the plaintiff's planned retirement, a span of 15 years, was too speculative); *Peyton v. Dimario*, 287 F.3d 1121, 1130 (D.C.C.2002) (upholding a district court's finding that an award of front pay spanning 26 years was too speculative). As to both back and front pay, an employee is also required to mitigate damages by making a "diligent search for comparable employment." *See Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 771 (7th Cir.2006).

**\*7** "Numerous courts have found that Congress intended the specific remedies set forth in § 2617 to be the exclusive remedies available for a violation of the FMLA." *Alverez v. Hi-Temp Inc. et al.*, No. 03-C2610, 2004 U.S. Dist. LEXIS 4775, at \*14 (N.D.Ill. Mar. 23, 2004) (Nolan, Mag. J.) (internal citations omitted) (citing cases, and holding that a claim of negligent supervision premised on a violation of a right created by the FMLA is barred under the doctrine of conflict preemption). "The remedies available under the FMLA do not include damages for emotional distress or punitive damages." *Id.* Consequential damages are not recoverable under the FMLA. *Id.; see Cianci v. Pettibone Corp. et al.*, 152 F.3d 723, 728-29 (7th Cir.1998) (finding that where the plaintiff suffered no loss of income and no costs, the FMLA did not offer any form of relief in compensatory

*Brenelsen v. Motorola, Inc., Not Reported in F.Supp.2d (2009)*

2009 WL 1759575, 158 Lab.Cas. P 35,596

or punitive damages). Courts have also held that nominal damages are not included in the scheme of the FMLA. *Alverez,* 2004 U.S. Dist. LEXIS 4775, at *14; *Penny Sons v. Henry County,* No. 05-C516, 2005 U.S. Dist. LEXIS 79604, at *31 (S.D.Ind. Oct. 31, 2006); *see* 🔖 *Franzen,* 543 F.3d at 426 n. 6 (declining to decide whether nominal damages are available under the FMLA).

A "plaintiff may not collect damages for periods of time in which he otherwise would have been unable to work for the company." 🔖 *Franzen,* 543 F.3d at 426. An employee who is "either unable or unwilling to perform the essential functions" of his job at the end of his twelve week period of leave has no right to reinstatement or damages. *Id.;* 29 C.F.R. § 825.214.

The Seventh Circuit found that there were issues of fact remaining with regard to James's reinstatement, retaliation, and discrimination claims under the FMLA. If the factfinder holds Motorola liable under any of these causes of action, damages might be available. If James was denied the opportunity for further promotion because Motorola failed to reinstate, discriminated, or retaliated against him in violation of the FMLA, for example, James might be able to collect back pay and employment benefits equal to the difference between what he would have gotten at a promoted position and what he received on the keypad line and in the Contracts Department.

James suggests that he is eligible for back pay covering a time period up to trial. (*E.g.* Pls.' Resp. 12-13.) That is incorrect in this case. James took medical leave on February 5, 2002. Parties do not dispute that, beginning on February 5, 2002, James was unable to perform the duties of Process Analyst. (Pl.'s Resp. 13; Def.'s Mot. 6.) James had exhausted his protected FMLA leave by that date. Motorola had no legal obligation to promote, or to even pay, him as of February 5, 2002; indeed, Motorola could have fired him. 🔖 *Franzen,* 543 F.3d at 426. Appropriately, James has not brought a claim based on this termination.

Back pay covers a time period during which a plaintiff is able and willing to work, and would otherwise be working and getting paid but for a defendant's FMLA violation. *Id.* Back pay may cover a time period up to trial in some cases, but in this case, the time period for which James is eligible for back pay does not span that entire period of time. Because James was unable to work as of February 5, 2002, regardless of whether Motorola had violated the FMLA, James cannot

collect a back pay award for a time period reaching after that date. James was also unable to work during his leave from April 20, 2001 to September 4, 2001, a time period also unprotected by the FMLA. Accordingly, James's back pay award is limited to the following time periods: (1) April 9, 2001 to April 20, 2001; and (2) September 4, 2001 to February 5, 2002.

**\*8** That said, some medical evidence may be relevant to the calculation of James's back pay damages. James may have accumulated medical bills during a time period relevant to back pay. Unpaid bills may have been paid under a Motorola health plan available to employees in promoted positions, but not have been paid under plans available to employees in positions such as the one held by James. Had James not been denied the opportunity for promotion, his bills may have been paid. Motorola has not demonstrated why a motion in limine to ban past medical bills accumulated during the back pay time period should be barred. Medical bills accumulated during that time period may be relevant to an award of past employment health benefits under 🔖 29 U.S.C. § 2617(a)(1)(A)(i)(I), and may be admitted under appropriate circumstances.

The medical evidence as it relates to the equitable front pay sought by James raises more complicated relevancy issues. Because James has a permanent disability and can no longer work at his previous job or obtain the health benefits that he had while working for Motorola, he seeks front pay and future health benefits lasting until at least his retirement age. He purports to be entitled to this unusually large equitable award because Motorola "directly caused" his disability when Patterson retaliated against him for exercising his rights under the FMLA. (Pl.'s Resp. 16.) Motorola argues that James is not entitled to any damages pertaining to the time period after February 5, 2002 because he was unable to return to work. (Defs.' Resp. 6.) According to Motorola, James's argument that Motorola should be liable for front pay under the FMLA until retirement because Motorola "directly caused" James's disability by way of an FMLA violation is an attempt to obtain consequential damages not otherwise allowed under the FMLA. (*Id.* at 8.)

Front pay is an equitable remedy designed to supplant reinstatement where reinstatement would be infeasible. 🔖 *Franzen,* 543 F.3d at 426. As an example, reinstatement can be infeasible if it would result in social cost from friction

in the workplace. Judge Posner aptly explains the logic of awarding front pay in an FLSA context,

> Suppose that reinstatement would be worth $100,000 to the employee but would cost the employer $150,000 because of a negative effect of reinstatement on the employer's productivity; in contrast, an award of $100,000 would cost the employer only $100,000 while benefitting the employee to the tune of $100,000. The substitution of front pay for reinstatement would produce a savings in social costs of $50,000[.]

*Avita,* 49 F.3d at 1232. Without the option of reinstatement, awarding front pay is unavailable because it does not serve the purpose of the statute or save social costs. *Id.* The court views this as a three step sequential analysis. All of the following questions must be answered in the affirmative for front pay to be awarded: (1) Does the plaintiff qualify for reinstatement under the facts and circumstances of the case; (2) If the plaintiff qualifies for reinstatement, is reinstatement infeasible; and (3) If reinstatement is infeasible, is front pay the appropriate substitution? This logic should be the same in FMLA cases. *See Frizzel v. Southwest Motor Freight et al.,* 154 F.3d 641, 643 (6th Cir.1998) (noting the relationship between the FLSA and the FMLA, and the fact that the FMLA's legislative history references the FLSA); *see also Franzen,* 543 F.3d at 425 (interpreting *Frizzel* to suggest that "Congress intended the remedial provisions of the FMLA to mirror those of the FLSA").

**\*9** Under the FMLA, a plaintiff is not entitled to reinstatement if he is "either unable or unwilling to perform the essential functions" of his job at the end of his twelve week period of leave. *Franzen,* 543 F.3d at 426; 29 C.F.R. § 825.214. It logically follows that if a plaintiff is not entitled to reinstatement under the FMLA because he is unable to perform the essential functions of his job, he is not entitled to equitable front pay either.

This analysis finds support in a Sixth Circuit case, *Edgar v. JAC Products, Inc.,* 443 F.3d 501 (6th Cir.2006). In *Edgar,*

the plaintiff was unable to return to work after the expiration of her FMLA leave. *Id.* at 506. The plaintiff alleged that the defendant exacerbated her medical condition by interfering with her FMLA rights, and this was the primary reason that her condition persisted. *See id.* at 515. The court of appeals found this inapposite to the FMLA framework. *Id.* at 516. The Sixth Circuit held that if an employee is unable or unwilling to return to work at the end of her FMLA leave period because of a medical condition, regardless of how that condition occurred or if it is even the same one that forced the employee to take leave in the first place, she has no right to reinstatement. *Id.* The court grounded its holding in the policy that "the stress inherent in adverse employment decisions" would aggravate many common physical and mental ailments. *Id.* The court cautioned that if the exacerbation theory were accepted, "an argument that summary judgment is precluded by factual disputes as to whether the actions of the employer worsened the employee's mental [or physical] state and prevented the employee from resuming his or her position could become standard fare." *Id.*

In this case, the parties do not dispute that James's condition has rendered him unable to perform the duties of Process Analyst since February 5, 2002. (Pl.'s Resp. 13; Defs.' Mot. 3.) His medical condition rules out reinstatement as an available remedy under the FMLA. Under *Franzen* and *Avita,* front pay follows as an unavailable remedy.

James argues that front pay is still an appropriate remedy because Motorola's conduct caused his inability to work by exacerbating his medical condition. If the court accepted this argument, it would carve out the following exception to an otherwise straight-forward rule: a plaintiff who is unable or unwilling to work such that reinstatement is not an appropriate remedy may not recover front pay *unless FMLA violations by the defendant caused the plaintiff's inability to work.*

The FMLA was designed to protect workers' employment in times of medical uncertainty, and the remedies available under section 2617 are related to employment. The remedies under the FMLA are exclusive. *Alverez,* 2004 U.S. Dist. LEXIS 4775. Consequential damages and compensatory damages are not recoverable under the FMLA. *Id.* at *14; *see Cianci,* 152 F.3d at 728-29.

**\*10** If otherwise unrecoverable front pay becomes recoverable because Motorola's conduct caused an injury to

---

Brenelsen v. Motorola, Inc., Not Reported in F.Supp.2d (2009)

2009 WL 1759575, 158 Lab.Cas. P 35,596

James, then that front pay award is related to the injury and transforms into consequential and compensatory damages. *See Johnson v. Georgia Television Co.,* 435 F.Supp.2d 1237, 1240-41 (N.D.Ga.2006) (holding that where a defendant's failure to reinstate a plaintiff aggravated that plaintiff's fibromyalgia rendering her unable to work, damages of future lost wages and employment benefits were consequential damages and unrecoverable under the FMLA). Consequential and compensatory damages are unrecoverable under the FMLA. Thus, James's argument fails and he is ineligible for front pay damages. Medical evidence related to front pay damages is not relevant. If Motorola's conduct physically harmed James, James's remedies are under tort and workers' compensation laws. Indeed, James realized this and attempted to bring an IIED claim, which ultimately failed.

## V. Conclusion

According to the statutory framework of the FMLA, the rational behind awarding equitable front pay, and the policy considerations espoused by the Sixth Circuit in *Edgar,* the court grants Motorola's motion in limine in part. Medical evidence related exclusively to front pay, including future health benefits, is irrelevant and barred. Medical evidence relevant to back pay may be relevant and the court will not grant Motorola's motion in limine with respect to that evidence.

## All Citations

Not Reported in F.Supp.2d, 2009 WL 1759575, 158 Lab.Cas. P 35,596

## Footnotes

1   According to Motorola, James "was covered under Motorola's health plans at all times during his Motorola employment, including while on FMLA leave." (Defs.' Mot. 7 n. 7.) Motorola also claims that James received long-term disability benefits from a Motorola Plan until August 2003, "at which point he failed to submit the necessary medical information to maintain his benefits." (*Id.*) James disputes the circumstances regarding his long-term disability benefits. (Pl.'s Resp. 20-22.)

2   James and Motorola seem to agree that James only worked for eight days in April 2001. (Def.'s Mot. 2 n. 2.; Pl.'s Resp. 16.) April 9, 2001 to April 20, 2001 is ten week days. Whether James worked eight or ten days in April is inapposite to this opinion.

3   The FMLA allows for 12 workweeks of protected leave during any 12 month period. ⚑ 29 U.S.C. 2612(a)(1). James took 12 weeks of medical leave from January 15, 2001 to April 9, 2001.

4   The parties dispute the authenticity of these five emails that allegedly prove discriminatory and retaliatory animus.

5   The court is unsure on what date James started in the Contracts Department. It seems, though, that the alleged harassment that is the subject of James's surviving retaliation claims occured only while he was working in the Contracts Department.

6   It is not clear to the court what exactly constitutes "medical expenses." That term, as used by James, seems to include medical bills that James has already paid or must pay, as well as the cost of future insurance for James.

7   James acknowledges that the Seventh Circuit has not directly addressed the proper measure for an equitable award of future health benefits in FMLA cases, but cites Seventh Circuit cases that have opined in this regard to damages under the Age Discrimination in Employment Act ("ADEA"). (Pl.'s Resp. 10.) (*citing* 🔖 *EEOC v.*

**Breheisen v. Motorola, Inc., Not Reported in F.Supp.2d (2009)**

2009 WL 1759575, 158 Lab.Cas. P 35,596

*O'Grady et al.,* 857 F.2d 383 (7th Cir.1988) and ⚑ *Kossman et al. v. Calumet County,* 800 F.2d 697 (7th Cir.1986)).

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

853 F.Supp.2d 472
United States District Court, E.D. Pennsylvania.

Judith CAVALIERE

v.

ADVERTISING SPECIALTY INSTITUTE INC.

Civil Action No. 11–1180
|
Feb. 16, 2012.

**Synopsis**

**Background:** Discharged employee of advertising company, who was diagnosed with spondylolisthesis, brought action against her former employer, alleging violations of Family and Medical Leave Act (FMLA) and Americans with Disabilities Act (ADA). Employer moved for partial summary judgment.

**Holdings:** The District Court, Dalzell, J., held that:

[1] employee's statements to Social Security Administration (SSA) estopped her from making out prima facie case of discrimination under ADA;

[2] fact issues precluded summary judgment as to FMLA retaliation claim; but

[3] employee's statement to SSA that she was disabled as of date employer terminated her employment estopped her from claiming that she was entitled to back pay or front pay.

Motion for partial summary judgment granted in part and denied in part.

**Procedural Posture(s):** Motion for Summary Judgment.

West Headnotes (11)

**[1]    Estoppel** 🔑 Claim inconsistent with previous claim or position in general

Doctrine of judicial estoppel aims to prevent playing "fast and loose" with courts, which has been emphasized as evil courts should not tolerate.

**[2]    Civil Rights** 🔑 Practices prohibited or required in general; elements

To establish prima facie case of discrimination under Americans with Disabilities Act (ADA), a plaintiff must show that he (1) is disabled, (2) is otherwise qualified to perform essential functions of job, with or without reasonable accommodations by employer, and (3) has suffered adverse employment action as result of discrimination. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

3 Cases that cite this headnote

**[3]    Social Security** 🔑 Past or customary work
**Social Security** 🔑 Actual availability of employment; ability to compete

Social Security Disability Insurance (SSDI) program provides benefits to person with disability so severe that she is unable to do her previous work and cannot engage in any other kind of substantial gainful work which exists in national economy. Social Security Act, § 223(d)(2)(A), 42 U.S.C.A. § 423(d)(2)(A).

1 Case that cites this headnote

**[4]    Estoppel** 🔑 Claim inconsistent with previous claim or position in general
**Summary Judgment** 🔑 Employment Practices; Discrimination

Americans with Disabilities Act (ADA) plaintiff cannot simply ignore prior Social Security Disability Insurance (SSDI) benefits contention that she was too disabled to work, but rather, to survive summary judgment on ADA claim, she must explain why that SSDI contention is consistent with ADA claim, that is, her explanation must be sufficient to warrant reasonable juror's concluding that, assuming truth of, or plaintiff's good-faith belief in, earlier statement, plaintiff could nonetheless perform essential functions of her job, with or without reasonable accommodation. Fed.Rules Civ.Proc.Rule 56(a), 28 U.S.C.A.; Social

Security Act, § 223(d)(2)(A), 42 U.S.C.A. § 423(d)(2)(A); Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

2 Cases that cite this headnote

**[5]    Estoppel** ⚖ Claim inconsistent with previous claim or position in general

In employment discrimination case in which a plaintiff has applied for and received Social Security Disability Insurance (SSDI) benefits, district court must first determine whether positions taken by plaintiff in his SSDI application and his discrimination claim genuinely conflict; next, it must evaluate whether plaintiff's explanation for that inconsistency meets standard set forth in *Cleveland v. Policy Management Systems Corp.* Social Security Act, § 223(d)(2)(A), 42 U.S.C.A. § 423(d)(2)(A).

**[6]    Estoppel** ⚖ Claim inconsistent with previous claim or position in general

Statements of discharged employee, who was diagnosed with spondylolisthesis, to Social Security Administration (SSA) in support of her application for Social Security Disability Insurance (SSDI) benefits that she voluntarily left her job, and would not have left but for her inability to work, estopped her from claiming in her subsequent Americans with Disabilities Act (ADA) action that accommodation of working from home would have allowed her to perform essential functions of her job, as would support her prima facie case of discrimination under ADA. Social Security Act, § 223(d)(2)(A), 42 U.S.C.A. § 423(d)(2)(A); Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

1 Case that cites this headnote

**[7]    Labor and Employment** ⚖ Request for leave; notice to employer; foreseeability

For an employee to prove first element of Family and Medical Leave Act (FMLA) retaliation claim, namely, that he took FMLA leave, he must show that he provided at least verbal notice sufficient to make employer aware that employee needed FMLA-qualifying leave. 29 C.F.R. § 825.302(c); Family and Medical Leave Act of 1993, § 102(a)(1), 29 U.S.C.A. § 2612(a)(1).

1 Case that cites this headnote

**[8]    Labor and Employment** ⚖ Questions of law or fact

**Summary Judgment** ⚖ Time off; leave

Genuine issues of material fact existed as to whether employee, who was diagnosed with spondylolisthesis, informed her employer that she needed Family and Medical Leave Act (FMLA) qualifying leave, and as to whether decisionmaker who ultimately terminated employee was aware that employee had taken leave, precluding summary judgment as to employee's FMLA retaliation claim. 🚩 29 C.F.R. § 825.220(c); Family and Medical Leave Act of 1993, § 102(a)(1), 🚩 29 U.S.C.A. § 2612(a)(1).

1 Case that cites this headnote

**[9]    Civil Rights** ⚖ Monetary Relief; Restitution

Underlying premise in computing employment discrimination plaintiff's award is that injured worker must be restored to economic position in which worker would have been but for discrimination.

**[10]    Civil Rights** ⚖ Back pay or lost earnings

In variety of situations, back pay award is reduced, or eliminated entirely, if employment discrimination plaintiff has not received, or, indeed, could not receive, offsetting income in post-discriminatory period, so that as general rule, plaintiff will not be allowed back pay during any periods of disability.

Cavaliere v. Advertising Specialty Institute Inc., 853 F.Supp.2d 472 (2012)

44 NDLR P 214

---

**[11]  Estoppel ⚐➔ Claim inconsistent with previous claim or position in general**

Statement of discharged employee, who was diagnosed with spondylolisthesis, to Social Security Administration (SSA) in support of her application for Social Security Disability Insurance (SSDI) benefits that she was disabled as of date her employer terminated her employment estopped her from claiming in her subsequent employment discrimination action that she was entitled to back pay or front pay damages. Social Security Act, § 223(d)(2)(A),

⚑ 42 U.S.C.A. § 423(d)(2)(A).

1 Case that cites this headnote

---

**Attorneys and Law Firms**

**\*473** Paul C. Lantis, Ari Risson Karpf, Karpf & Karpf, Bensalem, PA, for Judith Cavaliere.

**\*474** Theresa M. Zechman, Stevens & Lee, Lancaster, PA, William J. Payne, Stevens & Lee PC, King of Prussia, PA, Zachary R. Davis, Stevens & Lee, Philadelphia, PA, for Advertising Specialty Institute Inc.

---

*MEMORANDUM*

DALZELL, District Judge.

Plaintiff Judith Cavaliere ("Cavaliere") brings this action against defendant Advertising Specialty Institute Inc. ("ASI") under the Family and Medical Leave Act ("FMLA" or the "Act"), 29 U.S.C. §§ 2601 et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq. Cavaliere worked for ASI for nearly six years—both as an associate publisher and business development director—before ASI terminated her in 2010. Cavaliere alleges that ASI retaliated against her in violation of the FMLA, [1] and also discriminated against her (based both on her actual disability and perceptions of her disability) and retaliated against her in violation of the ADA.

ASI has filed a motion for partial summary judgment as to which Cavaliere has filed a response in opposition and ASI has filed a reply in support. For the reasons that follow, we

will grant ASI's motion in part and dismiss Cavaliere's claim for discrimination under the ADA on the grounds of estoppel as well as her damages claim for back pay and front pay.

**I. *Factual Background***

Under Fed.R.Civ.P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," where "[a] party asserting that there is a genuine dispute as to a material fact must support that assertion with specific citations to the record." ⚐ Bello v. Romeo, 424 Fed.Appx. 130, 133 (3d Cir.2011). We will thus recite the undisputed facts in this matter, pausing occasionally to supplement those facts with disputed factual assertions that the parties have supported with specific citations to the record.

**A. *Cavaliere's Career And Termination At ASI***

Cavaliere began working for ASI in August of 2004 as an associate publisher, and became its business development director around January 1, 2007. Her supervisor in the latter capacity was Ed Koehler ("Koehler"). Def.'s Statement of Facts ("Def.'s Stmt.") ¶¶ 1–3; Pl.'s Resp. to Def.'s Stmt. ("Pl.'s Resp.") ¶¶ 1–3. The position description for business development director stated that it required travel thirty percent of the time, Def.'s Stmt. ¶ 5 (citing Ex. 3 to Def.'s Stmt. ("Position Description")), and Cavaliere explained in her deposition that she believed her employment contract required travel between seventy-five and eighty percent of the time. *Id.* (citing Ex. 12 to Def.'s Stmt. ("Cavaliere Dep.") at 74). In any event, Cavaliere claims that "she could have performed her job without traveling," Pl.'s Resp. ¶ 5 (citing Cavaliere Dep. at 120 ("I could have done it from home.")), and that Koehler confirmed this fact. *Id.* (citing Koehler Dep. at 54 ("As long as the rep makes the sales and the sales come in and they make their budget, whether they travel or not, it's up to them.")).

According to Koehler and ASI's publisher, Rich Fairfield ("Fairfield"), ASI had to deal with problems relating to Cavaliere's work that involved (1) pricing discrepancies **\*475** in which Cavaliere's clients said they should have been billed at a lower amount than ASI billed them for particular advertisements, and (2) claims by those clients that they had not agreed to orders that Cavaliere had placed for them. Def.'s Stmt. ¶¶ 6–7; Pl.'s Resp. ¶¶ 6–7. Some of these clients asked that a new ASI account representative replace Cavaliere. Def.'s Stmt. ¶ 8; Pl.'s Resp. ¶ 8. At a February 9, 2010 meeting

with Koehler and Carol Albright ("Albright"), ASI's Senior Vice–President of Human Resources, Cavaliere received a Final Written Warning. Def.'s Stmt. ¶ 12; Pl.'s Resp. ¶ 12. At that meeting, ASI instructed Cavaliere to (1) stop submitting false orders, (2) make a list of existing orders with potential problems, and (3) submit that list to Koehler. Def.'s Stmt. ¶ 20; Pl.'s Resp. ¶ 20.

Koehler and Albright ultimately decided to terminate Cavaliere's employment with ASI, and on March 8, 2010, Koehler and Albright informed her by phone that she had been fired. Def.'s Stmt. ¶¶ 26, 29; Pl.'s Resp. ¶¶ 26, 29. Koehler testified that ASI terminated Cavaliere because (1) she was falsifying orders, (2) her inaccuracies regarding pricing had created problems with clients, and (3) she had failed to provide a complete list of problem accounts contrary to what she was told at the February 9, 2010 meeting. Fairfield added that Cavaliere terminated because she put in orders that were either not real or partially real, but at different prices than had been agreed upon. Def.'s Stmt. ¶¶ 30–31; Pl.'s Resp. ¶¶ 30–31. ASI did not hire a new business development director following Cavaliere's termination. Def.'s Stmt. ¶ 32; Pl.'s Resp. ¶ 32.

### B. *Cavaliere's Health Problems*

In October of 2009, Cavaliere was diagnosed with spondylolisthesis.[2] Def.'s Stmt. ¶ 34; Pl.'s Resp. ¶ 34. She also claims to suffer from osteoarthritis, fibromyalgia,[3] degenerative disc disease, depression, obsessive-compulsive disorder ("OCD"), and anxiety, and states that she has been seeing an orthopedic surgeon, Dr. Jeffrey Miller ("Dr. Miller"), for five or six years.[4] Def.'s Stmt. ¶¶ 35–36; Pl.'s Resp. ¶¶ 35–36. According to Cavaliere, her condition flared up in September of 2009, causing pain in her hip that was treated with a steroid injection. Def.'s Stmt. ¶ 37; Pl.'s Resp. ¶ 37. According to Dr. Miller, she told him on October 20, 2009 that she was experiencing pain in her right leg, and in December of that year stated that she was experiencing pain in her back, hip, and right leg. Pl.'s Stmt. ¶¶ 23–24; Def.'s Resp. to Pl.'s Stmt. ("Def.'s Resp.") ¶¶ 23–24. Dr. Miller further reported that Cavaliere told him on March 25, 2010 that she did not feel able to do her job due to its travel requirements. Pl.'s Stmt. ¶ 25; Def.'s Resp. ¶ 25. Cavaliere has seen a chiropractor, continues to treat with Dr. Miller, and began seeing a psychiatrist in **\*476** 2011. Def.'s Stmt. ¶¶ 38–40; Pl.'s Resp. ¶¶ 38–40.

### C. *Cavaliere's Requests For Accommodations From ASI*

ASI claims that Cavaliere only made one request for accommodations from ASI on account of her health problems, asking for a chair and a lumbar support that ASI provided to her. Def.'s Stmt. ¶ 47 (citing Cavaliere Dep. at 137 (Counsel for ASI: "Did you ever request, other than asking Ms. Ambrose to rearrange your office—and 'rearrange' is a loose term, but I think that's what you said—did you request any other accommodation from ASI because of your back condition?" Cavaliere: "Just the chair.")). Cavaliere responds that she "requested from Mr. Koehler that she be able to work from home after her back problems began to flare up in the fall and winter of 2009" and that he told her that she could not. Pl.'s Resp. ¶¶ 40, 47 (citing Cavaliere Dep. at 120 ("I asked Ed if I could work from home when I started feeling ill and he said no.")). While Cavaliere testified that she was not allowed to work from home while at ASI, she also testified that she " 'could work at home for California calls, which I did late at night,' " Def.'s Stmt. ¶ 56 (quoting Cavaliere Dep. at 309); Pl.'s Resp. ¶ 56, and that she occasionally worked from home as part of her job at ASI. Def.'s Stmt. ¶ 56; Pl.'s Resp. ¶ 56.

Cavaliere also alleges in her complaint that ASI terminated her "in retaliation for seeking reasonable accommodations (periodic time off from work)." Pl.'s Compl. ¶ 32. ASI insists that Cavaliere never sought periodic time off from work, instead requesting only occasional days off "which ASI granted her without issue", Def.'s Stmt. ¶ 49 (citing Cavaliere Dep. at 261). Cavaliere appears to agree with the first part of this statement, Pl.'s Resp. ¶ 49 (quoting Cavaliere Dep. at 261 (Counsel for ASI: "Was there a point where you sought periodic time off from work and were denied?" Cavaliere: "No, just days.")), but disagrees with the latter portion, Pl.'s Resp. ¶ 49 (citing Cavaliere Dep. at 260–62), apparently because Koehler "might have commented" on Cavaliere taking those days off. Cavaliere Dep. at 261. The parties agree, in any case, that (1) Cavaliere never exhausted the number of days off that ASI allowed her, (2) all of the time off that she took was permitted by ASI, and (3) ASI never indicated to her that the time she took off from work played any role in her termination. Def.'s Stmt. ¶¶ 52–53; Pl.'s Resp. ¶¶ 52–53.

ASI claims that Cavaliere never told anyone at ASI that she was unable to travel. Def.'s Stmt. ¶ 57 (citing Cavaliere Dep. at 94 (Counsel for ASI: "Did you tell anyone at ASI while you still worked there that you could no longer travel at all?" Cavaliere: "No.")). Cavaliere responds that she told Koehler

about her inability to travel on specific trips, Pl.'s Resp. ¶ 57 (citing Cavaliere Dep. at 93–94), though she admitted that she never told him that she could not travel at all. Cavaliere Dep. at 94.

#### D. *Cavaliere's Requests For Leave From ASI*

According to Cavaliere's testimony, while she never spoke with Koehler about taking leave under the FMLA, she did ask Jeannette Killeri ("Killeri"), an employment specialist at ASI, about getting FMLA forms. Cavaliere testified that Killeri told her she would get the forms for her, but never did. Def.'s Stmt. ¶¶ 60–63; Pl.'s Resp. ¶¶ 60–63. Cavaliere also testified that she spoke with Kathleen Piazza ("Piazza"), a disbursement accountant at ASI, about obtaining FMLA papers in late 2009, about two weeks after she spoke to **\*477** Killeri. Piazza printed out the FMLA forms from her computer and gave them to Cavaliere. Def.'s Stmt. ¶¶ 65–67, 69–70; Pl.'s Resp. ¶¶ 65–67, 69–70.

Cavaliere did not fill out these forms, and never applied for FMLA leave from ASI. Def.'s Stmt. ¶¶ 71–72; Pl.'s Resp. ¶¶ 71–72.[5] ASI claims that Cavaliere testified that she did not fill out these forms because she didn't want FMLA leave, Def.'s Stmt. ¶ 73, but Cavaliere responds that her testimony "does not stand for the proposition that she did not intend to invoke her rights under the FMLA." Pl.'s Resp. ¶ 72. The parties agree that neither Albright, nor Koehler, nor Ambrose was aware that Cavaliere had asked anyone at ASI about taking leave under the FMLA. Def.'s Stmt. ¶¶ 74–76; Pl.'s Resp. ¶¶ 74–76.

The parties also agree that Cavaliere had to cancel two to three business trips in late 2009 due to her medical conditions. Pl.'s Stmt. ¶¶ 26–28; Def.'s Resp. ¶¶ 26–28. Cavaliere testified that during a business trip in September of 2009, she explained to Koehler that she could not attend certain (presumably trade) shows because of her back, and that traveling and driving were difficult for her. Pl.'s Stmt. ¶ 36 (citing Cavaliere Dep. at 275, 75 (Counsel for ASI: "Were you disciplined for not being able to attend the San Francisco show?" Cavaliere: "I told him that I had back problems.")). ASI denies that Cavaliere ever made any such statement to Koehler, Def.'s Resp. ¶ 36 (citing Koehler Dep. at 167 (Counsel for Cavaliere: "Did Ms. Cavaliere ever tell you that she was having difficulty traveling because of her back?" Koehler: "Not that I recall, no.")), and states that Koehler was only aware that Cavaliere had to cancel a single trip to Chicago. Def.'s Resp. ¶ 37 (citing Koehler Aff. at 163–65).

Cavaliere claims that after she informed Koehler of her medical conditions in September of 2009, Koehler made comments to her that she needed to care for her back on about ten occasions, Pl.'s Stmt. ¶ 38 (citing Cavaliere Dep. at 103–104, 106); ASI denies that Koehler ever made any such statements. Def.'s Resp. ¶ 38 (citing Ex. B to Def.'s Resp. ("Koehler Aff.") ¶¶ 4–6). Cavaliere testified that she wore a brace and shoulder device, including to work. Pl.'s Stmt. ¶ 39; Def.'s Resp. ¶ 39. Deb Mayfield, a sales representative at ASI, also testified that she overheard Koehler talking to an administrative assistant about Cavaliere being absent from work because of her back. Pl.'s Stmt. ¶ 40; Def.'s Resp. ¶ 40.

#### E. *Cavaliere's Capacity To Work At ASI*

Cavaliere testified that she believed that she could have continued working even after her termination, and ASI admits that she was able to perform the essential functions of her job at the time of her termination. Pl.'s Stmt. ¶¶ 42–43; Def.'s Resp. ¶¶ 42–43. Cavaliere also testified that she looked for work after her termination from ASI but was unable to find work similar to what she had performed at ASI because each position she sought required travel, Pl.'s Stmt. ¶¶ 45, 47–50; Def.'s Resp. ¶¶ 45, 47–50, and that she waited until May 27, 2010 to apply for Social Security Disability Insurance ("SSDI") because she had hoped instead to find a job. Pl.'s Stmt. ¶¶ 52–53; Def.'s Resp. ¶¶ 52–53.

#### F. *Cavaliere's Application For Social Security Benefits*

Around May 27, 2010, Cavaliere applied for SSDI from the Social Security Administration **\*478** ("SSA"). Def.'s Stmt. ¶ 77; Pl.'s Resp. ¶ 77. ASI claims that Cavaliere "told the SSA that her disability began on March 8, 2010, which was the exact date on which ASI terminated her employment," Def.'s Stmt. ¶ 78, citing the SSA's April 19, 2011 decision in which it recorded that "[t]he claimant ... is alleging disability since March 8, 2010." Ex. 21 to Def.'s Stmt. ("SSA 2011 Decision") at P717. Cavaliere denies this statement, Pl.'s Resp. ¶ 78, pointing to testimony in which she was asked, "So do you recall, at any time, you alleging that March 8th, 2010, was the date of onset of your disability?," and answered "I don't recall alleging that." Cavaliere Dep. at 325.

In Cavaliere's submissions to the SSA, she answered the question, " 'What were you able to do before your illnesses, injuries, or conditions that you can't do now?,' " by answering " 'Walk long distances—drive long distances—fly on plane—bend—lift—turning,' " and noting that her condition affected

her ability to dress, bathe, and feed herself. Def.'s Stmt. ¶¶ 81–82; Pl.'s Resp. ¶¶ 81–82. Cavaliere explained that she does not do house or yard work because " 'I'm in pain—(chronic),' ", that her condition affected an array of daily activities, [6] and that she could lift only five pounds and walk four blocks. Def.'s Stmt. ¶¶ 84, 87; Pl.'s Resp. ¶¶ 84, 87. When asked "[f]or how long can you pay attention?," Cavaliere answered, "not long." June 29 SSA Submission at P591. Cavaliere submitted a report from Dr. Miller in which he noted that Cavaliere reported on March 25, 2010 " 'that the pain has become incapacitating [and] she is unable to continue working.' " Def.'s Stmt. ¶ 89 (brackets in Def.'s Stmt.); Pl.'s Resp. ¶ 89. Dr. Miller also noted, though, that Cavaliere "feels she is no longer able to do her job because of the travel requirements." Pl.'s Resp. ¶ 89 n. 5 (quoting Ex. 25 to Def.'s Stmt. ("Miller Report") at P386), and that she "has inability to travel including prolonged driving and flying which is 50% of her job." Miller Report at P386.

The SSA denied Cavaliere's SSDI application on November 23, 2010, and Cavaliere appealed this ruling the next month, stating that " 'I am disabled and unable to work.' " Def.'s Stmt. ¶¶ 91–93; Pl.'s Resp. ¶¶ 91–93. In her submissions, Cavaliere stated that her condition had not changed since her last disability report, explaining that she " 'still can't sit, walk or drive,' " Def.'s Stmt. ¶ 94; Pl.'s Resp. ¶ 94, and that she could not fly on planes for her job. Pl.'s Resp. ¶ 98 n. 8 (citing Ex. C to Pl.'s Resp. ("SSA Application") at P583). In response to the question " 'What changes have occurred in your daily activities since you last completed a disability report?,' " Cavaliere answered, " 'All is basically the same—with not working (after working a high level position for 25+ years) I'm very depressed. I'm scheduled to see psychiatrist Jan. 4. I loved my job—never would have left.' " Def.'s Stmt. ¶ 95; Pl.'s Resp. ¶ 95. Cavaliere further stated that

> "I left my job in March 2010. I had a 25–year career making [a] six figure income for many years. I could not fly, drive or stand for long periods. On my job I had to fly to trade show[s] and clients 60 percent of [the] time. The denial letter from [Social Security] said I could do 'my job'—I cannot. I would not leave a [$]130,000 job if I could—I paid all [Social Security] since I'm 17—now at 57, I need help and have no income."

> **\*479** "I cannot do my job because of spondylosis [sic ]—degenerative disc disease—arthritis[,] hip problems and now depression is getting worse because of this disability situation."

Def.'s Stmt. ¶ 98 (brackets in Def.'s Stmt.) (emphasis omitted from Def.'s Stmt.); Pl.'s Resp. ¶ 98.

The SSA denied Cavaliere's appeal on March 10, 2011, leading her to file a second appeal that month, Def.'s Stmt. ¶ 100; Pl.'s Resp. ¶ 100, in which she explained that "I had a high six-figure salary for many years —a great job as a bus. dev. [business development] director. I cannot work anymore due to spodolthosis [sic ]—degenerative arthritis—fibromyalgia—depression—OCD —anxiety." Def.'s Stmt. ¶ 101 (brackets in Def.'s Stmt.); Pl.'s Resp. ¶ 101. The SSA then issued a "Fully Favorable" decision on April 19, 2011, finding that (1) " '[t]he claimant has been under a disability as defined in the Social Security Act since March 8, 2010, the alleged onset date of disability,' " Def.'s Stmt. ¶ 102–03; Pl.'s Resp. ¶ 102–03; (2) Cavaliere's severe impairments included degenerative joint disease, lumbar disc herniation, spondylosis, and depression, Def.'s Stmt. ¶ 104; Pl.'s Resp. ¶ 104; (3) Cavaliere " 'is unable to perform any past relevant work' " and " 'there are no jobs that exist in significant numbers in the national economy that the claimant can perform,' " Def.'s Stmt. ¶ 105; Pl.'s Resp. ¶ 105; and (4) " 'the requirement that the claimant alternate between sitting and standing every 15 minutes precludes her work as a publisher.' " Def.'s Stmt. ¶ 105; Pl.'s Resp. ¶ 105. Cavaliere now collects $2,448 per month in disability benefits. [7] Def.'s Stmt. ¶¶ 106–07; Pl.'s Resp. ¶¶ 106–07.

Cavaliere concedes that she never told the SSA that her departure from ASI was involuntary, Def.'s Stmt. ¶ 96; Pl.'s Resp. ¶ 96, explaining this omission in a variety of ways that we explore in Section II.A. below.

## II. *Analysis*

On a motion for summary judgment, "[t]he moving party first must show that no genuine issue of material fact exists," *Adderly v. Ferrier,* 419 Fed.Appx. 135, 136 (3d Cir.2011) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), whereupon "[t]he burden then shifts to the non-moving party to set forth specific facts demonstrating a genuine issue for trial." *Id.* " 'A disputed fact is "material" if it would affect the outcome of the suit as determined by the substantive law,' " *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.,* 650 F.3d 915, 925 (3d Cir.2011) (quoting *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1078 (3d Cir.1992)), while a factual dispute is genuine " 'if

the evidence is such that a reasonable jury could return a verdict for the nonmoving party.... The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be [significantly probative] evidence on which the jury could reasonably find for the plaintiff." *Bialko v. Quaker Oats Co.,* 434 Fed.Appx. 139, 141 n. 4 (3d Cir.2011) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (bracketed material in original). We "draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence." *Eisenberry v. Shaw Bros.,* 421 Fed.Appx. 239, 241 (3d Cir.2011) (quotation marks omitted).

**\*480 A. *Estoppel And Cavaliere's Disability Claim***

[1]   ASI argues that "Cavaliere is estopped from claiming that she could still perform the essential functions of her job at ASI—an essential element of a claim for disability discrimination—because she repeatedly took an irreconcilably conflicting position with the Social Security Administration in her successful quest for Social Security Disability Insurance ('SSDI') benefits." Def.'s Mem. of L. in Supp. of Mot. Summ. J. ("Def.'s Mem.") at 1. Cavaliere responds [8] that she "has asserted throughout this matter that she was affected by her difficulties with traveling," and that "[a] reasonable jury could find that Ms. Cavaliere could have performed her job for Defendant without having to perform the high level of travel that she has [*sic* ] been previously doing, but that she was unable to find a new position where she would not be required to travel." Pl.'s Mem. of L. in Opp'n to Def.'s Mot. Summ. J. ("Pl.'s Mem.") at 6.

[2]   [3]   As our Court of Appeals has explained, "[t]o establish a prima facie case of discrimination under the ADA, a plaintiff must show that he (1) is disabled, (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer, and (3) has suffered an adverse employment action as a result of discrimination." *Irving v. Chester Water Auth.,* 439 Fed.Appx. 125, 126 (3d Cir.2011). As the Supreme Court observed in *Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 797, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (quoting 42 U.S.C. § 423(d)(2)(A)) (brackets and ellipsis in original), "[t]he Social Security Disability Insurance (SSDI) program provides benefits to a person with a disability so severe that she is 'unable to do [her] previous work' and 'cannot ...

engage in any other kind of substantial gainful work which exists in the national economy.' "

[4]   While it might appear, at first glance, that a plaintiff's pursuit of SSDI must logically estop her from asserting the second element of a *prima facie* case under the ADA, the statutes differ in one crucial respect: while the ADA considers whether a plaintiff can perform her job with reasonable accommodations, the SSA does not take such accommodations into account in determining eligibility for SSDI. *Id.* at 803, 119 S.Ct. 1597. As a result, the Supreme Court has concluded that "pursuit, **\*481** and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim." *Id.* at 797, 119 S.Ct. 1597. But "an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work. To survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim," *id.* at 798, 119 S.Ct. 1597—that is, her "explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.' " *Id.* at 807, 119 S.Ct. 1597.

**1. *Cavaliere's Representations To The SSA***

[5]   ASI argues that Cavaliere's representations to the SSA cannot be reconciled with the claim that she can perform the essential functions of her job at ASI, since Cavaliere made "many definite and unambiguous claims that she was not capable of working at ASI." Def.'s Mem. at 15. Though Cavaliere did make categorical and unqualified statements to the SSA such as "I am disabled and unable to work," Def.'s Stmt. ¶ 93; Pl.'s Resp. ¶ 93, our Court of Appeals has cautioned that such statements to the SSA should be read with the implied qualification "without reasonable accommodation," *Turner v. Hershey Chocolate USA,* 440 F.3d 604, 609 (3d Cir.2006)—so that Cavaliere's statement above becomes "I am disabled and unable to work *without reasonable accommodation,"* which is certainly reconcilable with the *prima facie* elements a plaintiff must prove under the ADA. Rather than focus on Cavaliere's general descriptions of her capacity to work, we will instead examine two other types of statements she made to the SSA regarding (1) the reason

she stopped working at ASI, and (2) particular limitations on her capacities. [9]

As we have noted, Cavaliere admits that she did not inform the SSA that she left ASI involuntarily. Cavaliere explains this lacuna and her statements to SSA in three ways: (1) "she filled out what was asked on the forms and ... the forms did not inquire [about] the reasons for her separation," Pl.'s Resp. ¶ 96 n. 6 (citing Cavaliere Dep. at 337); (2) "her statement was accurate because she 'never would have left' had circumstances not forced me to leave my job, meaning Ed Koehler not relaying to management that I had a back problem," *id.* ¶ 97 n. 7 (quoting Cavaliere Dep. at 336–37); and (3) "by left, she mean[t] gone and that it was not her decision to leave the company." *Id.* (citing Cavaliere Dep. at 335–36).

Even if we draw all reasonable inferences from the record in Cavaliere's favor, her explanations are fanciful. Cavaliere asserted to the SSA that " 'I left my job in March 2010.... The denial letter from [Social Security] said I could do "my job"—I cannot. I would not leave a [$]130,000 job if I could.' " Def.'s Stmt. ¶ 98 **\*482** (emphasis omitted); Pl.'s Resp. ¶ 98. Thus, whether or not the forms inquired about the reasons for Cavaliere's separation, she *volunteered* such reasons to the SSA. And despite Cavaliere's theories about the equivalence between the words "left" and "gone," her use of the verb "leave" [10] to the SSA suggests that her departure was voluntary. [11] The unavoidable implication of Cavaliere's statements is that she could not do her job (without reasonable accommodations) and therefore left voluntarily, and that she would not have left but for her inability to do her job—not that ASI terminated her involuntarily. There can be little doubt that presenting the former account to the SSA—rather than the latter—helped Cavaliere's SSDI application, since a version of the events in which she voluntarily left a high-paying job due to an inability to work would bolster the heft of her claims to the SSA that she was seriously disabled. Though the parties agree that the latter account is more accurate, we will hold Cavaliere to the former account in determining how estoppel applies to her ADA claims.

As for Cavaliere's specific limitations and symptoms, she informed the SSA on June 29, 2010 that as a result of her disability, she could no longer " 'walk long distances—drive long distances—fly on plane—bend—lift—turn [ing],' " and that her disability affected her ability to dress, bathe, and feed herself. Def.'s Stmt. ¶¶ 81–82; Pl.'s Resp. ¶¶ 81–82. She also suggested that her disability limited her

ability to engage in an array of activities: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, and concentration. June 29 SSA Submission at P590. Importantly, when asked "[f]or how long can you pay attention?," Cavaliere answered, "not long." *Id.* at P591. Cavaliere explained in the same submission that " 'I'm in pain—(chronic),' " Def.'s Stmt. ¶ 84; Pl.'s Resp. ¶ 84, and submitted a report from Dr. Miller in which he noted her self-report on March 25, 2010 " 'that the pain has become incapacitating [and] she is unable to continue working.' " Def.'s Stmt. ¶ 89 (bracketed material in Def.'s Stmt.); Pl.'s Resp. ¶ 89. Finally, Cavaliere suggested in December of 2010 that she "cannot work anymore due to spodolthesis [*sic*]—degenerative arthritis—fibromyalgia—depression—OCD—anxiety.' " Def.'s Stmt. ¶ 101 (brackets in Def.'s Stmt.); Pl.'s Resp. ¶ 101.

### 2. *Reconciling Cavaliere's Representations*

[6] Cavaliere attempts to reconcile these representations to the SSA. She contends that she "could have done her job from home or with less travel," Pl.'s Mem. at 6, and that (1) "Defendant did not work with her to have decreased travel instead of just letting her go," Pl.'s Stmt. ¶ 58; and (2) "Ms. Cavaliere requested that she be able to work from home form [*sic* ] Mr. Koehler, but was told that she would not be allowed to do so." Pl.'s Mem. at 6. Thus, the two "reasonable accommodations" **\*483** with which Cavaliere claims she could have performed the essential functions of her job at ASI—but without which she was deemed to be disabled for SSDI purposes—were traveling less and working from home. ASI replies that "Cavaliere never asked ASI to reduce her travel, nor did ASI ever tell her that she could not reduce her travel," Def.'s Reply Mem. in Supp. of Mot. Summ. J. ("Def.'s Reply") at 2, and that "Cavaliere testified that she did in fact work from home while at ASI, and that she did so *at least as of October 2009*—after the alleged onset of her condition." *Id.* at 3 (emphasis in original). We must judge whether a reasonable juror could believe that Cavaliere's stated need for accommodations reconciles her application for SSDI and her claims here under the ADA.

According to ASI, Cavaliere is "ask[ing] this Court to rule that an ADA plaintiff" can evade estoppel by "claim[ing] that she could have performed her job with an accommodation that is not requested of the employer nor identified until after her termination, and one that she could have exercised of her own accord". ASI contends that "[t]he law does not permit such

manipulation." *Id.* at 6 (emphasis omitted). We will not opine as to whether an ADA plaintiff may, as a general proposition, employ such a gambit. Our concern is rather with whether such an argument is available to a plaintiff who represents to the SSA without qualification that she left her job voluntarily due to her disability and would not have left but for her inability to work.

We conclude that such a stratagem will not work. A plaintiff cannot consistently represent on the one hand to the SSA that she voluntarily left her job and would not have left but for her inability to work, and on the other hand represent to a court that an accommodation that was known to her at the time of her departure [12] and not requested of her employer, would have allowed her to perform the essential functions of her job. If a plaintiff knows that a reasonable accommodation might allow her to work despite her disability and she does not request it of her employer, then she cannot claim that it was her inability to work that was the cause of her voluntary departure.

As ASI correctly notes, Cavaliere has pointed to *no* record evidence suggesting that she ever asked anyone at ASI to provide her with the accommodation of less travel. Cavaliere's alleged representations to Koehler that she could not travel on specific trips because of her back problems do not constitute a request for an accommodation. As a result, Cavaliere cannot resort to the need for accommodation of less travel to reconcile her statements to the SSA (that she voluntarily left ASI because of her inability to work) with the claims she must make before this Court (*i.e.,* that she is capable of performing the essential functions of her position at ASI). No reasonable juror could believe that this travel accommodation would allow Cavaliere to perform a job that she told the SSA she *left* because of her (unqualified) inability to work, given that Cavaliere knew that this accommodation might well have been afforded at the time of her departure from ASI *but she did not request it.*

**\*484** In contrast, Cavaliere has pointed to record evidence suggesting that she *requested* the accommodation of working from home from Koehler, and that *this* accommodation was denied in part. Although Cavaliere was occasionally able to work from home, she has presented evidence that she was not permitted to work *solely* from home. Even though Cavaliere represented to the SSA that she voluntarily left ASI because of her (unqualified) inability to work, she could claim—at least theoretically—that this latter accommodation

—allegedly requested from and denied by ASI—would have allowed her to perform the essential functions of her job.

But while there is no *theoretical* bar to this argument, it nevertheless fails to persuade when juxtaposed against the details of Cavaliere's application to the SSA. As we have noted, Cavaliere represented in her SSDI application that she (1) had difficulty with completing tasks and concentration, (2) could not pay attention for long, (3) was in chronic, incapacitating pain, and (4) could not work due to anxiety, depression, and OCD. But none of these conditions has anything to do with *where* she could work. Cavaliere has failed to proffer *any* explanation as to how working from home would address these limitations more successfully than working from ASI's office. An ADA plaintiff may not simply point to any accommodation requested from, and denied by, an employer to explain away representations of disability made to the SSA. She must provide a plausible basis for a reasonable juror to believe that the accommodation would permit her to work despite her representations of disability to the SSA. Cavaliere has provided no such basis. Her representations to the SSA therefore estop her from claiming that a working-from-home accommodation would have allowed her to perform the essential functions of her job at ASI.

Cavaliere has thus failed to provide an explanation "sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement [to the SSA], the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.' " *Cleveland,* 526 U.S. at 807, 119 S.Ct. 1597. Because she is thus estopped from making out a *prima facie* case of discrimination under the ADA, we will grant summary judgment as to her discrimination claims under Count II of the complaint.

### B. *Notice And Cavaliere's FMLA Claim*

ASI argues that "[t]he Court should also dismiss the remainder of the First Cause of Action of Cavaliere's Complaint, alleging that ASI terminated her in retaliation for exercising her FMLA rights, because Cavaliere cannot show that any of the people responsible for her termination knew about her alleged request for FMLA paperwork." Def.'s Mem. at 27. Cavaliere responds that "[t]his argument misses the mark in terms of the FMLA activity for which Defendants [*sic* ] retaliated against Ms. Cavaliere. Rather, Defendant retaliated against Ms. Cavaliere for exercising her rights

*Cavaliere v. Advertising Specialty Institute Inc.,* 853 F.Supp.2d 472 (2012)

44 NDLR P 214

under the FMLA, namely taking time off for a qualifying serious health condition." [13] Pl.'s Mem. at 12. ASI replies that "Cavaliere has not proffered any **\*485** evidence that Koehler knew the extent of her alleged ailments ... or that she ever had to miss work because she was visiting a doctor or seeking medical treatment." Def.'s Reply at 9.

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period" for certain medical conditions, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1). Under the Act, it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter," § 2615(a)(2). The Act's regulations explain that it "prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights.... [E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c).

Our Court of Appeals has explained that to succeed on an FMLA retaliation claim a plaintiff "must show that (1) he took an FMLA leave, (2) he suffered an adverse employment decision, and (3) the adverse decision was causally related to his leave." *Conoshenti v. Public Serv. Elec. & Gas Co.,* 364 F.3d 135, 146 (3d Cir.2004). In order to take FMLA leave, "[a]n employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave. Depending on the situation, such information may include that a condition renders the employee unable to perform the functions of the job ..." 29 C.F.R. § 825.302(c).

ASI ultimately makes two arguments with respect to Cavaliere's claim for FMLA retaliation: (1) Cavaliere "conflates two distinct concepts in FMLA jurisprudence," since her "arguments concerning whether ASI was on notice of her eligibility for FMLA leave bear more on a claim for FMLA *interference* than they would on her claim for FMLA *retaliation,*" Def.'s Reply at 8 (emphasis in original); and (2) no ASI decisionmaker knew that Cavaliere was taking FMLA-protected leave since no decisionmaker knew "the extent of her alleged ailments." *Id.* at 9.

**[7]** With respect to ASI's first argument, ASI seems to confuse the elements of a claim for retaliation under the FMLA. The question of whether an employer is on notice that an employee's leave qualifies for FMLA protection is relevant not only to claims for FMLA interference but also to claims for FMLA retaliation. [14] For a **\*486** plaintiff to prove the first element of a retaliation claim under *Conoshenti*—that "he took an FMLA leave," 364 F.3d at 146—he must show that he "provide[d] at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave." § 825.302(c).

**[8]** This brings us to ASI's second argument, that "Cavaliere has not proffered any evidence that Koehler knew the extent of her alleged ailments." Def.'s Reply at 9. Cavaliere has pointed to evidence in the record suggesting that (1) she told Koehler that her back problems prevented her from making specific trips; (2) she told Koehler about her medical conditions in September of 2009; (3) she wore a brace and shoulder device, including to work; (4) Koehler told Cavaliere that she needed to care for her back on multiple occasions; and (5) Koehler told co-workers at ASI that Cavaliere was absent from work because of her back. Drawing all reasonable inferences in Cavaliere's favor, a factfinder could reasonably conclude from this evidence that Cavaliere notified ASI (via Koehler) that she needed FMLA-qualifying leave—as the first *Conoshenti* element requires. Furthermore, a factfinder could conclude that the decisionmaker who ultimately took the alleged adverse employment decision against Cavaliere—Koehler—was aware that Cavaliere had taken leave, as the third *Conoshenti* element requires.

Of course, ASI contests the evidence described above, but Cavaliere has at the least carried her burden of showing a genuine dispute as to whether (1) she provided sufficient notice to ASI of her need for FMLA-qualifying leave, and (2) Koehler—one of the decisionmakers who participated in her termination—knew she had taken leave. Inasmuch as these are the only two aspects of Cavaliere's FMLA retaliation claim that ASI challenges, we will deny its motion for summary judgment with respect to Count I of the complaint.

### C. *Cavaliere's Claim For Damages*

Finally, ASI argues that "Cavaliere is not entitled to back pay or front pay damages in this action because the SSA determined that she was completely disabled as of her last day of work, and she continues to be disabled through the date

of this motion." Def.'s Mem. at 29. Cavaliere responds that "the factual inquiry of Ms. Cavaliere's availability for work is the same with respect to both her ability to establish her *prima facie* case and her ability to recover front and back pay," and that since her "disability award should not preclude her from asserting claims under the ADA .... [t]he same rationale should apply with respect to a plaintiff's availability to recover front and back pay damages." Pl.'s Mem. at 15.

**[9]    [10]**    As Judge Pollak has explained, "[t]he underlying premise in computing an employment discrimination plaintiff's award ... is that the injured worker must be restored to the economic position in which the worker would have been but for the discrimination." *Mason v. Assoc. for Independent Growth,* 817 F.Supp. 550, 553 (E.D.Pa.1993). Thus, "in a variety of situations, a back pay award is reduced, or eliminated entirely, if the plaintiff has not received—or, indeed, could not receive—offsetting income in the post-discriminatory period," so that "as a general rule, a claimant will not be allowed back pay during any periods of disability." *Id.* at 554.

**[11]**    Cavaliere is correct that this general rule would not apply when a claimant's disability may be reconciled with her ability to perform the essential functions of **\*487** her position if given reasonable accommodations. We have already determined, however, that Cavaliere's pursuit and receipt of SSDI cannot be reconciled with her having such an ability to work. As Cavaliere suggests, we will apply "[t]he same rationale," Pl.'s Mem. at 15, to both her discrimination claim under the ADA and her damages claims for back pay and front pay. In both cases, we find that Cavaliere's representation to the SSA that she was disabled beginning on March 8, 2010 [15]—the date ASI terminated her employment—estops her from claiming that she could perform the essential functions of her position at ASI, so that she can assert neither claim successfully. We will therefore grant ASI's motion for summary judgment with respect to Cavaliere's damages claim for back pay and front pay.

**All Citations**

853 F.Supp.2d 472, 44 NDLR P 214

---

# Footnotes

1    Though Cavaliere's complaint also includes a claim for interference with her rights under the FMLA, Pl.'s Compl. ¶¶ 24–27, she has now withdrawn that claim. Pl.'s Mem. of L. in Opp'n to Def.'s Mot. Summ. J. ("Pl.'s Mem.") at 1 n. 2.

2    Spondylolisthesis: "forward displacement of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth, usually due to a developmental defect in the pars interarticularis." Richard Sloane, *The Sloane–Dorland Annotated Medical–Legal Dictionary* 483 (Supp.1992).

3    Fibromyalgia: "a chronic disorder characterized by widespread pain, tenderness, and stiffness of muscles and associated connective tissue structures that is typically accompanied by fatigue, headache, and sleep disturbances." Medline Plus Medical Dictionary, U.S. Dep't of Health & Human Servs., http://www.nlm.nih.gov/medlineplus/mplusdictionary.html.

4    Though Cavaliere admits this statement, she also states that she "first treated with Dr. Jeffrey Miller on October 4, 2000." Pl.'s Statement of Facts ("Pl.'s Stmt.") ¶ 18 (citing Ex. F to Pl.'s Stmt. ("Miller Dep.") at 14).

5    Though Cavaliere denies Paragraph 72 of ASI's Statement of Facts, it appears—given her qualification of this denial—that she meant to deny Paragraph 73. Pl.'s Resp. ¶ 72.

6    Including lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, and concentration. Ex. 23 to Def.'s Stmt. ("June 29 SSA Submission") at P590.

7    It bears noting that Cavaliere also receives about $3,000 per month under a private disability policy Unum issued. Def.'s Stmt. ¶¶ 42–43; Pl.'s Resp. ¶¶ 42–43.

8    Cavaliere also suggests that ASI "has already admitted in this litigation that Ms. Cavaliere was able to perform the essential functions of her position at the time of her termination" in response to Cavaliere's requests for admissions, Pl.'s Mem. at 10 (emphasis omitted), and that " '[b]ecause admissions are conclusive, they are not weighed against competing evidence on a summary judgment motion.' " *Id.* (quoting *Kida v. EcoWater Sys. LLC,* 2011 WL 4547006, at *4 (E.D.Pa.2011)). It is true that Rule 36 admissions are ordinarily conclusive, and that this practice serves to preserve the efficacy of the discovery process. As our Court of Appeals observed nearly sixty years ago, however, the doctrine of judicial estoppel aims to prevent "playing 'fast and loose with the courts' which has been emphasized as an evil the courts should not tolerate." ⚑ *Scarano v. Cent. R.R. Co. of N.J.,* 203 F.2d 510, 513 (3d Cir.1953). Though giving conclusive effect to Rule 36 admissions undoubtedly serves an important interest, the doctrine of judicial estoppel advances a higher purpose: protecting the integrity of the courts. We will not permit a party to play "fast and loose with the courts" just because the opposing party made an admission that would appear to permit such sharp practice. Under the circumstances, we will construe ASI's presentation of its judicial estoppel argument as a request to withdraw its admission that Cavaliere was able to perform the essential functions of her position at the time of her termination, and will grant this request pursuant to Fed.R.Civ.P. 36(b).

9    We note that Judge Stengel has synthesized ⚑ *Cleveland* and the jurisprudence of our Court of Appeals on this subject as requiring "a two-part analysis when an employment discrimination plaintiff has applied for and received SSDI benefits. First, the court must determine whether the positions taken by the plaintiff in his SSDI application and his [discrimination] claim genuinely conflict. Then, it must evaluate whether the plaintiff's explanation for that inconsistency meets the standard set forth in ⚑ *Cleveland*." *Ruhl v. Cty. of Lancaster,* 2011 WL 3862257, at *4 (E.D.Pa.2011). In the context of this framework, Cavaliere's statement that she was "unable to work" satisfies the first step of the analysis, leading us to consider her explanations thereof and particular representations to SSA in the second.

10    As defined by the *Oxford English Dictionary, leave* means "[t]o depart from, quit, relinquish"—a definition that underscores its connotations of voluntariness, as the OED's usage examples confirm, *e.g.,* "**1837** DICKENS *Pickw.* ii, I think we shall leave here the day after to-morrow"; "**1866** THIRLWALL *Lett.* II 70, I do not leave for town until tomorrow."; "**1791** BENTHAM Let. 12 May, Wks. 1843 x. 254 So says Lord L. who himself leaves on the 1st." VIII *Oxford English Dictionary* 777–78, def. II (2d ed.1989).

11    We use *voluntary* here to mean that Cavaliere, and not her employer, made the ultimate choice as to whether she would continue working. We do not mean that this choice was freely made in the sense that it was not compelled by circumstances.

12    We assume in this discussion that we are dealing with an accommodation whose existence was known to a plaintiff at the time she ceased working. To be sure, our reasoning would not hold if this assumption were not true since there is no contradiction between a plaintiff claiming that (1) she voluntarily left her position without requesting an accommodation because of her inability to work and (2) she only *later* learned of an accommodation—perhaps a medical technology—that might permit her to work.

13    In her complaint, Cavaliere alleges that "Plaintiff's termination was based in substantial part due to [*sic* ] her FMLA-qualifying absenteeism, FMLA needs, and requests for FMLA." Pl.'s Compl. ¶ 26. Based on her response to ASI's motion, Cavaliere appears now to have abandoned the claim that ASI retaliated against her based on her "requests for FMLA."

14    ASI's argument does raise an interesting question: for an FMLA plaintiff to prove the third 🚩*Conoshenti* element, must she show that the decisionmaker who took an alleged adverse employment decision against her was aware that her leave qualified for FMLA protection? Our reading of 🚩*Conoshenti* suggests that the answer to this question is "no". In that decision, our Court of Appeals stated only that a plaintiff must show that "the adverse decision was causally related to his leave," 🚩364 F.3d at 146—not to "his taking of leave under the FMLA." Upon reflection, this makes sense. If a plaintiff informs one supervisor at her employer that she may need to take leave under the FMLA, then takes leave and experiences an adverse employment decision at the hands of another supervisor because of her leave-taking, a right has been violated under the FMLA even if the second supervisor did not know that the leave qualified for FMLA protection. In this case, Cavaliere has presented evidence suggesting that she informed Koehler of her need for FMLA-qualifying leave, and that Koehler later retaliated against her for taking such leave—so that the first and second supervisors in our hypothetical are here the same individual. We thus need not reach this question, though we note it in the interests of analytical precision.

15    Though Cavaliere states that she does not remember telling SSA that her disability began on this date, we have already explained that the SSA itself noted her representation to this effect. Cavaliere's failure to recall conveying this information does not create a genuine dispute of fact on this point, given the SSA's affirmative statement to the contrary.

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   13